RECEIVED
FEB 0 2 2026
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF NEBRASKA

FILED
U. S. DISTRICT COURT
DISTRICT OF NEBRASKA

2026 FEB -2 PM 12: 11

STEPHEN PULLENS
    Petitioner

    vs

ROB JEFFREYS
    Respondent.

)
)
)
)
)
)
)

CASE No. 4:26cv 3026

## PETITION UNDER 28 U.S.C. §2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

    COMES NOW Petitioner Stephen Pullens, pro se submits to this Court his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C §2254:

### RELEVANT PROCEDURAL FACTS

1) On December of 2004 the Petitioner (Stephen), was living and working in Switzerland as a Computer Engineer when his mother, Matsolonia, invited him to visit her in Omaha, NE.

2) During the visit Matsolonia fell from her third story apartment balcony.  Stephen called 911.

3) Records show Stephen went to his mother's side and waited for paramedics to arrive. When paramedics did arrive, Stephen helped them carry equipment so their hands would be free for life saving procedures.

4) Paramedics made multiple unsuccessful attempts at intubation where following each attempt Matsolonia vomitted.  Matsolonia died, December 13th, 2004.  (T876)

5) An Autopsy was performed the next day, December 14th, 2004 by Douglas County Pathologist Dr. Blaine Roffman.  The Autopsy report listed 18 specific injuries which included 2 internal hemorrhages on the right and posterior membrane wall of the trachea and larynx.  But this report did not mention anything about unconsciousness or strangulation.  Instead it concluded that, "All injuries were secondary to a Fall from a balcony."  (T887)

6) A week later Stephen gave his statement to police without ever knowing the rusults of the Autopsy.  Stephen's statement to police explained all the physical and medical evidence found in this case.  Following this statement, Stephen informed police that he needed to return back to Switzerland for work.

1

7) In response, and without evidence of a crime, Police attempted to get an arrest warrant for Second Degree Murder and presented an affidavit in support to the Douglas County Court, appearing at: CR04-39214, On December 23, 2004.

8) On this same date the Court issued an Order to seal this file, which remained sealed until July 13, 2010, a year after the Petitioner's trial in 2009. Also on July 13, 2010 a proceeding was held to Dismiss the Warrant never having issued due to lack of evidence to sustain probable cause to believe the crime of murder had been committed.

9) Since the physical and medical evidence have not changed, i.e. - Having the same Autopsy report and same CSI Unit report; and both arrest affidavits read exactly the same, the Prosecutor was committing a Brady Violation by keeping the failed arrest warrant sealed until after trial. ( T491)

10) In 2005 Police hired an expert in the Reconstruction of Falls, Dr. Bates. Dr. Bates received 26 items of evidence including Stephen's statement to police. After investigation Dr. Bates conveyed his findings which were exculpatory. The prosecution including Lead Prosecutor Retelsdorf, told Dr. Bates not to write his results down and then hid the tape recording of this conversation until 2024 - An 18 year long Brady Violation. (T1236 -Call with Police),(T1242 Letter),(T1237-T1240-26-items)

11) Dr. Bates' opinion was Bagley Evidence because it directly refuted Dr. Roffman's trial testimony, and below the Petitioner will show that Dr. Roffman's trial testimony was completely unreliable and inadmissible under Neb. Rev. Stat.§27-702.

12) In 2008 Stephen learned that the Omaha Police lied to his Mentally Ill sister, Glenda, telling her that they had evidence that her brother, Stephen, killed their mother. And upon hearing this Glenda committed suicide, overdosing on pills. After learning this Stephen wrote a letter of complaint to the U.S. Justice Department which threatened a lawsuit against the Omaha Police. About one week later a single charge for Manslaughter was filed against Stephen, The case appearing at: CR08-12720, May 5th, 2008.

13) This 2008 arrest affidavit read exactly the same as the 2004 Dismissed arrest affidavit. After Stephen's arrest, during the Bail Hearing the Assistant Douglas County Attorney read the conclusion of the CSI Unit report: "No conclusive evidence of a crime". Stephen, through counsel filed a Motion to Dismiss the Mansalughter charge due to the statute of limitations. The Court treated the Motion to Dismiss as if it were a plea in bar, but sustained the Motion to Dismiss. However before Stephen could leave the jail, he was charged with 2nd Degree Murder under the same circumstances as the Manslaughter charge.

2

14) The case was bound over for Trial in Douglas County District Court, Doc. 178 141. The trial commenced March 16, 2009 and Stephen was quickly found guilty on March 23, 2009 on the sole charge of Second Degree Murder.

## TRIAL (CR10-9070333)

15) The main part of this Habeas Petition will deal with the basic fact that there was NO ADMISSIBLE EVIDENCE of a crime and there never was any evidence of a crime. In other words Stephen is Actually Innocent because Plain Error allowed inadmissible evidence to be placed on the Record. And this inadmissible evidence was the sole evidence of otherwise nonexistent murder:

* The Prosecutor engaged in Misconduct by committing a Discovery Violation hiding the inadmissible testimony until the last moment in her case.

* The Prosecutor knowingly tendered this false testimony and then committed four Brady Violations to cover-up impeachment evidence.

* The Trial Court abused it's discretion when it failed to act as the GateKeeper to insure evidentiary relevance and reliability as Neb. Rev. Stat.§27-702 requires.

* Complete Ineffective Assistance of Counsel: Failing to Object or ask for a continuance or a Daubert Hearing; Failing to investigate or interview known alibi or expert witnesses with exonerating scientific opinions; Failing to investigate the Prior Bad Act issue where if he had, he would had found that the declarant of the hearsay told police officers directly that no "Bad Act" occurred. This rendering the hearsay inadmissible; and in general failing to put on an adequate Defense.

* The prosecutor's case was not a reasonable interpretation of the facts of the case: "Although there were no external marks, cuts, bruises or injuries on the neck; Although there were no subcutaneous injuries in the structures of the neck; Although the cartilages of the neck were not ripped or torn; Although the Hyoid Bone was not broken or damaged; Although there were no petechiae hemorrhages or other signs of asphxiation or unconsciousness; Although there were no injuries to the anterior tissues of the trachea on larynx; Although there were no signs of a struggle - no offensive or defensive wounds ... dispite all injuries being consistent with a fall - the two quarter sized - tube sized - hemorrhages could only have been created by strangulation. And since this strangulation occurred Matsolonia could have been unconscious. And since she could have been unconscious she could have also been thrown over a balcony. **This entire logic is highly speculative even without making the argument that Dr. Roffman's Differential Diagnosis was deficient because he failed to read the Paramedics report.**

3

DIRECT APPEAL   (S-09-0588)

16) For the entire Direct Appeal process, Petitioner Stephen had been trying to raise the Plain Error, Medically Unreliable, Daubert issue.  In addition there were 4 Brady Violations, One Discovery Violation and Numerous Ineffective Assistance of Counsel Claims.  But each and every time Stephen tried to raise these issues of Constitutional Infringement appointed counsel, Tim Burns, ignored these claims only to insist upon making more ancillary, weaker claims which would ultimately be dined by the Court. The Direct Appeal case appearing at: S-09-0588, in the Record.

17) Appointed Counsel's ancillary claims included:
* District Court erred in allowing Kenneth Myers to testify about hearsay of an alleged prior bad act.
* e-mails were inadmissible - not properly authenticated.
* The Court erred in giving Jury Instruction number 14.
* Right to counsel during sentencing.
* Denied effective assistance of counsel during trial.

18) The Direct Appeal Record will show the numerous efforts by the Petitioner to raise the more important issues
An alleged murder was: Medically Unreliable, false, perjurious and inadmissible testimony, (Dr. Roffman).

19) In an attempt to try and raise several exonerating issues because his counsel would not raise them, Petitioner Stephen filed pro se motions directly to the Nebraksa Supreme Court.  Petitioner also sent letters to the Court trying to get help from the Court to have counsel contact Petitioner and raise these important issues. The court denied the motions striking them from the Record. (2010)

POSTCONVICTION

20) POSTCONVICTION PROCEEDINGS WERE FILED IN 2011 AND CONCLUDED IN 2025 - 14 YEARS; APPEARING AT: CR10-9070333.

21) Following the Petitioner's Direct Appeal, his Trial Prosecutor, Leigh Ann Retelsdorf and his Direct Appeal Counsel, Tim Burns, were both appointed as Judges in the Douglas County District Court.  This left the Petitioner making claims of egregious misconduct against two sitting Judges in the same District Court as his Postconviction.  I believe that this Court should consider that this is the reason proceedings took 14 years, with a number of irregularities which included an 18 year long Brady Violation that lasted the entire length of Postconviction proceedings.

4

22) Stephen originally filed his Verified Motion for Postconviction Relief and Request for Evidentiary Hearing, pro se, on Dec. 16th, 2011, having nearly 70 Claims which included:   (T358 )

   * Dr. Roffman's testimony was a Discovery Violation and completely unreliable according to Daubert / §29-701, 702 703.

   * Brady Violation occurred when the Prosecutor failed to turnover the Opinion of Biomechanical Expert Dr. Bates, from 2005.

   * Brady Violation occurred when the Prosecutor failed to turnover the exculpatory CSI Unit report from 2004.

   * Brady Violation when the Prosecutor failed to turnover the failed 2004 arrest warrant. Prosecutorial Misconduct when the Prosecutor knowingly tendered perjury from the Douglas County Pathologist, which was the sole evidence of an otherwise nonexistant murder creating Plain Error.  The Petitioner is Actually Innocent.

   * Ineffective Assistance of Counsel for numerous reasons including: Fialure to Object, Failure to investigate and interview known alibi witnesses, Failing to argue that the Hearsay of an alleged prior bad act was inadmissible and failing to put on a viable Defense. (T542, T550, T579).

23) The Court appointed counsel, Mr. Dunn, who then took over a year to contact the Petitioner.  In Oct. 28, 2013 the Petitioner filed a Motion to Compel counsel to contact the Petitioner.  (T634).

24) The first thing counsel did, without explaining why, was to file an Amended Motion, which had the effect of erasing all of the Petitioner's original claims, July 14, 2014.  (T688).

25) Stephen insisted upon adding the Prosecutorial Misconduct claim; (T849).

26) On Jan. 15, 2015, Postconviction Counsel Dunn on his own, withdrew from representation due to his taking a job in the Douglas County Public Defender's Office.  Dunn told Petitioner that this was a conflict of interest and therefore Petitioner would need new counsel appointed.

27) During the period when Petitioner was not represented, Stephen filed a motion to add a Claim to the Ordered Evidentiary Hearing.  The Claim was that the Hearsay of an alleged prior bad act allowed in to Trial, was inadmissible because the declarant Matsolonia, told police directly, that No Bad Act Occurred. (T1013 – T1017)

28) But because Stephen was not an attorney the motion was deficient because it failed to describe the prejudice aspect of claim.  And when new counsel was appointed, Ms. Mathias, she failed to refile or resubmit the deficient motion.

29) Instead Ms. Mathias filed a Motion Requesting a Ruling on Stephen's pro se motion. (T1026)

30) Next Ms. Mathias disappeared for the next 3 years never telling Stephen what arguments she intended to make at the upcoming evidentiary hearing. With little to no communication between Stephen and counsel, Stephen filed a Motion to place arguments on the Record for the evidentiary hearing, filed on Dec. 18, 2017. (T1132)

31) During this time Stephen wrote the Court as well as the Nebraska State Bar trying to get appointed counsel to communicate with him. The urgency was that the Court had ordered the deposition of Dr. Bates the Biomechanical expert who had given police exculpatory evidence in 2005. Specifically, police had asked Dr. Bates to read Stephen's statement to police, research whether his statement was biomechanically consistent or inconsistent. The purpose of the deposition was to put this Brady Violation on the Record. For nearly four years, Ms. Mathias told Stephen that she could not complete the deposition because Dr. Bates was unavailable. Ms. Mathias repeatedly said this to Stephen. THEN - Stephen contacted Dr. Bates directly. Dr. Bates told Stephen that no one had made contact with him in years. Not Ms. Mathias nor the Prosecutor. When Stephen learned that Ms. Mathias had been lying to him, he wrote a letter to the Court asking for it's help in scheduling the deposition. June 29, 2018 (T1166), (T1121 - T1130)

32) Sep. 20, 2018 Stephen wrote the Court telling the Judge that Ms. Mathias had been lying to him. (T1166) Suddenly the deposition was complete and when counsel finally gave Stephen a copy of the deposition transcript, he saw that Ms. Mathias had not asked Dr. Bates for the results of his consistency analysis. The failure to place the exculpatory evidence on the record was failing to establish that a Brady Violation had occurred. (Page 11, line 1 , (T1277).

33) Due to the sabotaging ---- of the deposition, Stephen sent a letter to his attorney and the Court which, "stopped all legal representation by counsel". It also told counsel ------ not to do anything unless she got written permission from Stephen for each and every intended act. (T1177), (T1182), Oct. 22, 2022.

34) Stephen filed a Motion to Replace Counsel because at this point is was impossible to trust counsel Mathias. Nov. 1, 2018 (T1188).

Stephen filed Motion to Retake Deposition and a Motion Making Objections on the Record, Nov. 16, 2018 (T1261);

35) In response, counsel Mathias filed a bogus Motion to Determine Competency, filed April 1, 2019 (April fool's day). (T1323).

36) On April 9, 2019 on counsel Mathias' motion and without Stephen being present, a hearing was held where the Court sustained the Competency Motion ordering an evaluation. (T1333).

37) **Four years passed** before Stephen was allowed to take the Competency Evaluation. Following this exam by a doctor, Stephen was immediately found competent. This should be an indication to the court that the competency issue was a "Red-Harring" brought up to distract attention away from Stephen's complaints about counsel. (T1716).

38) The District Court never investigated Stephen's complaints of Attorney Misconduct on the Record. However make no mistake, this was a vailed threat by the District Court for Stephen to stop making complaints of attorney misconduct or irregularities in proceedings, or else the proceedings would be delayed indifinitely.

39) Then in a series of Orders by the District Court starting on 1/30/2023:
   * The Court gave an order stopping further Hybrid Representation. (This was also an admission that Stephen had been allowed Hybrid Representation since 2011).
   * The Court struck all pro se filings since 2015. (This had the effect of hiding all of Stephen's complaints of attorney misconduct and proceeding irregularities). (T1719).
   * The Court re-ordered the Evidentiary Hearing restating that the issues included were: The Testimony of Dr. Roffman and the Dr. Bates Brady Violation. (T1722).

40) Stephen filed a Motion requesting a ruling on his Motion to Replace Counsel. (T1807) Aug. 14, 2023.

   The District Court responded by an Order Denying All of the pro se filings. (T1826)

41) The Court then Ordered a pre-evidentiary hearing status meeting, filed 6/16/23 and held ----- Aug. 8th, 2023. **During this meeting the Prosecution suddenly claimed that it found a tape-recording of the phone call from 2005, where Dr. Bates told Police and Prosecutor Retelsdorf his exculpatory findings.** And based upon this NEW Evidence the Court granted a successive Postconviction Motion.

42) Stephen filed a Motion Objecting to the 18 year long Brady Violation and the events surrounding this Newly Discovered Evidence. The Prosecution obviously had this evidence since 2005 and deliberately kept it from Stephen at Trial, Direct Appeal and Postconviction. (T1767), June 14 2023.

7

POSTCONVICTION EVIDENTIARY HEARING

43) Counsel Mathias refused to inform the Petitioner about what arguments she intended to make.  So going in to the evidentiary hearing Stephen knew nothing about he intended strategy to defend him. (T1630)

44) During oral arguments Stephen repeatedly asked counsel Mathias to include the major arguments including Plain Error / Inadmissible evidence issue.  Counsel Mathias informed Stephen that she would be submitting all of his arguments in the brief.  But when the District Court ordered simultaneous briefings giving a due date, this date came and past with no brief being filed by counsel Mathias.  There was no explanation by counsel and in fact Ms. Mathias disappeared.

45) Stephen filed Objections (T1749), which went unanswered by the District Court. Then on  5 / 10/ 23  , the District Court filed an Order Denying all Postconviction Relief.

46) Because there was no communication from Counsel Mathias, Stephen had to file his own pro se Motion for Reconsideration / Rehearing.  Both Motions denied.

47) Stephen was forced to file a pro se Notice of Appeal - case number: S-24-0200, but unknown to Stephen Counsel Mathias filed a Notice of Appeal - S-24-0214. One  case was the Appeal from the order denying relief, and the other seems to be associated with the Court **granted successive Postconviction.**

48) It was only after the Court denied relief and the two notice of appeals were filed that suddenly after 10 years of ineffective representation by Mathias that the court appointed replacement counsel.. (Mr. Kortus).

APPEAL TO THE NEBRASKA SUPREME COURT  (S-24-0200 AND S-24-0214)

49) WITHOUT AUTHORIZATION Counsel Kortus consolidated both cases in to one appeal. This prevented Stephen from making claims under the granted successive Postconviction.

50) Counsel Kortus refused to show Stephen a prototype brief of the arguments which he intended to make.  In fact one day before the brief due date, Kortus showed up at the prison with a draft copy saying that this was what he intended to file. When Stephen requested that he include the Plain Error issue and other assignments of error, Kortus became angry and snatched the draft away from Stephen.  Kortus threatened not  to file any brief at all leaving Stephen in prison for life.

51) Stephen quickly raised these issues with the District Court who refused to **replace** counsel Kortus.  In a hearing Judge Wheelock stated that all Stephen had to do was to discharge counsel and request new counsel from the Nebraska Supreme Court, and he would be allowed replacement counsel.

8

52) When Stephen tried to do this, the Nebraska Supreme Court refused to replace counsel. This left Stephen to file a brief pro se. Stephen quickly submitted a handwritten brief because he had no time to do otherwise. The NESC struck this brief stating that it did not meet the page requirements or the use of exhibits.

53) Stephen submitted a replacement brief using no exhibits but had no time to rewrite or type a new brief. The timelines given were too aggressive and the Petitioner did file a Motion to extend the brief due date. But all motions were denied. The NESC dismissed the entire appeal (Exhibit AA), stating that it lacked the jurisdiction to hear the appeal because no brief was submitted.

---

The issue with Mr. Kortus' representation was that since I clearly received ineffective counsel during postconviction, where counsel deliberately failed to file a brief of the Petitioner's claims, on Appeal to the NESC these issues would have to be raised or they would be forfeited. I clearly did not want to forfeit the Plain Error / Inadmissible testimony of Roffman issue. This is in fact the entire case because there is no evidence of a crime and there never was evidence of a crime. ; "Absent Plain Error, Appellate Court will not address issues that are not both assigned as error and discussed in brief of the party alleging prejudicial error", Ashby V. First Data Resources Inc. 1993, 242 Neb. 529, 497 N.W.2d 330.

---

***If the Respondent argues any of these grounds for relief are procedurally defaulted due to the appellant counsel's failure to raise them on Direct Appeal, Stephen can show "Cause and Prejudice" due to appellate counsel's ineffective assistance; See: Gray v. Netherland 518 U.S. 152, 162, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996); Colman v. Thompson 501 U.S. 722, 731-732, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

GROUND ZERO

## EXHAUSTION OF STATE REMEDIES

PURSUANT TO 28 U.S.C.§2254(b)(1): " An application for Writ of Habeas Corpus may not be granted unless it appears that the applicant has exhausted state remedies or that no adequate state remedies are available or effective to protect the applicant's rights"; O'Sullivan v. Peoples 489 U.S. 346, 351 (1989).

On Direct Appeal Petitioner raised the following claims:

* District Court erred in allowing Kennith Myers to testify about hearsay of an alleged prior bad act.
* e-mails were inadmissible - not properly authentcated.
* The Court erred in giving Jury Instruction #14 (Fleeing from a crime).
* Denied the right to counsel during sentencing.
* Denied effective assistance of counsel during trial.

ON POSTCONVICTION - STEPHEN filed -

his Verified Motion for Postconviction Relief and Request for Evidentiary

Hearing making 60+ claims which were consolidated to: (T358)

PULLENS RIGHT TO DUE PROCESS WAS VIOLATED BY ACTS AND OMISSIONS OF INVESTIGATING OFFICERS AND PROSECUTORS, CONSTITUTING PROSECUTORIAL MISCONDUCT:

A.  THE STATE DENIED PULLENS DUE PROCESS OF LAW BY FAILING TO DISCLOSE MATERIAL EVIDENCE PURSUANT TO NEB. REV. STAT.§29-1919; UNITED STATES V. BAGLEY 105 S.CT. 3375 (UNITED STATES SUPREME COURT).

B.  STATE DENIED DEFENDANT DUE PROCESS OF LAW BY FAILING TO DISCLOSE EXCULPATORY EVIDENCE THE EXISTENCE OF WHICH WAS KNOWN TO THE STATE, IN VIOLATION OF THE HOLDING OR BRADY V. MARYLAND 373 U.S. 83(1963) (UNITED STATES SUPREME COURT).

     i)   THAT THE STATE OFFERED ROFFMAN'S TESTIMONY AT TRIAL WHEN THE STATE KNEW OR SHOULD HAVE KNOWN THAT ROFFMAN'S TESTIMONY WAS NOT TRUE, GIVEN THE STATE'S KNOWLEDGE OF DR. BATES' OPINION PRIOR TO TRIAL; THAT THE PROSECUTION IN THIS REGARD WAS CALCULATED TO MISLEAD THE JURY, THAT ROFFMAN'S TESTIMONY AFFECTED THE VERDICT; GIGLIO V. UNITED STATES 405 U.S.150 (1972); NAPUE V. ILLINOIS 360 U.S. 264 (1959).

     ii)  THAT THE STATE'S FAILURE TO DISCLOSE DR. BATES' CONFLICTING EXPERT OPINION PRIOR TO TRIAL AND THE STATES' FURTHER AND CONTINUED EFFORTS TO CREATE A FALSE IMPRESSION IN THE MINDS OF JURORS THROUGHOUT TRIAL CONSTITUTES PROSECUTORIAL MISCONDUCT.

10

II.  TRIAL COUNSEL WAS DEFICIENT IN THEIR REPRESENTATION OF PULLENS, PULLENS WAS PREJUDICED THEREBY AND, BUT FOR TRIAL COUNSEL'S DEFICIENT PREFORMANCE, THERE IS A REASONABLE PROBABILITY THAT THE RESULT OF THE PROCEEDING WOULD HAVE BEEN DIFFERENT:

    A.  TRIAL COUNSEL WAS INEFFECTIVE FAILING TO RESPOND TO THE DISCOVERY VIOLATION PURSUANT TO NEB. REV. STAT.§29§1919; AND THE UNITED STATES CONSTITUTION.

    B.  TRIAL COUNSEL WAS INEFFECTIVE IN FAILING TO IDENTIFY THE EXISTENCE OF AND TO FULLY INVESTIGATE THE OPINION OF DR. BATES AND ADDUCE SAME AT TRIAL HEREIN.

    C.  TRIAL COUNSEL WAS INEFFECTIVE IN THAT THEY FAILED TO PROPERLY INVESTIGATE THE STATE'S PROPOSED EVIDENCE OF OTHER CRIMES, WRONGS OR ACTS, MATERIAL EVIDENCE NOT ADDUCED BY TRIAL COUNSEL INCLUDES: POLICE REPORT E70467DA AND THE TESTIMONY OF POLICE OFFICERS IN THAT REPORT.

THE UNITED STATES SUPREME COURT HAS PREVIOUSLY LISTED FIVE SITUATIONS IN WHICH THE STATE MAY BE TO BLAME FOR FAILING TO RESOLVE FACTUAL DISPUTES:

1)  The merits of the factual dispute were not resolved in State court.

2)  The State factual determination is not supported by the record as a whole.

3)  The fact finding procedure was not adequate to be evidence of a full and fair hearing.

4)  There is a substantial allegation of newly discovered evidence.

5)  There is another reason to indicate that the State trier of fact didn't offer a full and fair hearing.(Like Brady Violations or Plain Error)

ALL OF THE ABOVE SITUATIONS ARE REPRESENTED BELOW WITH THESE GENERAL CLAIMS:

*  **ROFFMAN'S TESTIMONY** - was medically unreliable and false.  The prosecutor knowingly tendered false testimony from Dr. Roffman - Inadmissible / Plain Error

*  **TRIAL COUNSEL WAS INEFFECTIVE** - for failing to object or respond to the discovery violation resulting in PLAIN ERROR at trial by allowing inadmissible evidence and a wrongful conviction.

*  **BRADY VIOLATION** - when the prosecutor hid the exculpatory opinion of Dr. Bates. Prosecutorial Misconduct.

*  **INADMISSIBLE HEARSAY** - was used to convict and the ineffective assistance of counsel surrounding this issue.

11

\*  **THREE BRADY VIOLATIONS**- The CSI Unit report, The failed arrest warrant and the telephone recordings could all been used as impeachment evidence against - Flight from a crime, evidence of a crime and general state of mind.

PURSUANT TO THESE POSTCONVICTION CLAIMS THERE WAS NO RESOLUTION TO THESE FACTUAL DISPUTES BY CHOICE OF THE STATE BECAUSE THE FACTUAL DETERMINATIONS FAVOR THE PETITIONER:

UNRESOLVED FACTUAL DISPUTES

A.    STRANGULATION

AT TRIAL - A Discovery violation occurred when Dr. Roffman made medically unreliable, false statements alleging murder. Specifically Roffman said, because of two focal type hemorrhages on the right and posterior larynx, Matsolonia had been stranguled. BUT - inconsistent with Roffman's testimony was: No secondary indications of strangulation: No external bruising or crescent shaped scratches from fingernails, No bruising in the connective tissues or strap muscles which surround the trachea and larynx, No torn cartilages or broken hyiod bone, No hemorrhage or injury to the anterior membrane walls of the larynx, No petechiae hemorrhages anywhere in the body ... And according to Roffman's own autopsy report, these two focal hemorrhages could not be seen until the trachea and larynx were completely removed. (T737-T739)        E70467AF.

At trial when Stephen recognized this false testimony by Roffman, how should he have responded? When he tried, defense counsel said nothing and the court would not let him speak. Stephen was at the mercy of whatever the prosecutor could think of saying.

ON DIRECT APPEAL - The Nebraska Supreme Court record will show that Stephen tried to raise these claims because counsel would not. Stephen's response was to Motion the Supreme Court for replacement counsel. (See: S-09-0588).

ON POSTCONVICTION - Common experience tells us that if strangulation had occurred, where fingers were pressing on the neck, the injury would have been created from the outside in. Fingers could not pass through: Skin & connective tissues, muscles, cartilages, hyiod bone and the anterior walls leaving all of these areas undamaged and then create injury behind the larynx on the posterior side. It's therefore very significant that Dr. Cina recognized this physical impossibility with Roffman's accusation. (EXHIBIT AB )                    (T1251-T1252)

12

*(Postconviction Counsel failed to argue or present Dr. Cina's exculpatory report)*

The lack of injuries was a strong indication that the source of whatever caused the injuries came from inside the neck -i.e. Intubation or a broken neck.

Since Roffman's faulty strangulation diagnosis is at the core of his speculative logic, the reverse would also be true: No strangulation means no struggle; No strangulation means no unconsciousness; No unconsciousness means no carrying or dragging an unconscious body accross an apartment and balcony; No unconsciousness means no lifting an unconscious 200-pound body 45+ inches high, ----- No dropping or throwing a body over a railing; and therefore no reason to believe a crime had occurred. No conviction.

Stephen did bring up all of these aspects of this claim in the State proceedings starting with his pro se filed Motion for Postconviction Relief, **claim#8,**(T358) but the Postconviction Court never considered Dr. Roffman's testimony under Neb. Rev. Stat.§27-702; Rule 702 to ensure the admissibility of this medical testimony.

Since this testimony was the only evidence of the alleged crime, **until this testimony is evaluated under the §702 Rules of evidence, this factual dispute remains unresolved.**

B.  **Forced, Pushed or Thrown over a balcony - Dr. Bates EXONERATING OPINION**

In 2005 Police and Prosecutor Retelsdorf hired a Fall Reconstruction expert, Dr. Bates.  Police gave Dr. Bates 26-items of evidence which included Stephen's description about what happened.  Police asked him to read Stephen's description and determine whether it was "Consistent or Inconsistent" with the Biomechanics of the fall, ("The anatomy of the fall").  (Exhibit AC)  (T1236)

On __10_/_21__/2005, in a telephone call, Dr. Bates conveyed the results of his research.  Following this conversation, Police told Dr. Bates to not write anything down and not to create a report. (T1236) (Exhibit AD ) , (E206).

Additionally, to make sure that Dr. Bates did not write a report Police failed to pay Dr. Bates for his services. (T1279 - Page 20, line 4)

ON POSTCONVICTION: In 2012, Appointed counsel Dunn gave Dr. Bates the exact same 26-items of evidence and asked Dr. Bates to write the report he would have written in 2005 had Police allowed him to do so.

13

## DR. BATES REPORT CONCLUSION - 2012 (T1237-T1240)

The conclusion of this report submitted to the Postconviction court was: "Matsolonia was not: forced, pushed or thrown over a balcony, unconscious or conscious".
This report was exonerating and represents the most Direct Evidence in the case.

Following the Dr. Bates Report, Counsel Mathias was appointed replacement counsel.

There were three major impediments preventing the proper adjudication of these legal and factual ISSUES:

1)  During the deposition of Dr. Bates, the State was still withholding material evidence favorable to the accused. (i.e.- the telephone recording of Dr. Bates). And this prevented the effective cross-examination of this witness on Postconviction.

2)  During the deposition in 2018, non-adversarial counsel Mathias deliberately failed to ask Dr. Bates for the results of his "consistency analysis." The answer to this question was the point of the deposition - to establish a Brady Violation occurred. (Page 11, line 1, T1277).

3)  The Court, Judge Wheelock, denied Stephen's motion to retake the deposition of Dr. Bates. Judge Wheelock ignored the fact that the prosecution had just committed an 18 year long Brady Violation. (T1261)

Taken all together this shows the State's coordinated effort to defeat or suppress this evidence at all costs. The Court's lack luster response to the police withholding exculpatory evidence shows    they were really not interested in resolving the factual dispute or providing a full and fair appeal of conviction.

THEREFORE THIS FACTUAL DISPUTE REMAINS UNRESOLVED DUE TO DELIBERATE EFFORTS BY THE STATE.

As seen below the State Court / Judge Wheelock ignored all four submitted expert opinions from varying fields of science and medicine:

**Dr. Weymuller - Otolaryngologist:** "Injuries were likely from intubation since there were no secondary indications of strangulation." (T435- T440),(T774).

**Dr. Okoye - Pathologist:** "Injuries were likely from intubation. Strangulation not diagnosised. A strangulation diagnosis is something an inexperienced pathologist would make." (T775- T781).

14

**Dr. Cina - Pathologist and Strangulation Expert:** "Injuries were likely from intubation. Autopsy protocol was deficient to make determinations about the cause of the hemorrhage on the posterior aspect of the larynx. Strangulation cannot account for this injury. A broken neck or intubation could account for this injury but further dissection of the cervical vertebre would be necessary in order to make this determination." Dr. Cina's Report: (EXHIBIT AB ),(T1251-T1252)

**Dr. Bates - Biomechanical Fall Reconstruction Expert:** "Matsolonia was not forced, pushed or thrown from a balcony, unconscious or conscious. Her right leg was restricted causing her to rotate 90 degrees." - This was all consistent with Stephen's testimony at trial.(T921-T926) --    (891:24-25;892:16-20;893:6-11);

The Postconviction court's determination of the facts was unreasonable because while each of the above expert opinions had to withstand the rigors of Rule 702 type standards, Roffman's trial testimony did not. -i.e. - When Roffman failed to read the paramedics report, he failed to rule-in all possible causes of the internal injuries making his differential diagnosis unreliable...

  BECAUSE ---        if any doctor was going to preform postmortum exploratory surgery to determine the cause of an injury in the neck, it would be important to know if Firefighters had been repeatedly trying to cram a hard metal tube through the very same area you are examining. And not knowing about this treatment history could cause the expert to incorrectly attribute these injuries to a false event.

AT TRIAL AND ON POSTCONVICTION IT WAS ERROR OR ABUSE OF DISCRETION TO NOT ACT AS THE GATEKEEPER TO ENSURE EVIDENTIARY RELEVANCE AND RELIABILITY - (AS RULE 702 REQ.)

THEREFORE Petitioner Stephen has done all he can to raise these claims in a hostile State Court environment. Each and every time Stephen has raised these very same issues, - proceedings have been delayed or the Court denies to hear the claim or appointed counsel fails to file a brief. Even after an 18 year long Brady violation the State District Court seem to ignore the prosecution's misconduct saying it was somehow harmless to withhold exonerating evidence. ( T1860-T1905)

I think that this Court should consider that because the prosecutor's misconduct was clearly malicious and abundant, the reason proceedings are being delayed and calims not adjudicated, has to do with liability not Justice.

15

**ATTORNEY MISCONDUCT AND THE COURT'S FAILURE TO REPLACE COUNSEL PREVENTED THE RAISING OF CLAIMS AND THE EXHAUSTION OF REMEDIES -- 10+ YEARS OF COMPLAINTS**

EXAMPLE 1

In 2018 during the deposition of Fall Reconstruction Expert, Dr. Bates, counsel Mathias deliberately failed to ask Dr. Bates for the results of his "Consistency Analysis".  The answer to this question was clearly exonerating and would establish that a Brady Violation occurred at trial. (Page 11, line 1- T1277).

Therefore not asking this question prevented material evidence form being placed on the Record.

EXAMPLE 2

The Postconviction court allocated funds to hire a Pathology Expert, Dr. Cina. Dr. Cina created a report for the Court which was 100% exculpatory, stating that: Roffman's diagnosis was incorrect and deficient; Strangulation cannot account for the posterior injury; and Intubation or a broken neck were the most likely cause of the injuries. ( EXHIBIT AB ) (Dr. Okoye concurs EXHIBIT AT )
**Then in it's opinion the District Court completely ignores the exonerating Pathology Report from Dr. Cina.          (T1251-T1252) , (T1860-T1905).**

EXAMPLE 3

During the deposition of Dr. Bates, counsel Mathias allowed the prosecutor to seed the deposition record with false statements.  ( Exhibit AG )-(Pages 39-40) This was done to debase Dr. Bates' testimony which prevented an accurate record.

EXAMPLE 4

Following the Postconviction evidentiary hearing the court ordered "Simultaneous Briefings" from Stephen and the prosecution,  Counsel Mathias repeatedly told Stephen that she would be filing this brief to make-up all the claims and arguments she had not made    until this point in the proceedings.  When the due date for the brief came and passed, No Brief Was File By Counsel Mathias. This forfeited Stephen chance to raise his claims.  In fact Counsel Mathias had disappeared. Stephen filed objections. ( T1830) and (T1735-T1738) and (T1782-T1995) and (T1749-T1752)

EXAMPLE 5

After the Court quickly denied Postconviction Relief, Counsel Mathias was not in contact with Stephen and she never filed a Motion for Rehearing or Reconsideration in order to preserve Stephen's claims and arguments.  ( T1908)

## JUDICIAL NOTICE

I respectfully request this Court take Judicial Notice of all the pro se filings Petitioner Stephen made following Counsel Mathias deliberately lying to him and sabotaging the Dr. Bates deposition: (10 years of complaints against Ms. Mathias)

10/21/2018 Letter to Halt Attorney's actions and not to file the Dr. Bates deposition(T1181-T1182); 11/1/2018 Motion to Replace Counsel- **Dr. Cina's Report filed** (T1261); Motion to Make Letter Halting Attorney Actions - a part of the Record (1293); Motion for Clerk to Provide printout of all filings to see what Mathias had filed (T1301); **Counsel Mathias filed a Motion to Withdraw (T1310);** Motion to Replace Counsel (T1316); Motion informing the Court that a Lawsuit had been filed against Counsel Mathias**(T1320);** Motion telling the Court that Petitioner Stephen does not trust Counsel (T1364); Counsel Mathias filed a Motion to Determine Competency (T1323)÷ This was done to obtain control of the complaints; Motion filing Objections (T1348); Motion Adding Claims (T1351) and (T1377); Writ of Mandamus filed to try and move forward with Postconviction proceedings - S-19-805, S19-774, S-20-303, S-21-578, S-22-067, S-23-199; Motion to Disqualify Counsel (T1470); Motion to Replace Counsel (T1520); Motion filing Objections(T1535); Motion to Appoint Counsel (T1538); **Motion Requesting Counsel Mathias to produce the Brief she intended to file (T1630);** Motion to Substitute Counsel (T1633); Motion for New Trial Based Upon Newly Discovered Evidence (T1639)- Because the prosecution had just revealed the Dr. Bates tape-recording from 2005;

* Following this last filing the Postconviction Court Ordered A Halt to all Hybrid Representation and Denying All pro se Motions since 2011. * (T1826)

AGAIN --- Stephen has done all that he can and was allowed to do to raise his claims. There are an enormous amount of filings since 2011 and the District Court has prevented raising them by refusing to replace counsel and then striking the pro se filings from the record.

**ALL OF THIS REPRESENTS AN EXTRAORDINARY CIRCUMSTANCE REQUIRING AN IMMEDIATE HEARING, BECAUSE THERE HAS BEEN NO EFFECTIVE STATE REMEDY BEING ALLOWED, BY DESIGN. THE PETITIONER REQUESTS A HEARING UNDER 28 U.S.C.§2254(d) AND THEREAFTER GRANT HABEAS PURSUANT TO 28 U.S.C.§2254(b)(1).**

The Ineffective Assistance of Counsel should be evaluated under Cronic: United States V. Cronic 466 U.S. 648, 104 S.Ct. 2039 (1984). -- Because it was a "Constructive Denial" by failing to subject the prosecutor's case to meaningful adversarial testing at meaningful times during the Appeal. - Brief was not filed.

17

GROUND ONE

THE NEBRASKA SUPREME COURT (NESC), PREVENTED STEPHEN'S RIGHT TO A FULL AND FAIR APPEAL AS GUARANTEED BY THE UNITED STATES CONSTITUTION BY: A) MISAPPLYING AN AMBIGUOUS STATE COURT RULE, (NEB. CT. R.§2-103) TO STRIKE THE SUBMITTED REPLACEMENT BRIEF WHICH PUT IT IN TIME DEFAULT; B) THE NESC QUICKLY SUSTAINED THE STATE'S "MOTION TO DISMISS" BASED ENTIRELY UPON TIME DEFAULT; C) THE NESC ABUSED IT'S DISCRETION OVERRULING STEPHEN'S "MOTION FOR RECONSIDERATION / REHEARING", EVEN AFTER STEPHEN PROFFERD, "CAUSE AND PREJUDICE" AS WELL AS A "MISCARRIAGE OF JUSTICE" EXCEPTIONS; THEN THE NESC SUMMARILY DISMISSED THE ENTIRE APPEAL CITING A LACK OF JURISDICTION WHEN IN FACT PROPER JURISDICTION HAD BEEN CONFERRED AND FULL LEGAL CAUSE ESTABLISHED

JURISDICTION CONFERRED

Stephen filed a timely Notice of Appeal in the District Court on: 3/15/24 for case number S-24-200()and on 3/20/24 case number S-24-214 mistakenly. This appeal was proper under the Nebraska Postconviction Act §29-3001 et. seq. (Reissue 2016). And In Forma Pauperis had been granted on 7/20/12/ ( T527 )

Determination of a jurisdictional issue which does not involve a factual dispute is a matter of law requires the Nebraska Supreme Court to reach a conclusion independent from the district court; State v. Gibbs 253 Neb. 241 (1977).

Appellate jurisdiction is conferred with the filing of the Notice of Appeal and a Poverty Affidavit within 30 days of the final order that is appealed; Neb. Rev. Stat.§25-11 (Reissue 2016), and Neb. Const. Art. I§23.

**Stephen's Notice of Appeal and Poverty Affidavit were filed within 30 days of the challenged order.**

Therefore having proper jurisdiction conferred, the Nebraska Supreme Court at it's option can consider Plain Error specified or not specified in the Appellate's brief; Geddes v. York County 2007, 729 N.W.2d 661, 273 Neb. 271; Neb. Rev. Stat. §25-1919.

PLAIN ERROR

Plain Error may be found on appeal when error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial rights and if uncorrected would cause a miscarriage of justice, damage the integrity reputation and fairness of the judicial process; In re Estate Fischer 1988, 227 Neb. 722, 419 N.W.2d 860; Murray v. Carrier 477 U.S. 478, 495, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986).

18

**Clearly the NESC's scope of review is to consider errors, note plain error on the record, and to consider abuse of discrition.**

Specifically - A trial courts ruling in receiving or excluding an expert's testimony which my be unreliable or irrelevant, will be reversed only when there has been an abuse of discretion; Nebraska Nutrients v. Shepard 261 Neb. 723, 626 N.W.2d 4271 (2001).

A judicial abuse of discretion exists when a judge within the effective limits of authorized judicial power, elects to act of refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system; Noon v. Noon 261 Neb. 552, 624 N.W.2d 314 (2001).

### MISAPPLICATION OF NEB. CT. R.§2-103 (Exhibit At )

The State misapplied state rule §2-103 to a handwritten brief when the rule was ambiguous specifying page limits for typewritten briefs and not handwritten briefs.

On 4/16/25 Stephen submitted a 92 page handwritten brief. His brief was nicely printed with about 130 words per page. Where as a typical typewritten page contains about 230 words per page or more.

§2-103 states that you are allowed 15,000 words in the brief and "50 Typewritten" pages. Therefore at 230 words per page x 50 pages = 11,500 words. This is well under the 15,000 word limit of §2-103.

Since Stephen's handwritten brief contained about 130 words per page x 92 pages = 11,900 words total in the brief. This is also within the word limit of §2-103.

**But - If the NESC limits Stephen's handwritten brief to 50 pages this would only allow him 6500 words total for his brief. This is clearly an abridgment of his rights to explain and argue his appeal. It prevents a full and fair review.**

AND - Since §2-103 does not give specifications for "Handwritten" briefs, the State Court Rule is **ambiguous.**

In fact, on 4/8/25 Stephen filed a Motion for Clarification of the rules. The NESC denied this motion. (Exhibit A A )

On  5 / 19 / 25 Stephen filed a Motion for Leave to submit the brief as is, but the NESC deemed this motion moot even after Stephen filed his Motion for Reconsideration giving Cause and Prejudice. (**Listing of filings: EXHIBIT** A A )

19

"Non-compliance with a State procedural rule generally precludes federal habeas corpus review of all claims as to which noncompliance with the procedural rule is an independent and adequate state law ground upon which to deny review"; Wainwright v. Sykes 433 U.S. 72, 97 S.ct 2497, 53 L.Ed.2d 594 (1977).

BUT

"A state procedural rule which bars presentation of a federal claim is NOT 'Independent and Adequate' if the state applies the rule in a sporadic or suprisingly harsh manner"; Francios v. Wainwright 741 F.2d 1275, 1281 (11th cir); Dugger v. Adams 489 U.S. 401 --- n.6, 109 S.Ct. 1211, 1217 n.6, 103 L.Ed.2d 435 (1989).

The adequacy of a state procedure presents a question of federal law; Williams v. Lockhart 873 F.2d 1129, 1131 (8th cir.); cert. denied 493 U.S. 942, 110 S.Ct. 344 ,107 L.Ed.2d 333 (1989).

QUOTING WILLIAMS:

**"IF THE STATE PROCEDURAL RULE IS UNCLEAR, OR HAS BEEN INCONSISTENTLY APPLIED, OR APPEARS TO BE A NEW RULE DESIGNED TO THWART THE ASSERTION OF FEDERAL RIGHTS IN THE VERY CASE UNDER REVIEW ... A FEDERAL HABEAS COURT MIGHT WELL CONCLUDE THAT SUCH A RULE OF STATE LAW, VALID THOUGH IT MAY BE FOR MERELY STATE LAW PURPOSES, WOULD NOT SUFFICE TO BAR HABEAS REVIEW UNDER THE WAINWRIGHT DOCTRINE".**

THE STATE PROCEDURAL RULE IS UNCLEAR

Neb. Ct. R. §2-103 is unclear regarding Handwritten Briefs.  There is no rule stating whether handwritten briefs are allowed, which leaves the Appellant to guess.  (Neb. Ct. R.§2-103)

If handwritten briefs are accepted then why does this rule not specifically state it?  And even after reading §2-103 it's logical for an appellant to assume that people cannot hand print a page with the same font size and exactness as a computer or typewriter.  Hand print is larger.

It's also logical for an appellant to assume fair treatment by the court. And the only way to do this for   handwritten briefs would be to allow extra pages so that  an appellant  HAS AN -------- equal  opportunity to explain his case / assignments of error.  Therefore 92 pages x 130 words per handwritten page = 11,900 words.  Within the word count for  §2-103 rule.  This is and was Stephen's logical assumption.

Therefore Stephen does not understand the unfair treatment or the rush by the state court to strike this brief from the record.  The fact that the court quickly struck this brief shows that they never wanted to adjudicate the claims.

## CAUSE AND PREJUDICE

"In all cases in which a State prisoner has defaulted his claims in State court pursuant to an independent and adequate state procedural rule, federal Habeas Corpus review of the claims is barred unless the prisoner can demonstrate <u>cause</u> for the default and actual <u>prejudice</u> as a result of the alleged violation of federal law, or demonstrate that a failure to consider the claims will result in a fundamental <u>miscarriage of justice</u>"; Murray v. Carrier 477 U.S. 478, 477 U.S. 485, 477 U.S.; Harris v. Reed 489 U.S. 255 (quoting Colman v. Thompson 501 U.S. 722(1991)

[In Stephen's case, he can demonstrate both cause and prejudice as well as a miscarriage of justice.]

### CAUSE

DUE TO STAFFING SHORTAGES, NEW SECURITY PROCEDURES FOR MAIL DELIVERY AND CONSTRUCTION PROJECTS, THE PRISON HAS BEEN ON MODIFIED LOCKDOWNS WHICH DELAY MAIL SERVICES AND LIMIT ACCESS TO TYPEWRITERS / COPY SERVICES.

This means even though the Nebraska Department of Correctional Services (NDCS)/ Reception and Treatment Center (RTC) prison is in the same city as the Nebraska Supreme Court (NESC), the mail had been delayed 10+ days for incoming mail and 10+ days for outgoing mail. This delay creates a 20+ day turnaround if Stephen is trying to respond to court directives and orders.

Since this is not a NDCS policy but an emergent logistics problem, the NDCS corporal whos duty it is to accept and distribute mail to inmates, can verify the incoming and outgoing delay. (Corporal Cooper - Exhibit <u>A I</u> ) - Verifies delay.

Additionally, Exhibit <u>A J</u> , is a mail receipt of the NESC letter where the court told Stephen to submit a replacement brief in 15 days, but this letter was not delivered to Stephen until after April 6th, 2025.

### PREJUDICE

### MAIL DELAY TIMELINE

On 2/10/25 In anticipation of self representation, Stephen mailed a motion requesting and extention on the brief due date. This is a normal request for any newly appointed (Self-represented) counsel.

On 2/21/25 The NESC receives this letter and denies the extention on the brief due date. Unknown to Stephen, this order made it all but impossible to avoid a time-procedural default, because of the 10 day mail delay.

21

On 2/28/25 The NESC sustained Stephen's motion to withdraw the unauthorized brief submitted by Mr. Kortus, allowing his own pro se brief to be submitted. The due date given for the pro se brief was March 14th, 2025.

On 3/10/25 four days before the brief due date, Stephen received the March 14th due date for his pro se brief. Stephen also learns the court denied his request for an extention on the brief due date.

On 3/12/25 Stephen quickly submits a 92 page handwritten brief. It was handwritten because of the short response time and lack of access to law typewriters.

On 3/14/25 The State Attorney General filed a Motion to Dismiss based entirely upon timeline default.

On 3/17/25 Because the NESC had not received Stephen's appeal brief, it issued a default letter giving Stephen 10 days from the receipt of the letter to submit his brief.

On 3/24/25 The NESC received Stephen's appeal brief and may have thought it was in response to the default letter they sent but actually it was sent by Stephen 10 days prior.

On 3/27/25 The NESC strikes Stephen's brief citing Neb. Ct. R. §2-103 (Number of pages) and §2-109 (Use of exhibits).

On 4/6/25 or a few days afterwards, Stephen received the court's letter striking the brief for §2-103 and §2-109. Stephen not only sends out the Replacement brief but he sends out a motion for leave to file his brief as corrected, without exhibits but having the same number of handwritten pages.

On 4/16/25 The NESC receives the Replacement breif. (**Note – The NESC had full Jurisdiction and legal cause to hear Stephen's appeal**). THE NESC STRIKES THE BRIEF CITING §2-103.

On 4/17/25 The NESC grants the State Attorney General's Motion to Summarily Dismiss the Appeal; (Where all of the reasons were due to the timeline default issue).

On 5/5/25 The NESC dismissed the Appeal stating it "Lacked Jurisdiction to hear the Appeal", citing §2-107(a)(1). (Exhibit AA)

22

THE NESC ERRED OR ABUSED IT'S DISCRETION DISMISSING THE APPEAL WHEN BOTH
CAUSE AND PREJUDICE AS WELL AS A MISCARRIAGE OF JUSTICE WAS PROFFERED

After receiving Stephen's Motion for Reconsideration / Rehearing which explained both the Cause and Prejudice as well as the Miscarriage of Justice issues, the NESC failed to investigate the issue on the Record or hold a formal hearing to develop the facts surrounding the stated exception. And it did so even though Stephen submitted an exhibit from the NDCS / RTC Corporal in charge of mail distribution to the inmates. The Corporal confirmed the 10 day mail delay at the prison.

Therefore had the NESC investigated this issue it would have found the reason for the time-default delay being an issue outside the control of Petitioner. Instead the NESC continued with an aggressive timeline which did not allow Stephen to submit a timely Appeal. By the time Stephen had received the due date letter from the NESC the default had all but occurred, preventing the right to a full and fair appeal.

THE STATE'S MOTION TO DISMISS

The State makes 5 points which are all about how the Petitioner not filing the brief or other motions in a timely manner. This suggests that Stephen had a choice and was simply choosing to file late. But all choice was taken away by the aggressive timeline. This was harsh and unreasonable under the circumstances. On Reconsideration after the NESC knew about the cause and prejudice as well as the Miscarriage of Justice issues, it could have overruled the State's Motion to Dismiss, allowing time for Stephen to submit his brief. Instead it choose to Dismiss the entire appeal citing lack of Jurisdiction when in fact it had full jurisdiction and legal cause/ obligation to hear the appeal. This too was an abuse of discretion by the NESC.

**THIS WAS AN UNREASONABLE INTERPRETATION OF THE FACTS AND LAW TO IGNORE BOTH CAUSE AND PREJUDICE AS WELL AS THE MISCARRIAGE OF JUSTICE.**

23

GROUND TWO

A MISCARRIAGE OF JUSTICE OCCURRED WHEN STEPHEN'S RIGHT TO DUE PROCESS WAS VIOLATED BY ACTS AND OMISSIONS OF INVESTIGATING OFFICERS AND PROSECUTORS FAILING TO DISCLOSE MATERIAL EVIDENCE PURSUANT TO NEB. REV. STAT.§29-1919; THE UNITED STATES CONSTITUTION 4TH, 5TH, 6TH AND 14TH AMENDMENTS WHEN: A WARRANT WAS OBTAINED FAILED TO STATE CIRCUMSTANCES GIVING PROBABLE CAUSE TO BELIEVE A CRIME HAD OCCURRED; THE PROSECUTOR INTRODUCED EVIDENCE WITHOUT PROPER DISCOVERY PREVENTING STEPHEN FROM KNOWING THE WITNESSES AND EVIDENCE AGAINST HIM; THE EVIDENCE INTRODUCED WAS MEDICALLY UNRELIABLE / FALSE IN VIOLATION OF NEB. REV. STST.§27-702, RULE 702 AND THE DAUBERT / SCHAFERSMAN FRAMEWORK (DAUBERT V MERELL DOW PHARMACEUTICALS 509 U.S. 579 UNITED STATES SUPREME COURT); THE TRIAL COURT FAILED IT'S DUTIES AS A GATEKEEPER TO ENSURE EVIDENTIARY RELEVANCE AND RELIABILITY; DEFENSE COUNSEL FAILED TO OBJECT WHICH ALLOWED PLAIN ERROR WHEN THE INADMISSIBLE EVIDENCE WAS ALLOWED TO STAND; ON POSTCONVICTION KNOWING THESE FACTS THE DISTRICT COURT UNREASONABLY INTERPRETED THE FACTS AND LAW DENYING RELIEF

"Upon a defendant's proper request through discovery procedures, the State must disclose information which is material to the preparation of a defense to the charge against the defendant. In order that the defendant receive a fair trial, requested and material information must be disclosed to the defendant." ; State v. Brown 665 (1983); United States v. Bagley 473 U.S. 667.

Pursuant to (T737-T739)  Detective Kozelichki's report detailing his involvement at Matsolonia Myers (Myers), autopsy, Roffman described the tracheal/laryngeal injury to Kozelichki in significant detail, as follows:
---
".... there was an area of hemorrhaging along the right side of the trachea and larynx. Roffman also advised there was an area within the victim's neck region (after the trachea / larynx was removed) along the back side where the trachea and larynx were located that also had hemorrhaging within it. Roffman pointed to this area to show reporting officer. Upon doing so, reporting officer noticed that this area of hemorrhaging was about the size of a quarter. Roffman advised that upon dissecting the victim's trachea there were no fractures to either the trachea, larynx, or the hyiod bone, **and these areas appeared to be normal.**"
---

"Roffman advised that the cause of death was massive blunt force trauma to the victim's chest and abdomen areas, which caused multiple fractures to both sides of the front rib cage and internal injuries to the aforementioned organs in the inner chest cavity."
---
24

Dr. Roffman did not make a finding of manual strangulation in his autopsy report, nor did he verbally communicate any such finding to Kozelichki during the autopsy examination, although ultimately, at trial, Roffman testified rather authoritatively and in a fashion suggesting that his testimony in that regard was obvious to him as a medical professional that the trachea / laryngeal injury was consistent **only** with manual strangulation. (EXHIBIT AS )

Detective Kozelichki did not include any facts suggesting strangulation of Matsolonia in either the 2004 affidavit for Stephen's arrest on the charge of Second Degree Murder, nor in the 2008 affidavit for Stephen's arrest for Manslaughter, because he was unaware of any such evidence.

Detective Kozelichki did not testify to any facts suggesting strangulation, incapacity or unconsciousness or Stephen physically carrying the unconscious 200 pound body of Matsolonia through the apartment, out the sliding glass door, onto the balcony and throwing the body over a 45+ inch high railing because he was unaware of any such evidence.

Had Kozelichki included in his 2004 arrest warrant affidavit for Second Degree Murder, (Which was not written until 9 days after Kozelichki attended the autopsy), facts suggesting manual strangulation, unconsciousness and manual disposal of the body, the county court without any question would have signed and issued the warrant immediately.  Instead the court refused to issue this warrant.

Had the Douglas County Attorney been aware of the fact that Roffman would later testify to those facts not disclosed in his autopsy report, specifically, manual strangulation, unconsciousness and throwing Matsolonia to her death from the balcony, Kozelichki would have been questioned regarding those facts by the prosecution at the preliminary hearing in September of 2008, and arguably, the prosecuting authority would have counseled Kozelichki to include those facts in his 2008 Manslaughter warrant affidavit and instructed him at that point to reapply for a warrant alleging murder rather than manslaughter.

As of July 18, 2008, when the State filed the second complaint against Stephen alleging Murder in the Second Degree in Douglas County Court, the State had no evidence at their disposal, nor did it know of the existence of any evidence that would support a finding of guilt on the charge of Second Degree Murder.

The State filed the Second Degree Murder charge in 2008 to skirt the statute of limitations issue and apparently decided to concern itself with how to prove the charge at some future date.  And according to the prosecution this future date was one week  before trial which means Stephen was in Douglas County Jail

25

for a year without evidence that a crime of murder had been committed.

At no time prior to trial of this matter in March of 2009 did the State or any agent thereof disclose these undocumented facts to which Dr. Roffman testified at trial, to Defense Counsel. The affidavits of Matt Knoblauch and David Tighe Defense Counsel were presented to the Postconviction Court in the Second Amended Motion for Postconviction Relief. (T740) and (T742).

It is difficult to imagine facts a defense attorney might consider more "Material to the preparation of a defense to the charge", than those testified to at trial by Roffman and not disclosed to defense Counsel. - United States v. Bagley 473 U.S. 667.

There was no way for trial counsel for Defendant to know or have predicted, without having deposed or interviewed Roffman, that he would be testifying alleging manual strangulation, unconsciousness and being thrown over a balcony. Yet if the Prosecutor had made up her mind to hide this evidence until (756:18-23) trial, then deposing Roffman three weeks before trial would have done no good.

And if the prosecution is claiming that they learned of Roffman's new opinion one week before trial then how were they able to get an arrest warrant using the same arrest affidavit they used in 2004 when the court refused to issue an arrest warrant.

In fact, the only evidence upon which a jury could make a finding of guilt beyond a reasonable doubt to the charge of Second Degree Murder herein is the testimony of Roffman regarding: strangulation, unconsciousness and throwing the unconscious body of Matsolonia over a balcony railing as it is the ONLY evidence adduced at any proceedings relative to Matsolonia's death that suggests an intentional and unmitigated killing, (murder), and without that testimony, the State likely would not have even been able to convict Stephen of Manslaughter:

ROFFMAN'S TESTIMONY

DIRECT
(739:17-25) AND (740:1-4)

Q. So based on your training and your -- based on the autopsy, your examination Ms. Myers, Mrs. Myers, and your 41 years of experience, would it be -- would you have an opinion as to whether or not Ms. Myers was strangled before she was thrown off the balcony?

A. Yes.

26

Q.  And what would that be?

A.  That she was strangled before she went off the balcony.

Q.  And that strangling could have rendered her unconscious?

A.  Yes.

Q.  And you indicated it would be in a matter of seconds?

A.  Correct.


REDIRECT - (THE SOLE EVIDENCE OF MURDER)

(765:18-25 AND 766:1)

Q.  So if you --- in your professional medical opinion, if you look at the totality
    of her injuries, fair to conclude that the totality of her injuries are
    consis --- are only consistent with strangulation, unconsciousness and being
    dropped off a balcony? Is that fair?

A.  Yes.

Q.  And the totality of her injuries are not consistent with her jumping on
    her own power or falling from the balcony?

A.  Correct.

IN ORDER TO UNDERSTAND THE PROSECUTION"S LOGIC YOU NEED TO SEE WHAT DEFENSE
COUNSEL ESTABLISHED ON CROSS EXAMINATION

CROSS EXAMINATION

(750-762)

Under questioning Defense Counsel established that each and every injury with
the  exception of the two hemorrhages in question were created by the fall,
i.e. - A non-criminal act.

(745:8-17)

Roffman admits that he DID NOT read the Paramedics Report describing multiple
unsuccessful attempts at intubation using the incorrect tube size, (Too large).

(745:8-17)

Roffman admits that he was not at all aware that Matsolonia had been intubated.

(745:25 and 746:1-6)

Roffman admits that he is not an intubation expert.

27

WHAT THE PROSECUTOR IS ALLEGING

a) An assault occurred inside of Matsolonia's apartment where Stephen strangled her until unconsciousness, but there are no offensive or defensive wounds. No cuts, scrapes or bruises. No scratches or blood or other biological evidence. Neighbors were home on all sides of the apartment but no one heard any sounds from a life and death struggle. No ripped clothes or broken furniture. No signs of asphxiation or other secondary signs of strangulation like petechaie hemorrhages. And no signs of unconsciousness.

b) While Matsolonia lay unconscious, Stephen at 178 carried or dragged Matsolonia at 200 pounds, across an apartment, through a sliding glass door and across a dust covered balcony - but left No signs of this laborious act.

c) The prosecutor further alleges that Matsolonia was still unconscious when Stephen lifted her body chest high, swung her about facing the building placing her feet first, dropping her from a height and a position which might not have killed her. THEN called 911.

d) Finally the prosecutor alleges that the ONLY signs from all this criminal activity are two hemorrhages along the membrane wall of the trachea / larynx which just happen to be in the same exact area of Matsolonia's body where paramedics were trying unsuccessfully to push a hard metal tube through her trachea and larynx where blood was seen during the intubation procedure.

THIS ALLEGED SEQUENCE OF EVENTS IS AN UNREASONABLE INTERPRETATION OF THE FACTS

* Biomechanically - It would be highly unlikely if not impossible for Stephen at 178 pounds, to lift or drag a 200 pound body and maneuver the unconscious body in to such a position. (Dr. Bates' Report)

* Forensically - It would be nearly impossible to engage in this much activity without leaving trace evidence like blood or DNA. (Missing CSI Report)

* Pathologically - It is unreasonable and medically negligent not to read a paramedics report and then use a hemorrhage on the posterior larynx to speculate a chain of improbable events, to a medical certainty.

** (There are thousands of on-line Medical Studies like this ; EXHIBIT A K ) **
Associated Risk Factors for Intubation Injury:  Older, Woman, Short, Over weight, Emergent Intubation, Inexperienced Technician, Neck Injury ...
(See Exhibit Article representing thousands of stdies)

28

DAUBERT / SCHAFERSMAN FRAMEWORK – RULE 702 / §27-702

"Under rule §27-702, it's not enough that a witness is qualified as an expert. The trial court must also act as a GateKeeper to ensure the evidentiary relevance and reliability of the expert opinion." : Schafersman v. Agland Coop. 262 Neb. 215, 631 N.W.2d 862 (2001); Daubert v. Merrell Dow Pharmaceuticals Inc. 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and progeny.

**This type of gatekeeping was not done.**

"It's not enough for the trial court to determine that a witness may be an expert or determine that an expert's methodology is valid in the abstract; In order for the expert's opinion to be admitted, the trial court must also determine if the witness has applied the methodology in a reliable manner; Rule 702; Neb. Rev. Stat.§27-702; Carlson v. Okerstrom 675 N.W.2d 89;

In determining whether an expert medical opinion based on a <u>differential diagnosis</u> is reliably based, the question will be whether the expert conducted a reliable differential diagnosis; Rule 702; Neb. Rev. Stat.§27-702

"The first step in conducting a reliable differential diagnosis is to compile a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration"; Clausen v. M/V New Carissa 339 F.3d 1049, 1057 (9th cir. 2003).; Kumho Tire Company et. al. Petitioner v. Charmichael 119 S.Ct.1167
If the expert completely fails to consider a cause that could explain the patient's injuries, the differential diagnosis is not reliable"; Cooper v. Smith & Nephew Inc. 259 F.3d 194, 202 (4th cir. 2001); Carlson v. Okerstrom 675 N.W.2d 89 (2004);

**BECAUSE DR. ROFFMAN FAILED TO READ THE PARAMEDICS REPORT, HE FAILED TO RULE-IN A POSSIBLE CAUSE OF THE HEMORRHAGES**

**THEREFORE BECAUSE ROFFMAN FAILED TO PROPERLY RULE-IN INTUBATION AS A POSSIBLE CASUAL AGENT FOR THE INJURIES, HIS DIFFERENTIAL DIAGNOSIS SHOULD HAVE BEEN CONSIDERED UNRELIABLE AND INADMISSIBLE BY THE COURT.**

(1) Error, (2) That is Plain, and (3) That affected the substantial rights; Johnson v. United States 520 U.S. 461, 467, 117 S.Ct. 1544 137 L.Ed.2d 718. Where the proceedings would have been different; United States v. Dominguez Benitez 542 U.S. 74, 124, S.Ct. 2333, 2339, 159 L.Ed.2d 157 (2004); United States v. Bagley 473, U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

29

IN SUPPORT OF INTUBATION AS THE LIKELY SOURCE OF THE HEMORRHAGES:

a) Thousands of on-line medical studies showing that both the right side hemorrhage as well as the posterior aspect of the trachea / larynx are well known products of intubation ; See - "Membraneous Tracheal Rupture After Endotracheal Intubation", (T783-T794)

b) On Postconviction: Pathologist Dr. Okoye reviewed the medical records in this case. Dr. Okoye opined that strangulation was a faulty diagnosis and that intubation was the most likely cause of these two homorrhages. (T775)

c) On Postconviction: Dr. Cina a Pathologist and strangulation expert, opined that in the absence of injuries to the anterior structures of Matsolonia's neck, strangulation cannot account for the posterior injury and that in the absence of secondary indications of strangulation or asphxiation, intubation was the most likely cause $_{of}$ the hemorrhages. And Dr. Cina added that a broken cervical vertebre might also expalin the posterior injury and that if Dr. Roffman would have preformed further dissection of this area positive conformation would be possible. Dr. Cina also added that the injuries are consistent with Matsolonia being conscious trying to land on her feet. (T1251-T1252) (See: #1 --- #7) (EXHIBIT AB )

**Dr. Roffman did not take the necessary steps to positively rule-in or rule-out potential causes of the injuries. i.e. - his autopsy was deficient or incomplete to make medical determinations of injury causation.**

Therefore it was not simply that a discovery violation occurred, it was also ------- that the Prosecutor was ambushing the Defense with medically false speculative or perjurious testimony from a medical expert. The only possible solution would have been a mistrial and / or a Daubert Hearing on the new testimony from Roffman. The reason a mistrial is the necessary remedy is because the admission of Roffman's testimony was admitting inadmissible evidence as the sole alleged evidence of an otherwise non-existent murder. This was Plain Error rendering the conviction unconstitutional.

---

The Petitioner has demonstrated that the state court's decision was "contrary to or involved an unreasonable application of clearly established Federal Law"; 28 U.S.C §2254(d)(1). - And Petitioner has demonstrated that the state court proceedings resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented - 28 U.S.C.§2254(d)(2).

GROUND THREE

THE STATE DENIED STEPHEN DUE PROCESS OF LAW BY FAILING TO DISCLOSE EXCULPATORY EVIDENCE THE EXISTENCE OF WHICH WAS KNOWN TO THE STATE BEFORE TRIAL, IN VIOLATION BRADY V. MARYLAND 373 U.S. 83 (1963); 4TH,5TH AND 6TH AMENDMENTS OF THE CONSTITUTION:

* THAT THE STATE OFFERED ROFFMAN'S TESTIMONY AT TRIAL WHEN THE STATE KNEW OR SHOULD HAVE KNOWN THAT ROFFMAN'S NEW OPINION WAS NOT TRUE, GIVEN THE STATE'S KNOWLEDGE OF DR. BATES' OPINION PRIOR TO TRIAL

* THAT THE CONDUCT OF THE PROSECUTION IN THIS REGARD WAS CALCULATED TO MISLEAD THE JURY, WHERE ROFFMAN'S TESTIMONY WAS PROFFERED AS THE SOLE EXISTING EVIDENCE OF AN ALLEGED CRIME

* THAT THE STATES FAILURE TO DISCLOSE DR. BATES' CONFLICTING EXPERT OPINION PRIOR TO TRIAL AND THE STATES FURTHER AND CONTINUED EFFORTS TO CREATE A FALSE IMPRESSION IN THE MINDS OF THE JURORS THROUGHOUT TRIAL CONSTITUTES PROSECUTORIAL MISCONDUCT

* THAT THE WITHHOLDING OF THIS EXCULPATORY EVIDENCE WENT ON AFTER TRIAL FOR THE NEXT FOURTEEN    YEARS UNTIL THE END OF POSTCONVICTION PROCEEDINGS WHICH PREVENTED THE EFFECTIVE CORSSEXAMINATION OF DR. BATES TO PROVE A BRADY VIOLATION OCCURRED, ON THE MOST DIRECT EVIDENCE ABOUT WHAT HAPPENED ON THE BALCONY: "MATSOLONIA WAS NOT – FORCED PUSHED OR THROWN OVER A BALCONY; SHE FELL FACING THE BUILDING AND WAS CONSCIOUS SHWOING A REFLEXIVE RESPONSE" – ALL OF WHICH CORROBORATED STEPHEN'S TESTIMONY AT TRIAL

In 2005 police gave Dr. Bates 26 items of evidence including Stephen's statement to police. Police asked Dr. Bates to preform a "Consistency Analysis", to determine whether Stephen's statement was consistent with the "Anatomy of the Fall". In 2005 Dr. Bates conveyed his findings to police. (T759, E70467BP)

DR. BATES 2005 TELEPHONE CONVERSATION WITH POLICE – THE WITHHELD RECORDING

(E206, PAGE 1)    (EXHIBIT AL)    (PAGE 1 AND 2)

"Thinking about it, the first thing I wanted to determine or see is if I could determine with reasonable probability was how she went off the balcony – orientation – whether she went over starting out facing the fall or with her back to the fall ... and what I did was basically just looked at the Biomechanics of that type of fall. There are two aspects, there's one- rotation, how much she had to rotate to land on her chest. And two – she had to re-orient herself or

she had to be re-orientated relative to North// South, to go over front first. Because I feel pretty certain that she went over back first and that justifies.

Because re-orientating herself, East / West to North / South, is going to take a force thats off center."

[ **Dr. Bates is telling police that Matsolonia fell facing the building. And therefore she was not pushed from behind with her back to the building. This corroborates Stephen's trial testimony.**]

"If she went over just sitting on the railing and pushed, she'd end up with her head or feet, head-feet orientation perpendicular to the building - and she doesn't end up that way"

[**Dr. Bates is now eliminating that Matsolonia was pushed from the front or from behind, or else her head / feet orientation would be perpendicular to the building**]

"She ends up parallel. So if you push her over backwards or she falls over backwards or whatever, she's got to rotate 90 degrees to East / West, she'd be in the North / South parallel to the building orientation. So we need a force to accomplish that."

"**My opinion right now is** the most likely force that caused that is ... looks like she went over backwards and for whatever reason her right leg was restricted or restrained partially."

\*\* Dr. Bates told police this four years before trial and since the investigation was sealed there would have been no way for Stephen to know what was said on this conference call. \*\*

STEPHEN'S TRIAL TESTIMONY - 100% CONSISTENT
(891:24-25) CROSS EXAMINATION

Q. After you had grabbed on to her shirt, what happened next?

A. Her legs were still on the balcony railing. I started pulling up and actually
   said, pull with your legs, and she started to -- I think she started move
or if I was moving her, I don't know which it was, but then her legs became
unhooked from the balcony railing. And at this point her weight dropped,
I felt the full force of her weight." (T187) (EXHIBIT AM). DIAGRAM

32

(892:16-20)

A. "I had her by the lapels and I was pulling her up.  But when her feet became unhooked, the force ... went straight down ... Her feet came off and all of the sudden I had all one hundred and whatever ... 180 pounds of her sitting there. (Matsolonia was 200 pounds)

(893:6-11)

Q. Did your mom react at all or do you remember?

A. I remember but what I'm saying is that she fell and rotated and fell flat, and during that whole time ... she did not react at all.  She just put her hands out and didn't say a word like she expected it.


MULTIPLE LEVELS OF CORROBORATION

| DR. BATES | STEPHEN |
|---|---|
| Fell facing the building | Fell facing the building |
| Leg was restricted | Leg was restricted |
| Fell feet first and rotated | Fell feet first and rotated |
| Landed arms up conscious | Landed arms up conscious |


*Additionally there were the zipper impressions which Dr. Roffman never gave an event which caused their creation, but in Stephen's description he fully explains how they were created even though he did not know about these impressions until trial.  (T187) and Exhibit AM


The Dr. Bates telephone recording  /  transcript is exonerating evidence considering that it's the most direct evidence, and only admissible evidence about what happened on the balcony.  This is why the prosecution hid this evidence for 18 years until 2024.


ONGOING BRADY VIOLATION DURING POSTCONVICTION PROCEEDINGS

On it's decision, the Postconviction Court abused it's discretion denying relief stating that "We know how Dr. Bates would have testified at trial."  But this is not true because during the Postconviction deposition of Dr. Bates no one asked him for the results of his 2005 consistency analysis, i.e. - how is the Biomechanics of the fall consistent or inconsistent with Stephen's description of what happened.

Additionally Appellate counsel Mathias did not prepare Dr. Bates nor give him any sort of reference materials, such as the 2005 telephone transcript of the conversation he had with police.                    (Court decision - T 1860 - T1906)

33

PREJUDICE

This means that Dr. Bates was trying to remember a conversation he had with police and prosecutor 13 years before.  And because the prosecution was still withholding this recording / transcript Dr. Bates' answers were as follows:

(E204) (EXHIBIT AN )

Page 9, line 15
"I don't know"

Page 9, line 23
"I think, but I'm not sure ... I don't know"

Page 10, line 21
"As best I can remember"

Page 11, line 4
I don't remember all the details because that's a long time ago"

Page 11, line 14
"I don't know"

Page 11, line 14
"I don't know"

Page 11, line 15 .
"I don't remember"

Page 11, line 16
"I do not recall"

Page 11, line 24
"I don't know for a fact ..."

All of these questions were about Dr. Bates' 2005 consistency analysis, the work he was originally hired to do for police. (E70467BK – T1237-T1240)

Therefore even during the 2018 deposition of Dr. Bates the prosecution was still supressing evidence which prevented the effective corss-examination of this former police expert; Brookhart v. Janis 384 U.S. 1; Smith v. Illinois 390 U.S. 131; Davis v. Alaska 415 U.S. 308; Giglio v. United States 405 U.S. 150 ,405 U.S. 154; Brady v.Maryland  373, U.S. 83, 87; United States v. Bagley 473 U.S. 667; United States v. Agurs 427 U.S. 97, 112-113

Where the State court has adjudicated a constitutional claim on the merits, a petitioner must demonstrate that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law."; 28 U.S.C.§2254(d)(1).  Alternatively, petitioner can demonstrate that the state court proceedings "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" –

34

UNREASONABLE APPLICATION OF FEDERAL LAW

THE HOLDING OF BRADY AND PROGENY:

Is clearly established law. Whether the Court believed that the 2005 Dr. Bates recording contained just a little bit of material exculpatory evidence or was completely exonerating, had the prosecution turned over this recording to the Defense at trial, with proper inquiry by defense counsel, it would have led to the same exonerating report which Dr. Bates submitted to the Postconviction Court (T1237-T1240). This report was based upon the **same 26-items** of evidence which police gave him in 2005. The conclusion of this report was: "Matsolonia was not forced, pushed or thrown over the balcony conscious or unconscious". (T764). Therefore the "Suppression of evidence favorable to the accused" was a violation of the Petitioner's Due Process rights under the 4th, 5th and 6th Amendments of the United States Consitution. (United States v. Bagley 473 U.S. 667)

UNREASONABLE DETERMINATION OF THE FACTS

The state Postconviction Court allocated funds for Dr. Bates to review the evidence and give his opinion. Since this opinion was based upon the same evidence he was given in 2005, it's reasonable to conclude that had Dr. Bates been allowed to testify at trial, he would have testified in conformity with his unmodified report submitted on Postconviction. There was no new evidence which would have changed the Physics of Matsolonia's fall, thereby changing Dr. Bates' opinion. But instead of implementing a reasonable interpretation of the facts, the Postconviction Court focused upon Dr. Bates' deposition performance claiming that it was somehow ambigious. In fact the Postconviction Court under Judge Wheelock did this to ignore and disguard both Dr. Cina's and Dr. Bates' exonerating opinions.

In the decision denying Postconviction Relief, Judge Wheelock ignored Dr. Cina's submitted report, (T 1251) which stated: a) Strangulation cannot have created the posterior side hemorrhage; b) Both injuries were likely created by intubation; c) Dr. Roffman's autopsy was deficient because he failed to dissect the cervical vertebre to rule-out a broken neck which could have also been the cause of the posterior hemorrhage; d) There was evidence Matsolonia was conscious and trying to land on her feet.

In the decision denying Postconviction Relief Judge Wheelock ignored Dr. Bates' report which concluded: "Matsolonia was not: forced, pushed or thrown over the balcony, conscious or unconscious."; Matsolonia fell facing the building which corroborates Stephen's statement to police.; Matsolonia's leg was restricted causing her to rotate 90 degrees parallel with the building. All of which corroborated Stephen's trial testimony.

35

Both of these experts were unambiguous never changing or modifying their opinions.

The Court should also note that Stephen was not notified about witnesses being deposed or the dates of these depositions. Stephen was not allowed to be present during the depositions of ANY WITNESS ------    Not in person or by video conference. Therefore when the prosecutor repeatedly made false statements, not in the evidentiary record and defense counsel Mathias failed to react by objectionoor cross-examination of the witness, Stephen was not being allowed to **face** the witnesses and evidence against him. The District Court then used this hidden testimony to support upholding the conviction.

For Example: Referencing Exhibit AG , Pages 35-40 - The prosecutor told Dr. Bates Matsolonia was D.O.A. when paramedics arrived. But the records clearly show: a) Matsolonia had an irregular heart beat; b) Paramedics made multiple unsuccessful attempts at intubation where upon each attempt Matsolonia vomited; Together these illustrate that Matsolonia was clearly alive (Dead people don't have heart beats or vomit in reaction to a tube being placed in their mouth).

But the prosecutor put this false factoon the record in order to nullify Dr. Bates' finding that Matsolonia was conscious showing a reflexive response. ( T1237-T1240)

The prosecutor also lied to Dr. Bates when she told him that Stephen had moved Matsolonia prior to paramedics arrival. The prosecutor said this in order to nullify all of Dr. Bates' findings which were based upon impact body position.

But once again the evidentiary record shows - Exhibit AO, E70467BF, Page 12 - 13; that at no time did anyone see Stephen actually touching Matsolonia, (Not her clothing or her body). And Postconviction counsel failed to object or correct the record through cross examination, which left these false facts on the record.

THE POSTCONVICTION COURT ERRED BY NOT UNDERSTANDING THE SCIENCE BEHIND DR. BATES' OPINION / TESTIMONY:

Matsolonia's exact body position was Biomechanically consistent and technical. This is because her injuries are consistent with her body impact position. Matsolonia was right hand dominant and extended her right arm out to deflect the fall. This put her left arm in a lower minor position. On impact the force pushed her right arm up above her head creating grass stains on her hand, elbow hips and knees. Matsolonia leaned slightly towards her dominant side which cause the right side of her body to sustain greater injury than her left side; (Rib cage and legs). Corroborating the impact body position were indentations on the ground which were consistent with her body position.

36

Therefore had Stephen moved Matsolonia there would have been inconsistencies with: Grass stains on the clothing, injury locations and the indentations on the ground. In fact             Matsolonia did not sustain brain injury was conformation that she put    her arms up to deflect the fall. And the position she was seen in upon arrival of the paramedics was a known impact position in government funded studies on human fall analysis. (Exhibit AP ).

As Dr. Bates explained, had Matsolonia been unconscious before the fall, if pushed, forced or thrown, Matsolonia's unconscious body would have tumbled causing her arms and legs to twist or cross upon impact. So the fact that her arms and legs were parallel with one another shows tonal conscious body control. The key word being "Conscious".

The Postconviction Court erred or did not reasonably understand that the Dr. Bates opinion and testimony represented unrefuted science. There was no other contradicting Biomechanical expert or evidence about the details of the balcony fall. And respectfully Judge Wheelock of the Postconviction court was not an expert in the Biomechanics of Human Falls. Since the prosecution presented no contradicting expert, it's not       a viable option for the court to simply ignore scientific evidence on the ultimate issue in the case. This is not a reasonable interpretation of the facts in the case.

Likewise the Postconviction court did not give a reasonable interpretation of the Law: The point of Stephen's Postconviction claim was to show that a Brady violation had taken place:

* Stephen showed that the Prosecution withheld material-exculpatory evidence at trial.
* Stephen showed that the evidence withheld was material towards the ultimate issue in the case.
* Stephen showed that the evidence was impeachment evidence against Dr. Roffman's medically unreliable trial testimony.

**CLEARY A BRADY VIOLATION OCCURRED.**    (BRADY V. MARYLAND 373 U.S. 83,83 S.CT.1194, L.ED.2D 215 )

37

NOTE:

## EXHIBIT A L - E206

### TRANSCRIPT OF DR. BATES TELEPHONE CALL WITH POLICE IN 2005

It's very important to understand that there were two distinct parts to this conversation with police:

THE FIRST PART - of this conversation was Dr. Bates giving police his opinion about what happened on the fall.  i.e. - "The anatomy of the fall".

THE SECOND PART - of this conversation was a question and answer session about "what-if" scenarios.

The two parts of this call can be confirmed by both Dr. Bates (T1277,Page 11, line 1) and by Detective Kozelichki (T1236) and in a supplementary report authored by Kozelichki (T403), "At the begining of this conversation, Bates discussed the anatomy of the fall and how it relates to the investigation.  Bates then went into several different scenarios that could have occurred in reference to the death of Myers."

THEREFORE Exhibit A L  is the first part of this call where Dr. Bates tells police his Biomechanical opinion about what happened on the fall.  And we know it's his opinion because Dr. Bates says: "My opinion right now is ..."

What Dr. Bates says in his 2005 opinion is almost word for word the same as Stephen's trial testimony.  This was a BRADY VIOLATION which is why the prosecution kept the recording for 18 years, told Dr. Bates not to write anything down, why the Police failed to pay Dr. Bates fully and are now trying to conflate the two parts of this conversation in order to cover up the rather obvious Brady Violation.

** Dr. Bates answered the what-if questions posed by police but his OPINION about what actually happened is contained in his full biomechanical report (T
The gist and substance of his 2005 opinion is contained in his 2012 report given to the Postconviction Court.  DR. BATES' OPINION HAS NOT CHANGED. **

*( Currently there is a Motion to Properly Transcribe the E206  Tape Recording so that it can be referenced in the Record) * Motion filed in the District Court*

GROUND FOUR

PLAIN ERROR OCCURRED AT TRIAL IN VIOLATION OF THE 4TH, 5TH,6TH AND 14TH AMENDMENTS OF THE UNITED STATES CONSTITUTION WHEN FALSE / UNTRUSTWORTHY AND INADMISSIBLE HEARSAY WAS USED TO PROVE A METERIAL ELEMENT OF THE CRIME WITHOUT WHICH NO CONVICTION WOULD HAVE TAKEN PLACE:

* WHERE THE PROSECUTOR WAS AWARE OF THE FACTS AND CIRCUMSTANCES WHICH WOULD HAVE RENDERED THE HEARSAY INADMISSIBLE (PROSECUTORIAL MISCONDUCT)

* WHERE TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE OR ARGUE THAT THE DECLARANT OF THE HEARSAY TOLD POLICE IN PERSON THAT: "THAT'S NOT TRUE, NOTHING HAPPENED, I'M OK"

* THE POSTCONVICTION COURT ABUSED IT'S DISCRETION OR ERRED BY DENYING THE PETITIONER'S PRO SE MOTION WHICH STATED MATERIAL EXCULPATORY FACTS PREVENTING DEVELOPEMNT OF THESE FACTS AT STATE PROCEEDINGS

FACTS SURROUNDING THE INADMISSIBLE HEARSAY

In Nov. of 2000, Kenny Myers (Kenny), announced to Matsolonia that he was getting a divorce from her due to her pathological gambling problems.

Matsolonia asked Stephen to visit her from California to lend her support.

When Stephen arrived Matsolonia asked Stephen for money and Stephen told her "No".

Upset, Matsolonia attempted to pressure Stephen in to giving her money by lying to the family in order to embarrass him.

When Matsolonia told her daughter Glenda this lie, unknown to Matsolonia, Glenda called police asking them to visit Matsolonia's apartment.  When police arrived    described an incident questioning Matsolonia about it. (T794-T800)

Matsolonia told police: "That's not true, nothing happened and I'm Ok."

Police asked Matsolonia several times entering the apartment, where they saw Stephen.  Police observed no evidence of a crime.  No dishevelled hair, no cuts or bruises and most importantly Matsolonia was not upset or in shock from an alleged murderious attempt on her life.

39

Had there been any evidence of a crime, police would have been duty bound to write a report whether Matsolonia wanted them to write one or not. Instead, Police left the apartment, CODE-7, "No Report Taken". The details of their visit to the apartment are in police report #E70467DA. (T794-T800)

After they left, Matsolonia still trying to get money from Stephen spoke with Stephen's work supervisor getting him fired. Fourteen hours after this happened Kenny Myers returned to the apartment. It was during this time that Matsolonia tried to garner sympathy from a husband who was divorcing her, by lying, telling him that Stephen had done something to her. The statement Matsolonia made to Kenny Myers was the hearsay which was allowed in to the trial.

The problem with this hearsay evidence is two fold:

a) Because there were two hearsay statements by Matsolonia you cannot claim that the second hearsay statement made to Kenny Myers fits the hearsay exception as stated in Neb. Rev. Stat. §27-804; Rule 804 and Neb. Rev. Stat.§27-404; Rule 404. This is because the statement made to Kenny, is not the statement made as an excited utterance exception. The excited utterance was **THE FIRST** ---- statement Matsolonia made to police which was: --- "that's not true, nothing happened, I'm O.K."

b) Since the two hearsay statements contradict one another, one or both statements are not trustworthy.

These basic facts were conveyed to trial counsel, Direct Appeal counsel, Postconviction counsel and to the Postconviction Court. At no time did the Court allow development of these facts in State proceedings. And on Postconviction Stephen tried to take matters in to his own hands and filed a pro se motion to include this claim in to the evidentiary hearing. The Court denied including this claim. (T1013)

Had the District Court included this claim it would have seen the numerous inconsistencies in Matsolonia's statements and behavior. For example: At trial, the Prosecutor claimed that the prior bad act was a previous murderous attempt on Matsolonia's life. The Prosecutor claimed that Stephen held Matsolonia, at 200 pounds, over a 60 inch, neck high railing beating her up and trying to kill her. But when police came over immediately following the alleged event, Matsolonia showed no signs of an assault, was calm and repeatedly told police

40

that nothing happened.  Then two days later Matsolonia invited Stephen over to visit.  While family was present Matsolonia never said anything about a conflict or an assault.  And later in 2004 when Stephen was living in Switzerland, Matsolonia went out of her way to invite Stephen to visit her alone over the Holidays. This is not consistent behavior from Matsolonia if Stephen had actually assaulted her.  Reminding the court that Matsolonia was in debt over one hundred thousand dollars and gambling daily. And lying and doing things to manipulate money is consistent with Pathological Gambling Disorder (DSM-VI)

The District Court during Postconviction proceedings erred or abused it's discretion when it denied to hear this claim saying:  It failed to see how questioning the Police Officers would help ... or it failed to see how questioning them would have changed the outcome of the 404-hearing.  But this was deliberately obtuse.    - "The Court failed to ascertain the nature of the Appellant's claim"; Haines v. Kerner 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

"Moreover, there is a mandated liberal construction afforded to pro se pleadings. Meaning that if the court can reasonably read the pleadings to state a valid claim on which the Appellant could prevail, it should adjudicate the claim dispite the Appellant's failure to cite proper legal authority, his confusion with various legal theories, or his poor syntax or sentence structure or unfamiliarity with pleading requirements"; Hall v. Bellmon 935 F.2d 1106, 1110 (10th cir. 1991); Bracken v. Dormire 247 F.3d 699 (8th cir. United States District Court of Appeals).

The state Court failed to allow Petitioner to resubmit the claim. - i.e.   There was NO effective remedy to properly raise this claim, the prejudice was that the prosecutor used this false Hearsay to prove essential elements of their case: M.O.or Identity, Intent; and Absence of Mistake in Killing. PREJUDICE - without this false hearsay there would have been no conviction.

---

Where material facts were not adequately developed at the State court hearing, the petitioner is entitled , under both 28 U.S.C.§2245(d) and Townsend v. Sain 372 U.S. 293, 83 S.Ct. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), to an evidentiary hearing in Federal District Court, provided that the failure to develop the State Court record was not due to the Petitioner. The Petitioner can only raise the issue multiple times over the 14 years of Postconviction and the District Court repeatedly refused to allow development of these material facts.

41

## GROUND FIVE

AT TRIAL THE PROSECUTOR MADE THE ACCUSATION THAT IN 2004 FOLLOWING MATSOLONIA MYERS DEATH, STEPHEN FLED THE SCENE OF A MURDER; BUT WHEN THE PROSECUTOR MADE THIS ACCUSATION SHE WAS HIDING IMPEACHMENT EVIDENCE WHICH COULD HAVE SHOWN THAT IN 2004 THERE WAS NO EVIDENCE OF A CRIME: THE FAILED ARREST WARRANT; THE CSI UNIT REPORT AND PHONE RECORDING SHOWING STEPHEN WAS IN CONTACT WITH POLICE. WHERE THE PROSECUTOR'S ACT CONSTITUTE PROSECUTORIAL MISCONDUCT IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE UNITED STATES CONSTITUTION AND THE HOLDING OF BRADY V. MARYLAND 373 U.S. 83 S.CT. 1194 L.ED.2D 215 ; TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE OR RESPOND AT TRIAL - TO JURY INSTRUCTION #14

To establish a Brady violation a Petitioner must demonstrate: a) The prosecution suppressed evidence; b) The evidence was favorable or exculpatory; c) The evidence was material.

During trial the prosecutor claimed that following the autopsy of Matsolonia Myers Stephen left the Omaha area because he was fleeing the scene of a murder.

Additionally, the trial judge instructed the jury, (Instruction #14), to consider Stephen's movements following his mother's death. The evidence surrounding this issue is therefore material.

While the prosecutor made this accusation she was hiding the failed arrest warrant which failed due to lack of probable cause to believe a crime had occurred. This failed arrest warrant was given to Stephen in 2010 a year after Stephen's conviction in 2009 (T880) , Exhibit AQ ). In fact according to the prosecution there was no evidence of a crime from 2004, 2005, 2006, 2007, 2008 until 2009 - two weeks before trial when Roffman changed his opinion now stating that he believe strangulation and murder had occurred. But if this is true then how were police able to obtain an arrest warrant for manslaughter in 2008? And of course why would the prosecutor not tell the Defendant about this new evidence?

Additionally, at trial the prosecutor hid the CSI Unit report which was read at the Manslaughter hearing ( CR08-12720) , in 2008: "Non-conclusive evidence of any crime". This too was impeachment evidence to show that in 2004 there was no evidence of a crime.

42

Also:- There were numerous telephone recordings of Stephen's conversations with police. In these recordings police never asked Stephen to do anything and in fact told Stephen that they require nothing from him.

This makes these recordings Bagley impeachment evidence.to refute the accusation that Stephen was fleeing police. And these Brady violations were included in Stephen's original pro se motion for postconviction relief.

The postconviction Court abused it's discretion by:

a)  Denying to include these Brady claims in the court ordered evidentiary hearing. This left the material facts surrounding these claims inadequately developed in the State proceedings.

b)  IN --  the Court's order denying Postconviction relief, the court used these same undeveloped issues as some sort of cumulative justification to believe the unreliable testimony of Dr. Roffman.

If these undeveloped topics are going to be used against Stephen, then Stephen should have been allowed to defend himself by developing the true and actual facts surrounding these topics. The court's decision not to include these claims in the evidentiary hearing was an abridgment of the petitioner's Due Process rights to a full and fair appeal.

But this was a reoccurring theme in this case:

*  Due to ineffective assistance of counsel at trial no objections were made, no defense was proffered and there was no actual denial of facts supported by the evidence in the Record.

*  Dr. Roffman's medically unreliable, false testimony never had to stand the rigors of Neb. Rev. Stat§27-702, Rule 702. **Not included in the evidentiary hearing.**

*  The 404-Hearsay of an alleged prior bad act was not challenged for admissibility. **Not included in the evidentiary hearing.**

*  Brady Violation - Failed arrest warrant. **Not included in the evidentiary hearing.**

*  Brady Violation - CSI Unit report. **Not included in the evidentiary hearing.**

*  Brady Violation - Telephone Recordings. **Not included in the evidentiary hearing.**

*  Unauthenticated e-mails/ No confession. **Not included in the evidentiary hearing.**

*  Couch / No struggle occurred. **Not included in the evidentiary hearing.**

43

Example:

Had the postconviction court allowed Stephen to develop facts surrounding the flight issue, it would have learned:

* On Dec. 13th, 2004 Police confiscated Stephen's: Credit cards, Money and Identification, leaving him in the streets in the middle of Winter.

* On Dec. 14th, 2004 Stephen called police requesting to stay in his mother's apartemnt, police said "NO".

* Later Stephen called police, (and e-mailed police), informing them of his travel plans. In other words the timing of police seeking an arrest warrant was directly following Stephen telling them he was going to leave the area.

Since the warrant failed due to lack of probable cause to believe a crime had occurred, then there was no flight from a non-existent crime.

All incriminating facts could have been refuted had the court allowed their development.

"Where material facts were not adequately developed at state court hearing, the petitioner is entitled to an evidentiary hearing in Federal District Court".; 28 U.S.C.§2254(d); Townsend v. Sain 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770(1963).

"Where these valid claims made by petitioner has all but been abandoned by postconviction counsel in contravention of Stephen's instructions was thus fairly presented to the State Court and not defaulted"; Clemmons v. Delo 124, F.3d at 948 (8th cir.). (T358)

Since the postconviction court and appointed counsel failed to pursue adjudicating these claims, there was no remedy available to protect petitioner's rights – Pursuant to 28 U.S.C. §2254(b)(1): "An application for a Writ of Habeas Corpus may not be granted unless it appears that the applicant has exhausted state remedies or that no adequate remedies are available or effective to protect the applicant's rights" ; O'Sullivan v. Boerckel 526 U.S. 838 (1999).

GROUND SIX

**TRIAL COUNSEL WAS INEFFECTIVE THROUGHOUT THE TRIAL WHERE NOTHING WAS DONE TO PUT ON A VIABLE DEFENSE; NO INVESTIGATION, NO OBJECTIONS TO THE INADMISSIBLE EVIDENCE, (DR. ROFFMAN AND THE 404-HEARSAY); WHERE THERE WAS NO EVIDENCE THAT THE ACTIONS OF COUNSEL WERE THE PRODUCT OF REFLECTION, DISCUSSION, RESEARCH, STRATEGY OR THE ELECTION OF ONE COURSE OF ACTION AFTER ASSESSING THE VIABILITY OF OTHER CHOICES; ALL OF WHICH ALLOWED PLAIN ERROR TO STAND ON THE RECORD AS THE SOLE EVIDENCE OF AN ALLEGED MURDER**

At trial as soon as the Prosecutor ambushed the Defendant with the hidden accusation of strangulation, defense counsel should have been able to ascertain that not only was the Prosecutor committing misconduct by hiding the accusation, but the Pathologist, Dr. Roffman, was complicit in the misconduct by not filing a new autopsy report when he changed his opinion. And it's really not believable that a pathologist of 42 years would not know or understand his responsibilities in this type of situation. The only conclusion can be that both Dr. Roffman and the Prosecutor wanted to ambush the Defense with this medically unreliable testimony.

As trial counsel Knoblauch explained, the defense was suprised by Roffman's new positions. The discovery received from the State gave them no inclination that such opinions would be rendered. Opening statement was the first time defense counsel should have discovered this position, but Mr. Knoblauch could not acknowledge he was aware of what the State was asserting. Mr. Knoblauch explained that defense attorneys did not really understand the statement about strangulation when they heard it and were not sure what the Prosecutor was talking about, (E202 at 20:16-21:6;23:1-12).

After opening statement, no other opinion was explored and no attempt to contact Dr. Roffman was made, (E202 at 22:8-19;24:10-26:9).

This is consistent with being suprised and not appropriately assessing the change in circumstances. i.e. Ineffective Assistance of Counsel. It's also consistent with a deliberate effort to allow the false evidence against your client.

45

Defense counsel never raised an objection, moved for a mistrial, sought a continuance or requested a Daubert Hearing on the new evidence. Defense counsel could not explain the decision of not acting, (E202 at 20:12-21:18).

Mr. Knoblauch acknowledged that such actions should have been done in hindsight and that an expert could have been consulted, "Or have someone look at it", (E202 at 21:19-22:7).

On Postconviction the District Court's analysis appeared to proceed along the line of reasoning of what would occur if in fact counsel meant to rely on cross-examination as a choice to best advocate for your client. **But** - Defense counsel simply asking Dr. Roffman questions about intubation is not a substitute for a properly preformed Differential Diagnosis.  On Cross-examination Roffman was asked about intubation - however Roffman still had not read the Paramedics report; Roffman still did not know about the brownish-red vomit which was seen only after intubation; Roffman still had not read any of the thousands of medical texts on intubation injury nor had he consulted intubation injury experts; Roffman still had not viewed the posterior hemorrhages under magnification to see if there were linear lacerations from the intubation tube; and Roffman had not dissected the cervical vertebre to see if it was broken - which could also be responsible for the posterior hemorrhage, (See Ground Two). NONE of this could have been discovered by simple cross-examination, because it required expertise which defense counsel did not possess.

Additionally the prosecutor and her expert had just ambushed your client with the sole alleged evidence of a murder and your client insisted upon his innocence.  So why would you try to match wits with a medical expert who was being dishonest?  And later on cross examination, defense counsel had established: Roffman failed to read the paramedics report (745:8-17); Roffman did not know that Matsolonia had been intubated (745:25:746:1-6); And Roffman admitted that he was not an intubation injury expert. (Cited above). **Upon hearing this defense counsel should have immediately requested a Daubert Hearing. But Defense Counsel did nothing.**

## PREJUDICE

The Prosecutor used an expert to put Stephen in an unwinnable situation.  Junk Science and Dishonest expertise were juxtaposed against Stephen's version of events, while at the same time attacking Stephen's character and veracity.  Defense counsel failing to object shifted the burden of proof towards Stephen having to disprove the false facts layed out by the Prosecutor and her expert. The augmented opinions by the pathologist should have sent out a RED FLAG about Dr. Roffman's ability to accurately report findings. But this was not simply a matter of finding another expert to report different findings.  Yes another expert would have helped, but the real issue was that Dr. Roffman's new opinion was medically unreliable, inadmissible and the sole alleged evidence of a nonexistent murder.

To allow this medically unreliable evidence in to the trial was PLAIN ERROR caused in part by trial counsel failure to object or react to the introduction of this evidence.

THEREFORE Petitioner Stephen has met his burden under the first "Strickland" prong.  The performance of trial Counsel, (And Appellate Counsel), was deficient.  What happened was not the product of due diligence or measured consideration of available options.  Counsel was surprised and never fully recovered or ... Counsel's non-adversarial actions were deliberate allowing inadmissible incriminating evidence against your client to be placed on the Record;  (The then influencial prosecutor is now a Judge in the same district court).

Either way there was a reasonable probability that but for this deficient performance, the result of the proceeding would have been different.  Confidence in the outcome has been undermined.

Because this claim has been fairly presented, the State court's interpretation of the facts and Law surrounding the ineffective assistance of counsel claims was not reasonable - Habeas should be granted on this issue alone; Strickland v. Washington 104 S.Ct. 2051; United States v. Bagley 473 U.S. 667, 1055 S.Ct. 3375 (1985).

47

GROUND SEVEN  –  INEFFECTIVE ASSISTANCE OF COUNSEL

If someone said: "In the same light as pigs can fly, I robbed a bank",
this meaning is not to be interpreted as an admission to robbing a
bank.  Why? Because pigs cannot fly. The meaning is to sarcastically
deny robbing a bank.

The e-mail sent to police seem to be a sarcastic denial of the
criminal act in question.  The e-mail in question reads - In the
same light as my grandmother loves to fly I committed a crime.
But Stephen's grandmother hated to fly. Many people in her
generation felt the same way.  Therefore the words in the same light was
  meant to equate a false statement with a false act.

Additionally, it can be shown that during the time of many of the
e-mail Stephen was not in the country where they originated. And the
e-mail were likely sent by people who thought they were helping
Stephen communicate with police. And these e-mail clearly state that
Stephen did not send them or authorize them or edit them. When
police gave these e-mail to the prosecutor, they edited these e-mail
truncating parts off which stated that Stephen did not send the e-mail.
Doing this is altering evidence or tampering with evidence in order
to give a false impression to the jury.

Stephen made these issues known to trial counsel and to postconviction
counsel, and even made them on his original pro se Motion for
Postconviction Relief (T358).

**TRIAL COUNSEL FAILED TO ARGUE PROSECUTORIAL MISCONDUCT AND FAILED
TO REFUTE THAT A CONFESSION HAS TAKEN PLACE - THIS IS ANOTHER
EXAMPLE OF INEFFECTIVE ASSISTANCE OF COUNSEL**

## GROUND EIGHT —BRADY VIOLATION AND INEFFECTIVE ASSISTANCE OF COUNSEL

While it may seem like a trivial matter to argue that a glass table top being slid off center by 3-4 inches on one side is evidence of a murder, if the Prosecutor makes this claim and it goes unrefuted by defense counsel, then the trivial false issue remains on the record.

Once again the Brady Violations overshadowed this issue. Since the withheld Police CSI Report from 2004 concluded: "Non-conclusive evidence of any crime"; and the 2004 Nebraska Court refused to issue a warrant due to "No probable cause to believe a crime had occurred", both of these evidentiary items could have been used to refute the prosecutions accusations. Therefore, if the Prosecutor claimed that a glass table being moved 3-4 inches off center is evidence of a struggle or crime or murder - then Stephen could have presented the jury with a CSI Report concluding there was no evidence of a crime, in order to refute the accusation. The CSI Report and the Failed arrest warrant were material impeachment evidence- Clearly a Brady Violation.

But trial counsel was also Ineffective for failing to investigate or argue the following facts: After Stephen called 911 he ran to his mother's side outside behind the apartment building. He did so quickly and forgot to bring his jacket even though it was 18 degrees. When uniformed police officers arrived along with Paramedics, the uniformed officer asked Stephen if he had a jacket. Stephen's jacket was located right in the center of the livingroom where he left it. The uniformed officer went up stairs and entered the apartment. The officer removed Stephen's jacket but it's not clear if this officer removed or moved anything else in the apartment. Additionally it's also not clear how many other uniformed officers had entered the apartment prior to the arrival of Detectives. (2004)

At trial in 2009, the prosecution claimed that a pair of glasses were found right in the center of the livingroom where Stephen's jacket was located. Also - Stephen told police that Matsolonia put these glasses on a glass table by the wall near the entrance to the balcony area.

49

This is important because if the prosecutor's accusation was true, i.e. - that these glasses fell off in some sort of struggle, this suggests that Stephen did not know where these glasses were located. But in Stephen's statement to police he told police exactly where these glasses were located. So he was aware of these glasses. Therefore if the glasses were found in some other location then it was due to the movements of police in the apartment. By accident or deliberately these glasses were moved to an area right where the uniformed officer found Stephen's jacket.

The uniformed officer was never asked or interviewed about his movements.

PREJUDICE

Because trial counsel failed to investigate this issue and because the prosecutor withheld impeachment evidence, the false accusation was placed on the Record unrefuted. This allowed the Prosecutor to attribute **ANY ANOMALY** ------------ to some sort of criminal activity. This was an issue that the Postconviction court mentioned in it's order denying Postconviction relief.

Since the Petitioner tried to raise these issues in his original motion for postconviction relief (T358), these claims were fairly presented. And the failure to develop the facts surrounding this issue is due to the State refusing to adjudicate the claim.

The facts being presented demonstrate that the State court proceedings resulted in a decision to not hear the claim, was unreasonable in light of the facts presented. 28 U.S.C. §2254(d)(2). Alternatively since settled law even in Nebraska, is that: When the factual allegations if proven true would constitute constitutional infringement, an evidentiary hearing is required. The State refused an evidentiary hearing to develop these Brady Violation claims.

** State v. Dandridge 255 Neb. 364, 585 N.W.2d 433 (1998) ***

GROUND NINE - INEFFECTIVE ASSISTANCE OF COUNSEL (PATHOLOGICAL GAMBLING)

While the most important claim is the PLAIN ERROR CLAIM surrounding the Dr. Roffman trial testimony, the issue of Matsolonia's Pathological Gambling problems should have been investigated and explained in order to give the Jury the explanation why Matsolonia would have put herself at risk on December 13th, 2004. Had trial counsel investigated this issue he would have found:

The local Casinos would have reported Matsolonia's gambling losses totaling over $300,000.00, which represented her life savings spent in the casinos.

At the time of Matsolonia's death she had about $100,000.00 charged in a ponzi type scheme to obtain cash for gambling.

Matsolonia's was broke her bank account at zero, and the balance sheet showed that she was spending $1200.00 per week or more on slot machines. Since her retirement income was about $3000.00 per month, apartment was about $700.00 per month, she was slowly going in to debt.

Stephen stated to police that Matsolonia needed money from him, and at the time of his visit she had no gas in her car and no food in her house.

Additionally, Matsolonia's husband, Kenny Myers had recently divorced from her and his stated reason was her "Gambling Problems": Matsolonia would constantly need money from Kenny and manipulate him in order to get it. When she would get money to gamble, she would disappear to the casinos for days only to reappear when she was broke.

After the divorce Matsolonia had to come off of retirement and take a job which she did not enjoy, as a substitute teacher.

Had counsel investigated the issue of Pathological Gambling, he would have found that risky behavior and impulse control issue are hallmark symptoms of Pathological Gambling disorder. (DSM-VI)-(Including 1 in 4 or 1 in 5 attempting suicide)

Matsolonia had additional stress factors: Alone, broke, recent divorce, recent death of her mother and a growing debt which she   could not have paid. **ALSO** at the time of her death she was taking a drug called "Entex" with a side-effect of causing impulsive behavior.

ALL of this was the explanation that the Jury needed in order to understand why Matsolonia would have been engaging in risky beahavior on December 13th, 2004. This information giving corroboration to Stephen's trial testimony that Matsolonia was acting strange talking about lifetime regrets.

**PREJUDICE:** Not giving this explanation left Stephen's explanation without evidentiary backing. In a case where credibility was paramount.

CONCLUSION

THE PETITIONER, Stephen Mark Pullens, has raised all of these claims in State proceedings over the last 14+ years. These claims were raised in: Direct Appeal, Postconviction and in the Nebraska Supreme Court. The critical issue in all the claims has been was there ever any evidence of a crime? From 2004 when Matsolonia died until April 2008 the answer to this question has been NO. But when Stephen contacted U.S. Senator Mark Dayton and the U.S. Justice Department about the out of control Omaha Police investigation, suddenly Stephen was charged with Manslaughter. The Manslaughter charge was quickly dismissed. And for a year Stephen sat in jail awaiting a murder trial without there being evidence of a murder. At trial the prosecutor committed a Discovery Violation in order to ambush Stephen with false medically unreliable testimony from Dr. Roffman. (On Redirect).

But the prosecutor's misconduct was just starting. In order to prevent the impeachment of Roffman's inadmissible testimony, the prosecutor committed 4 Brady Violations: Hiding Dr. Bates' exonerating opinion; Hiding the Police CSI Report; Hiding the Failed Arrest Warrant from 2004; and Hiding various Telephone Recordings of conversations Stephen had with Police. Further prosecutorial misconduct took place when the prosecutor knowingly introduced inadmissible hearsay under the gize of it being trustworthy and an excited utterance. It was neither. In fact police knew that the declarant of the hearsay, Matsolonia told police in person, directly that no bad act took place. But due to suppression of this evidence the Jury never knew that Matsolonia told police, "Nothing happened".

Therefore, each and every incriminating aspect of the prosecution's case can be successfully refuted. But the only way to refute prosecutorial trial accusations is through the effective assistance of adversarial counsel. What Stephen is fighting is the false statements made by the Douglas County Pathologist. The medically negligent lie as stated in (765:18-23). But Stephen is also fighting deliberate ineffective assistance of counsel. Direct Appeal counsel failing to argue : PLAIN ERROR - DISCOVERY VIOLATIONS - BRADY VIOLATIONS. Since Stephen is not skilled in Law he was totally dependent upon honest representation. Yet no objections were made at trial, No Brief was filed on Postconviction and no Motion for Reconsideration was filed after the Court denied Postconviction Relief.

Currently there is a lawsuit against the Douglas County Corner's Office, (CI-25-3069). The issue in this lawsuit is the Medically Negligent testimony of Dr. Roffman at trial following a deficient autopsy.

52

If this court understands that the State has no interest in the "Proper Administration of Justice" in this case, then all of the numerous delays, missing evidence and aggressive timelines following ineffective counsel – makes sense. What Petitioner Stephen is fighting are the false statements made by Dr. Roffman at trial. And since trial, doctors have lined up willing to give opinions that Roffman's testimony is medically lacking and just wrong. A simple evaluation of Roffman's testimony under Rule 702 / Neb. Rev. Stat§27-702 would reveal the Plain Error at trial.

But Stephen can only make this case if he has competent adversarial counsel willing to expose the prosecutor's false statements and misconduct. Both should be evaluated in court. Because up until now there is no reason to believe that previous proceedings have been reliable or trustworthy - without adversarial counsel: Strickland v. Washington 466 U.S. 668 (1984); Chin v. Shoop U.S. 143, S.Ct. 28, 214 L.Ed.2d 229 (2022); and Cronic.

For the foregoing reasons Petitioner Stephen prays this Court will grant and issue a Writ of Habeas Corpus in this case directing the respondent to show cause why Stephen should not be released from his unlawful conviction and sentence; and to conduct such hearings as necessary to determine the issues presented in this petition; and provide counsel to assist Petitioner throughout these proceedings; and there upon hearing, grant him relief from his conviction and sentence as requested in this Petition or other relief as this Court sees fit in equity of Justice.

Respectfully Submitted,

*Stephen Pullens*
Stephen Pullens 69693
P.O. Box 22800
Lincoln, NE 68542

---

## CERTIFICATE OF SERVICE

I hereby certify that I filed foregoing motion in the United States District Court District of Nebraska send to the Clerk of said court to be served upon all parties of Record, this 26 Th day of January, 2026.

*Stephen Pullens*
Stephen Pullens 69693
P.O.Box 22800
Lincoln, NE 68542

*Julianna Kozloff*   1/26/26
NOTARY PUBLIC

General Notary - State of Nebraska
JULIANNA KOZLOFF
My Comm. Exp. Aug. 29, 2028.

1/28/2026

Dear Clerk,

Please file all the enclosed documents:

1)  Petition for Writ of Habeas Corpus under §2254.

2)  Waiver of filing fees form request.

3)  In Forma Puaperis motion with 6-month account statement, with affidavit.

4)  Motion for the Appointment of Counsel, with affidavit.

5)  Certified Service verification attached to the end of Habeas Petition.


Please verify that this has all been filed and send case number.

Thank you,

Stephen Pullens 69693
P.O. Box 22800
Lincoln, NE 68542

DOCKET SHEET                                                Page: 1

Case ID: S 24-200 State v. Stephen M Pullens          Exhibit AA

## INITIAL CASE DATA

```
Appealed:          03/14/2024
Filed:             03/15/2024
Classification:    Post Conviction Life

Trial Court:       Douglas County District Court
Trial Case ID:     178-141
Trial Judge:       Horacio Wheelock
Originating Court: Douglas County District Court

Mandated/Closed:   07/11/2025

See Also:
S 23-199       State v. Stephen M Pullens
S 22-67        State v. Stephen M Pullens
S 21-578       State v. Stephen M Pullens
S 20-303       State v. Stephen M. Pullens
S 19-805       State ex rel. Pullens v. Schatz
S 19-774       State v. Stephen M. Pullens
S 09-588       State v. Stephen M. Pullens
S 25-184       State v. Stephen M Pullens
S 24-214       State v. Stephen M Pullens
```

## ATTORNEYS/PARTIES

```
*****************************************************************************
Melissa R Vincent             23464 1) Appellee/Plaintiff
ATTORNEY GENERAL                    State of Nebraska
2115 State Capitol
PO Box 98920
Lincoln, NE 68509-8920
(402)471-3833


*****************************************************************************
Self-Represented Litigant           2) Appellant/Defendant
Stephen M Pullens #69693            Stephen M Pullens #69693
Reception & Treatment Center
PO Box 22800
Lincoln, NE 68542-2800


*****************************************************************************
   eNotice Emails
   Melissa R Vincent  23464
       melissa.vincent@nebraska.gov
```

## BRIEF INFORMATION

|  |  | Party # | Pages |
|---|---|---|---|
| 01/23/2025 | WITHDRAWN Brief of Appellant Pullens | 2 | |
| 03/24/2025 | Brief of Appellant Pullens (STRICKEN) | 2 | 090 |
| 04/15/2025 | Replacement Brief of Appt(Stricken) | 2 | |
| | 04/18/2025 Disposition | | |
| | Replacement brief of Appellant filed April 15, 2025, ordered stricken | | |

Case ID: S 24-200 State v. Stephen M Pullens

---

BRIEF INFORMATION - Continued
_____

for failure to comply with Neb. Ct. R. App. P. § 2-103.

EXTENSIONS OF BRIEF DUE DATES
_____

05/01/2024 APPT Default Notice
    05/01/2024 Default Notice provided via eNotice
05/08/2024 Motion Appt Extend Brief Date & Consol
        05/31/2024 Disposition
          Motion of Appellant to consolidate and to extend brief date
          sustained; cases S-24-0200 and S-24-0214 are consolidated for
          briefing and disposition. Appellant's brief date extended to
          July 1, 2024.
06/28/2024 Motion Appellant to Extend Brief Date
        07/03/2024 Disposition
          Pursuant to Neb. Ct. R. App. P. § 2-106(E)(3), Appellant's FINAL brief
          date extended to July 31, 2024.
07/31/2024 Motion of Appellant to Extend Brief Date
        08/02/2024 Disposition
          Motion considered; Appellant's FINAL brief date extended to August 15,
          2024.  No further extensions will be granted unless supported by
          exceptional cause.
08/15/2024 Motion Appellant to Extend Brief Date
        08/16/2024 Disposition
          Motion considered; Appellant's FINAL brief date extended to September
          16, 2024.  No further extensions will be granted unless supported by
          exceptional cause.
09/16/2024 Motion Appellant to Extend Brief Date
        09/19/2024 Disposition
          Motion of Appellant for brief date extension sustained; brief date
          extended to September 23, 2024. No further extension will be granted
          unless supported by exceptional cause.
10/25/2024 Motion Appellant to Extend Brief Date
        10/28/2024 Disposition
          Second or subsequent motion to extend brief date considered. By order
          of the Court, Appellant's FINAL brief date extended to December 24,
          2024.
12/23/2024 Motion of Appellant to Extend Brief Date
        12/31/2024 Disposition
          By order of the Court, Appellant's motion to extend brief date
          sustained. Appellant's FINAL brief date extended to January 23, 2025.
03/06/2025 Motion Appt Extend Brf, New Counsel etc.
    03/14/2025 Objection Appe to Appt's Mot to Continue
        03/14/2025 Disposition
          Motion of Appellant for substitute counsel overruled. Supplemental
          record shows that Appellant had choice of retaining previously
          appointed counsel or representing himself, and chose to represent
          himself. Appellant's motion for continuance also overruled.
03/13/2025 Motion Appellant to Extend Brief Date
        03/14/2025 Disposition
          Eighth motion of Appellant to extend brief date overruled. Clerk's
          office to issue default notice accordingly.
03/17/2025 APPT Default Notice

EXHIBIT AA

Case ID: S 24-200 State v. Stephen M Pullens

EXTENSIONS OF BRIEF DUE DATES - Continued

03/24/2025 Certified Mail Proof of Service
03/24/2025 Appt Acknowledgement - Notice of Default
03/27/2025 Appellant's Replacement Brief Due
      03/27/2025 Disposition
        Appellant's brief does not comply with Neb. Ct. R. §§ 2-103 and 2-109
        regarding number of pages and attachments. Attachments to Appellant's
        brief filed on March 24, 2025, are stricken. Appellant's replacement
        brief complying with the above-referenced rules is due on or before
        April 11, 2025. (Corrected Entry)

PETITIONS TO BYPASS

COURT RECORD

| Date | Description | Volume |
|---|---|---|
| 03/27/2024 | Transcript Pages 1-10 | Volume 1 |
| 03/27/2024 | Transcript acceptance letter | |
| 03/28/2024 | Supplemental Transcript Pages 1-556 | Volume 1 |
| 03/28/2024 | Transcript acceptance letter | |
| 04/02/2024 | 2nd Supplemental Transcript Pgs 1-4 | Volume 1 |
| 04/02/2024 | Transcript acceptance letter | |
| 10/16/2024 | 3rd Supplemental Transcript Pgs 1-22 | Volume 1 |
| 02/19/2025 | 4th Supplemental Transcript Pgs 1-11 | Volume 1 |
| 02/19/2025 | Transcript acceptance letter | |

---

| Date | Description | Volume |
|---|---|---|
| 05/09/2024 | Electronic BOE Volume 1 (P 1-72) | |
| 05/09/2024 | Acceptance Letter to Trial Court | |
| 05/09/2024 | Electronic BOE Volume 2 Exhibits 201-205 | |
| 05/09/2024 | Electronic Notice of Media Exhibit | |
| 11/08/2024 | B/E Exhibits 2-3,8,33,37,44,47,50-51,53+ | Volume 6 |
| 11/08/2024 | B/E Exhibits 142-150,152-168,170-173+ | Volume 7 |
| 11/08/2024 | B/E Test (P 1-250) | Volume 1 |
| 11/08/2024 | B/E Test (P 251-500) | Volume 2 |
| 11/08/2024 | B/E Test (P 751-1000) | Volume 4 |
| 11/08/2024 | B/E Test (P 501-750) | Volume 3 |
| 11/08/2024 | B/E Test (P 1001-1131) | Volume 5 |
| 02/28/2025 | Supplemental BOE Volume 4 (P 1-49) | |
| 02/28/2025 | Acceptance Letter to Trial Court | |

---

05/10/2024 Certification of Ct Rptr re 2009 BOE
    05/10/2024 Acceptance Letter to Trial Court

---

08/06/2025 Receipt of CDC for returned record

B/E EXTENSIONS

MISCELLANEOUS ENTRIES

03/15/2024 Documents from Previous Declines
    02/09/2022 Letter
    03/28/2022 Decline Letter

Case ID: S 24-200 State v. Stephen M Pullens    Exhibit AA

MISCELLANEOUS ENTRIES - Continued
_____

03/14/2023 Letter
03/28/2022 Clerks Certificate on Appeal
03/28/2022 Notice of Appeal
03/15/2024 Motion Appellant Leave to File BOE
       03/22/2024 Disposition
         Appellant's motion for leave to file Request for Bill of Exceptions
         out of time is sustained.
03/15/2024 Notice of Appeal
       03/15/2024 Acceptance Letter to the Trial Court
       03/15/2024 Clerks Certificate on Appeal
03/15/2024 New Case Letters
09/23/2024 Motion to W/D Mathias for Appt & Ext Brf
       09/27/2024 Disposition
         Motion sustained; attorney Renee L. Mathias allowed to withdraw as
         counsel for Appellant. Appellant's brief date extended to October 23,
         2024. No further extensions will be granted unless supported by
         exceptional cause.
10/11/2024 By order of the Court re Appoint Counsel
       10/11/2024 Disposition
         This court has reviewed the order of the district court for Douglas
         County dated October 10, 2024, denying Appellant's motion for
         appointment of new appellate counsel. As a motion to withdraw as
         Appellant's counsel filed by attorney Renee L. Mathias was previously
         sustained by this court on September 27, 2024, the district court
         shall reconsider Appellant's motion for appointment of new appellate
         counsel.
10/16/2024 Entry of Appearance Kortus
10/16/2024 Status Letter to Appointed Counsel
01/17/2025 Motion to Digitize Document (BOE)
       01/27/2025 Disposition
         Appellant's Motion to Digitize overruled. Bound volumes of bill of
         exceptions filed in S-24-0200 and S-24-0214 deemed official record of
         trial court for purposes of appeal. Appellate rules for preparation of
         electronic bill of exceptions only apply to requests for preparation
         of the bill of exceptions filed on or after January 1, 2022. See Neb.
         Ct. R. App. P. § 2-105.01(G).
01/23/2025 Mot Appellant Word Count Expansion
       01/27/2025 Disposition
         Appellant's motion to expand word count sustained in part, and
         combined total word count expanded to 18,000 for Appellant's brief and
         reply brief.
01/30/2025 Motion of Appt Time to File Pro Se Brief
    01/31/2025 Supplementary Information
    01/31/2025 Ltr - No Certificate of Compliance
    02/03/2025 Ltr - re Certificate of Service
       02/05/2025 Disposition
         Appellant Pullens' pro se motion seeking leave to file pro se brief,
         and related pro se motion asking the court to strike Brief of
         Appellant filed by appointed counsel on 1-23-25, are denied without
         prejudice. See Neb. Ct. R. App. P. § 2-101(F)(6).
02/05/2025 Entry of Appearance Vincent For State
02/05/2025 Motion Appt Withdraw Counsel/Strike Brf

Case ID: S 24-200 State v. Stephen M Pullens

MISCELLANEOUS ENTRIES - Continued

02/05/2025 Ltr - re Certificate of Service
02/12/2025 Appellant Certificate of Service
    02/28/2025 Disposition
      Motion of Appellant for substitute counsel, overruled. Supplemental
      record shows that Appellant had choice of retaining previously
      appointed counsel or representing himself, and chose to represent
      himself. Motion of Appellant to strike brief overruled as moot.
02/06/2025 Motion of Appellant Counsel to Withdraw
    02/21/2025 Disposition
      Motion of Appellant counsel to withdraw, supported by Appellant's
      waiver of counsel and election to proceed pro se on appeal, sustained.
02/07/2025 By order of Court re: Appellant Motions
    02/07/2025 Disposition
      Motions of Appellant counsel to withdraw and Appellant to waive
      counsel and represent himself, assigned to district court in aid of
      appellate jurisdiction for hearing, disposition, and certification of
      proceedings and dispositions to this court, including supplemental
      transcript and supplemental bill of exceptions. Motion of Appellant
      to strike brief of Appellant's counsel and permit pro-se brief held in
      abeyance pending filing of supplemental transcript and supplemental
      bill of exceptions. Except as so assigned or held in abeyance, motions
      of Appellant pro-se are overruled.
02/21/2025 Mot Appt Withdraw/Strike/Extend Appt Brf
    02/21/2025 Ltr - re Certificate of Service
    02/28/2025 Proof of Service
    02/21/2025 Disposition
      Motion of Appellant pro se to withdraw brief and submit new brief
      sustained; brief of Appellant due by March 14, 2025; brief date of
      Appellee extended to April 15, 2025.
02/24/2025 Motion to Replace/Appoint Counsel
    02/28/2025 Disposition
      Motion of appellant for substitute counsel, overruled. Supplemental
      record shows that appellant had choice of retaining previously
      appointed counsel or representing himself, and chose to represent
      himself.
02/27/2025 2nd Motion to Replace/Appoint Counsel
    02/28/2025 Disposition
      Motion of appellant for substitute counsel, overruled. Supplemental
      record shows that appellant had choice of retaining previously
      appointed counsel or representing himself, and chose to represent
      himself.
03/17/2025 Motion to Appeal Withdrawal of Counsel
    03/18/2025 Appe Resp W/D of Counsel & Self Rep
    03/17/2025 Disposition
      Motion of Appellant for substitute counsel overruled. Supplemental
      record shows that Appellant had choice of retaining previously
      appointed counsel or representing himself, and chose to represent
      himself. Appellant's motion for continuance also overruled.
      Appellant's motion dated March 12, 2025, for appointment of
      replacement counsel or resubmission of brief is overruled.
03/17/2025 Motion to Appeal Withdrawal of Counsel
    03/17/2025 Disposition

Case ID: S 24-200 State v. Stephen M Pullens   DOCKET SHEET   Exhibit AA

### MISCELLANEOUS ENTRIES - Continued

Court's order dated March 17, 2025, sent in error. Appellant's motion to appeal withdrawal of counsel and motion to replace counsel remain under submission to the court.

03/24/2025 Motion Apppt Requesting Copies of Brief
    03/27/2025 Disposition
    Appellant's motion for the Nebraska Supreme Court to provide copies of Appellant's brief to all parties and to waive service is overruled.

04/08/2025 Motion of Appellant for Clarification
    04/08/2025 Ltr - re Certificate of Service
    04/14/2025 Disposition
    Appellant's motion to correct and augment the record is overruled.

04/29/2025 Mot Appt Reconsideration Strike Brief
    05/19/2025 Disposition
    Motion of Appellant for reconsideration overruled.

05/05/2025 Mot of Appellant for Various Relief
    05/19/2025 Disposition
    Motion of Appellant for various relief overruled as moot.

05/09/2025 Mot Further Review and to Unconsolidate
    05/19/2025 Disposition
    Motion of Appellant to sever the appeals overruled as moot.

05/19/2025 Mot Appt to Accept Stricken Brief
    05/19/2025 Disposition
    Motion of Appellant to accept stricken brief overruled as moot.

07/22/2025 Misc Submission to Court re Jurisdiction

### SUBMISSION AND DISPOSITION OF APPEAL - Court of Appeals


### SUBMISSION AND DISPOSITION OF APPEAL - Supreme Court

04/14/2025 Mot. of Appellee for Summary Dismissal
    05/05/2025 Response Appellant to Summary Dismissal
      Funke, Miller-Lerman, Cassel, Stacy, Papik
        05/19/2025 Disposition
        Motion of Appellee for summary dismissal sustained.  See Neb. Ct. R. App. P., § 2-107(B)(1).

Mandated/Closed: 07/11/2025
Costs taxed to: Appellant
        Mandate

05/30/2025 Motion of Appellant for Rehearing
    06/03/2025 Appe Response to Appt Mot. for Rehearing
    06/27/2025 Response Appt to Appe Response
      Funke, Miller-Lerman, Cassel, Stacy, Papik, Bergevin
        07/03/2025 Disposition
        Motion of Appellant for rehearing overruled.

DOCKET SHEET    Page.

Case ID: S 24-214 State v. Stephen M Pullens    Exhibit AA

MISCELLANEOUS ENTRIES - Continued

of the bill of exceptions filed on or after January 1, 2022. See Neb. Ct. R. App. P. § 2-105.01(G).

01/23/2025 Mot Appellant Word Count Expansion
    01/27/2025 Disposition
      Appellant's motion to expand word count sustained in part, and combined total word count expanded to 18,000 for Appellant's brief and reply brief.

01/30/2025 Motion of Appt Time to File Pro Se Brief
    01/31/2025 Supplementary Information
    02/05/2025 Disposition
      Appellant Pullens' pro se motion seeking leave to file pro se brief, and related pro se motion asking the court to strike Brief of Appellant filed by appointed counsel on 1-23-25, are denied without prejudice. See Neb. Ct. R. App. P. § 2-101(F)(6).

02/05/2025 Entry of Appearance Vincent For State

02/05/2025 Motion Appt Withdraw Counsel/Strike Brf
    02/05/2025 Ltr - re Certificate of Service
    02/12/2025 Appellant Certificate of Service
    02/28/2025 Disposition
      Motion of Appellant for substitute counsel, overruled. Supplemental record shows that Appellant had choice of retaining previously appointed counsel or representing himself, and chose to represent himself. Motion of Appellant to strike brief overruled as moot.

02/06/2025 Motion of Appellant Counsel to Withdraw
    02/21/2025 Disposition
      Motion of Appellant counsel to withdraw, supported by Appellant's waiver of counsel and election to proceed pro se on appeal, sustained.

02/07/2025 By order of Court re: Appellant Motions
    02/07/2025 Disposition
      Motions of Appellant counsel to withdraw and Appellant to waive counsel and represent himself, assigned to district court in aid of appellate jurisdiction for hearing, disposition, and certification of proceedings and dispositions to this court, including supplemental transcript and supplemental bill of exceptions. Motion of Appellant to strike brief of Appellant's counsel and permit pro-se brief held in abeyance pending filing of supplemental transcript and supplemental bill of exceptions. Except as so assigned or held in abeyance, motions of Appellant pro-se are overruled.

02/21/2025 Mot Appt Withdraw/Strike/Extend Appt Brf
    02/21/2025 Ltr - re Certificate of Service
    02/28/2025 Proof of Service
    02/21/2025 Disposition
      Motion of Appellant pro se to withdraw brief and submit new brief sustained; brief of Appellant due by March 14, 2025; brief date of Appellee extended to April 15, 2025.

02/24/2025 Motion to Replace/Appoint Counsel
    02/28/2025 Disposition
      Motion of appellant for substitute counsel, overruled. Supplemental record shows that appellant had choice of retaining previously appointed counsel or representing himself, and chose to represent himself.

02/27/2025 2nd Motion to Replace/Appoint Counsel

Exhibit AA

Case ID: S 24-214 State v. Stephen M Pullens

---

MISCELLANEOUS ENTRIES - Continued
_____

02/28/2025 Proof of Service
      02/28/2025 Disposition
         Motion of appellant for substitute counsel, overruled. Supplemental record shows that appellant had choice of retaining previously appointed counsel or representing himself, and chose to represent himself.
03/17/2025 Motion to Appeal Withdrawal of Counsel
    03/18/2025 Appe Resp W/D of Counsel & Self Rep
      03/17/2025 Disposition
         Motion of Appellant for substitute counsel overruled. Supplemental record shows that Appellant had choice of retaining previously appointed counsel or representing himself, and chose to represent himself. Appellant's motion for continuance also overruled. Appellant's motion dated March 12, 2025, for appointment of replacement counsel or resubmission of brief is overruled.
03/17/2025 Motion to Appeal Withdrawal of Counsel
      03/17/2025 Disposition
         Court's order dated March 17, 2025, sent in error. Appellant's motion to appeal withdrawal of counsel and motion to replace counsel remain under submission to the court.
03/24/2025 Motion Apppt Requesting Copies of Brief
      03/27/2025 Disposition
         Appellant's motion for the Nebraska Supreme Court to provide copies of appellant's brief to all parties and to waive service is overruled.
04/08/2025 Motion of Appellant for Clarification
      04/14/2025 Disposition
         Appellant's motion to correct and augment the record is overruled.
04/14/2025 Motion Appellee to Dismiss Appeal
04/29/2025 Mot Appt Reconsideration Strike Brief
      05/19/2025 Disposition
         Motion of Appellant for reconsideration overruled.
05/05/2025 Mot of Appellant for Various Relief
      05/19/2025 Disposition
         Motion of Appellant for various relief overruled as moot.
05/09/2025 Mot Further Review and to Unconsolidate
      05/19/2025 Disposition
         Motion of Appellant to sever the appeals overruled as moot.
05/19/2025 Mot Appt to Accept Stricken Brief
      05/19/2025 Disposition
         Motion of Appellant to accept stricken brief overruled as moot.
07/22/2025 Misc Submission to Court re Jurisdiction
07/28/2025 Poverty Statement Paid

---

SUBMISSION AND DISPOSITION OF APPEAL - Court of Appeals
_____


SUBMISSION AND DISPOSITION OF APPEAL - Supreme Court
_____

04/14/2025 Mot. of Appellee for Summary Dismissal
    05/05/2025 Response Appellant to Summary Dismissal
      Funke, Miller-Lerman, Cassel, Stacy, Papik
        05/19/2025 Disposition

Case ID: S 24-214 State v. Stephen M Pullens    Exhibit AA

SUBMISSION AND DISPOSITION OF APPEAL - Supreme Court - Continued

    Motion of Appellee for summary dismissal sustained.  See Neb. Ct.
    R. App. P. § 2-107(B)(1)0.
  Mandated/Closed: 07/11/2025
  Costs taxed to: Appellant
      Mandate
      Poverty Statement
05/30/2025 Motion of Appellant for Rehearing
  06/03/2025 Appe Response to Appt Mot. for Rehearing
  06/27/2025 Response Appt to Appe Response
    Funke, Miller-Lerman, Cassel, Stacy, Papik, Bergevin
      07/03/2025 Disposition
    Motion of Appellant for rehearing overruled.

EXHIBIT AB



# Cina & Cina Forensic Consulting, P.C.

4883 Valley Oak Drive
Loveland, Colorado 80538
Autopsyreview.net

## RECORDS REVIEWED

In forming my opinions, I have had the opportunity to review the following material:

1. A transcript of the testimony of Dr. Blaine Roffman;
2. An expert opinion dated May 7, 2013, from Dr. Mattias Okoye;
3. A report from Dr. Barry Bates of HPW Biomechanics;
4. The autopsy report and toxicology results on Matsolonia Myers (ME 04-496);
5. Reports from the Omaha Police Department; and,
6. A Prehospital Care Report from the Omaha Fire Department dated December 13, 2004.

## EXPERT OPINIONS

1. The cause of death of Matsolonia Myers was Multiple Blunt Force Injuries due to a Fall from a Height. Internal injuries included multiple rib fractures, massive internal bleeding, lacerations of the heart and liver, and hemorrhage around the pancreas and adrenal glands.
2. The autopsy also documented superficial abrasions (scrapes and/or scratches) to the lower lip and right side of the chin. These types of injuries are often seen following falls from a height though other mechanisms may cause similar injuries.
3. The autopsy documented fractures of the right femur and right tibia. These injuries are often seen when someone falling from a height land on one leg. This suggests that Ms. Myers may have been attempting to land on her feet and, therefore, would be conscious at the time of the fall.
4. The autopsy report does not include a diagnosis of strangulation. Conspicuously absent in the autopsy report are the hallmark findings associated with manual strangulation which include ocular and facial petechiae; bruises and/or abrasions on the anterior neck; fractures of the hyoid bone and/or larynx (more common in older victims, particularly those with osteoporosis); and bruising of the strap muscles of the anterior neck. In my experience, several of these findings are found in the majority of cases of manual strangulation.
5. The autopsy report describes hemorrhage along the right side of the trachea and larynx. This finding is not specific for strangulation and may be seen following attempted endotracheal intubation. Intubation was attempted in this case and can explain this finding.
6. The autopsy report described hemorrhage on the posterior aspect of the trachea and larynx. This finding is not specific for strangulation. In fact, this finding cannot be used to establish evidence of strangulation in the absence of any injuries to the structures anterior to the vertebral column (e.g. strap muscles of neck, larynx, hyoid bone).
7. Hemorrhage into the posterior aspect of the trachea and larynx, along the vertebral column, may be seen with fractures and subluxations of the cervical spinal column. This type of injury is column in falls from a height. If a cervical spinal injury is possible, a posterior neck dissection with examination of the cervical vertebrae and their ligaments is required to confirm or refute this diagnosis. This dissection does not appear to have been performed in this case. Inspection of the foramen magnum is not sufficient to rule out a cervical spinal injury.

Exhibit AB



# Cina & Cina Forensic Consulting, P.C.

**4883 Valley Oak Drive
Loveland, Colorado 80538
Autopsyreview.net**

## SUMMARY

All of the injuries noted in the autopsy report can be explained by a fall from a height. There are insufficient anatomic findings documented at autopsy to establish a diagnosis of strangulation. Further, the autopsy report does not mention strangulation as a contributory condition to death in this case.

Respectfully submitted,

Stephen J. Cina, MD, FCAP, D-ABMDI

EXHIBIT AB



# Cina & Cina Forensic
# Consulting, P.C.

4883 Valley Oak Drive
Loveland, Colorado 80538
Autopsyreview.net

December 10. 2016

Renee L. Mathias
Schaeffer & Shapiro, LLP
1001 Farnam Street, Third Floor
Omaha, NE 68102-1817

Re: State v. Stephen Pullens

Dear Ms. Mathias:

I am writing to express my expert opinions on this case. All statements contained herein are made to within a reasonable degree of medical certainty and are supported by the medical literature and my experience.

## EXPERT CREDENTIALS

I received my B.A. degree in Natural Sciences in 1988 from The Johns Hopkins University and my M.D. degree from Vanderbilt University School of Medicine in 1992. I completed three years of residency training in Anatomic Pathology at the Medical University of South Carolina followed by one year of fellowship training as a Senior Clinical Fellow in Surgical Pathology at the Johns Hopkins Hospital and a one year fellowship in Forensic Pathology at the Office of the Chief Medical Examiner, State of Maryland. The latter fellowship included several weeks of training in forensic toxicology. In August 1997, I was dual Board-certified in both Anatomic and Forensic Pathology.

I served four years as a Regional Medical Examiner for the Armed Forces while on active duty in the Air Force earning a Meritorious Service Medal in 2001. From 2001 to 2006 I was a partner in a pathology group based out of McKee Medical Center in Colorado while also serving as a Deputy Coroner, Coroner, and Forensic Consultant for Northern Colorado and 80% of Wyoming. Between January 2007 and May 2011, I was the Deputy Chief Medical Examiner in Broward County (Fort Lauderdale), Florida. For the next seventeen months, I was an Associate Medical Director then Chief Administrative Officer of the University of Miami Tissue Bank.

In September 2012, I became Chief Medical Examiner of Cook County, Illinois until I moved to Colorado in June 2016. I am a past President of the Florida Association of Medical Examiners; Vice President of the National Association of Medical Examiners (NAME); past Chair of the College of American Pathologists' Forensic Pathology Committee; past editor of the forensic section of eMedicine; and have served five terms on the Board of Directors of NAME. I have held clinical Professorships at four medical schools and I am currently serving on the Board of Directors of the International Association of Coroners and Medical Examiners. I have performed over 6500 autopsies; been qualified as an expert in Forensic Pathology over 250 times; lectured extensively on forensic topics; and have authored over 100 publications. I currently serve as a Forensic Pathology consultant in Northern Colorado.

DEPOSITION
EXHIBIT TMN
AB
Cina 10-2-17

PENGAD 800-631-6989

Exhibit AC

OMAHA **ORIGINAL** DEPARTMENT
SUPPLEMENTARY REPORT                    Page 5 of 9

|  |  | RB# | E70467 BP |
|--|--|-----|-----------|

| OFFENSE: | VICTIM: | ADDRESS: |
|----------|---------|----------|
| HOMICIDE | MYERS, MATSOLONIA A. | 711 N. 92ND CRT. #405 OMAHA, NEBRASKA |

| ORIGINAL REPORT: | THIS REPORT: |
|------------------|--------------|
| 13 DEC. 04  1755 HRS. | THU. 27 OCT. 05  0600 HRS. |

| TYPED BY: | REPORTING OFFICERS: |
|-----------|---------------------|
| MORENO, K. C780 | TODD KOZELICHKI #1519 |

**PHONE CONVERSATION WITH BARRY BATES FROM THE HUMAN PERFORMANCE AND WELLNESS INCORPORATED LOCATED IN EUGENE, OREGON:**

As noted within supplementary report 70467-E (BK), Reporting Officer made phone contact and sent some investigating materials to Barry BATES, who is a senior scientist for Human Performance and Wellness Incorporated located in Eugene, Oregon. Reporting Officer had learned during this investigation that BATES was a bio mechanist and that he researched falls. Reporting Officer sent several materials relating to this investigation to BATES in order to gain his thoughts about the way Matsolonia MYERS fell from her balcony on the night of her death.

Reporting Officer also had email contact with BATES in October 2005 in order to set up a meeting with him to learn some of his findings relating to the research he conducted on this case. A conference call was set up with BATES on 21 October 2005 at approximately 1400 hrs. within the conference room at the Omaha Police Department's Homicide Unit. The individuals who met for this conference call included Sergeant Bill JADLOWSKI, Lieutenant Alexis HAYES, and Douglas County Attorney Leigh Ann RETLESDORF, along with Reporting Officer KOZELICHKI and Barry BATES. At the beginning of this conversation, BATES discussed the anatomy of a fall ← and how it relates to this investigation. BATES then went into several different scenarios that could have occurred in reference to the death of Matsolonia MYERS. BATES advised that he could provide a written report ← in reference to his findings, and stated that he would be willing to testify on the findings that he had relating to the research that he conducted for this case. BATES was advised that he would be contacted at a later time in order to complete a report, if it were needed for this investigation. For complete details in reference to the research that BATES conducted, refer to any reports that BATES completed for either the Omaha Police Homicide Unit or the Douglas County Attorneys Office. The phone conversation with BATES ended on 21 October 2005 at approximately 1445 hrs. This ended Reporting Officer KOZELICHKI'S participation with this part of the investigation on 21 October 2005.

18 years later tape given to Stephen

**PHONE CONTACT WITH BOB LUEBBE OF LINOMA LOGIC:**

On 26 October 2005 at approximately 1155 hrs., Bob LUEBBE of Linoma Logic contacted Reporting Officer by phone. At the beginning of the

Exhibit AD

**NPW Biomechanics**
*702.450.4838; Fax 702.450.2447*
*hpw@mail.com*
*www.hpwbiomechanics.com*

May 20, 2010

**TO:**      Stephen Pullens
            Inmate # 69693

**FROM:**    Barry T. Bates, B.S.E., Ph.D.

As I Indicated in my previous correspondence your ideas on what happened in your mother's accident are similar to mine. I believe we agree for the most part on the major issues although we might differ slightly on some of the details.

There was no written correspondence in the form of reports or observations on my findings. Everything was verbal at the request of the police department and the notes of the various conversations were discarded. I have some notes that document conference calls with the police department on 10/18/05 and 10/21/05 but they do not contain any detailed information. Unfortunately when a case closes for me I typically discard most of the documents. All that remains in my file are a few notes and references to individuals. Most of my correspondents was with officer Michael Kozelichki. At some point I was notified that I would not be called to testify but I was not given any reasons. I can only assume it was because my testimony would not have supported the prosecution's case.

If the need arises I am willing to prepare a written report of my opinions. If you need any additional information feel free to contact me.

Please acknowledge receipt of this correspondence.

Page 1: B.T. Bates

TELEPHONIC DEPOSITION OF BARRY BATES, B.S.E., Ph.D.    AUGUST 21, 2018

STATE vs PULLENS

**17**

anything else, any other work for you, and we'll just leave it there, and I said, fine, I'll do that.

And then there was probably --

Q. Hey, Dr. Bates, I'm going to cut you off right there. Were you instructed why -- or were you ever told why they were not going to use your services anymore?

A. Not that I recall, other than they didn't think I, you know, was providing them with the information they wanted, but there was no detail. It wasn't like, we think you're wrong, and we don't want you anymore. It was just like, we don't think you can help us anymore, thank you. It was very curt.

Q. And was that on the phone --

A. Kind of surprising.

Q. Dr. Bates, it's really important that we try not to talk over each other.

A. I understand.

Q. Okay. Was that conversation via E-mail or via telephone?

A. It was via telephone.

Q. And do you remember which law enforcement officer it was with?

A. No.

Q. And why did you -- you mentioned that you were surprised by this conversation. Why were you

**18**

surprised?

MS. BENSON: Objection, relevance. Go ahead.

Q. (BY MS. MATHIAS) And you can answer.

A. Basically, because I thought there was plenty -- there was some analyses that could and should have been done.

Q. And what are those?

A. Looking into more detail, but they didn't think so.

Q. Okay. And what specific analysis did you want to complete?

MS. BENSON: Objection, relevance. Go ahead.

A. I would have continued on the way I eventually did to do my report.

Q. (BY MS. MATHIAS) And did you discuss the request to continue and do a full analysis with law enforcement?

MS. BENSON: Objection, relevance.

Q. (BY MS. MATHIAS) You can answer.

A. I don't think so. I don't recall having that conversation. I just recall, kind of, the curt thing, we don't really want you to do any more, send us a bill.

Q. And --

A. And I guess -- I'm sorry, excuse me, let me finish, and I guess that was just the result of the various

**19**

interactions we had along the way, I don't know.

Q. And is it a fair statement to say that you were disagreeing with a lot of what law enforcement was presenting as their theory of the case?

A. I really don't know. I can't recall. Obviously, we agreed and disagreed. We never even got into enough detail for me to make that decision.

Q. Were you --

A. The only real dispute -- or not dispute -- difference we seemed to have -- well, the main difference we seemed to have was the relevance of the E-mails -- or differences, was the relevance of the E-mails and the forward versus backward fall. That's all I can recall.

Q. Dr. Bates, were you asked to do a report on this, on your findings?

A. At this time?

Q. No, when -- I'm just, right now, focusing on October of 2005. When you concluded your work with Omaha Police, did they ask you to do a report?

A. They did not want a report.

Q. Did you have any conversations about drafting or not drafting a report?

A. No, just a conversation that they didn't want one.

Q. So they, specifically, told you that they did not want a report?

**20**

A. That's my recollection, yes.

Q. Dr. Bates, were you paid for --

A. Basically -- I'm sorry.

Q. Dr. Bates, were you paid for your work on this case by --

A. I was paid for some of my work. We had a difference of opinion. I sent a bill, and I was told the bill was excessive; they didn't have that much money, and they wouldn't pay that bill. Would I consider reducing the bill? And after some thought, I said, yes, I'll reduce it. I'll give you a government courtesy discount of 25 percent.

Q. And then were you eventually paid your reduced rate?

A. Yes.

Q. Dr. Bates, did you eventually -- were you contacted by a Patrick Dunn?

A. Yes, eventually.

Q. And did you eventually do a full analysis of the cause of death or fall of Ms. Meyers?

A. Yes.

Q. And when was that?

A. Well, the report was completed on the 3rd of June, 2013. The work on the report, I assume it's ongoing. Once Stephen contacted me, and we started exchanging ideas, I started -- I told him that I

5 of 20 sheets          MATHESON-TAULBORG COURT REPORTERS



MATTHIAS I. OKOYE, MD.,J.D.
DIRECTOR

6940 VAN DORN STREET
SUITE 105
LINCOLN, NEBRASKA 68506
(402) 486-3447
FAX (402) 486-3477

## NEBRASKA INSTITUTE OF FORENSIC SCIENCES, INC.

May 7, 2013

W. Patrick Dunn, Esquire
Dunn & Stockman
Attorneys-At-Law
1411 Harney Street, Suite 200
Omaha, Nebraska  68102

**RE: State of Nebraska V Stephen M. Pullens**
**Case No: CR10-9070333**
**IN REF: ME-04-496 – (Our REF: MLC13-00007)**

Dear Mr. Dunn:

I have had ample opportunity to review the documents and records you submitted to me for review.

### DOCUMENTS AND RECORDS REVIEWED:

1.  Copy of Autopsy Report of Myers, Matsolonia (deceased), ME-04-496, dated 12-14-2004 and authored by Dr. Blaine Y. Roffman, M.D.;

2.  Copy of Forensic Toxicology Report, dated 12-27-2004;

3.  Copies of Autopsy Photos – Exhibits 145, 144, 146, 142, & 143;

4.  Copy of Omaha Fire Department Report, dated 12-13-2004, Exhibit C;

5.  Copy of Body Diagrams, Exhibit H;

6.  Copy of Body Diagrams, Exhibit D;

Exhibit

AT

ADVISORY BOARD

CYRIL H. WECHT, M.D.,J.D.
FORMER CORONER
COUNTY OF ALLEGHENY

MICHAEL M. BADEN, M.D.
DIRECTOR
NEW YORK STATE POLICE
MEDICOLEGAL INVESTIGATION UNIT

HENRY C. LEE, PH.D
CHIEF EMERITUS
CONNECTICUT STATE POLICE
FORENSIC LABORATORY

MICHAEL WELNER, M.D

1

\* (4 pages) \*

7.  Copy of Body Diagram, Exhibit J; and

8.  Copy of Transcript(s) of Court Testimony of Dr. Blaine Y. Roffman, M.D.

## MEDICO-LEGAL OPINON(S):

**1. It is my expert medical opinion, within a reasonable degree of medical certainty, that the cause of death in Matsolonia Myers, deceased, was multiple blunt force (traumatic) injuries secondary to a fall off a balcony.**

The basis for this opinion include(s):

a)  The fact(s) and information(s) that I obtained from my review of all the documents and records submitted to me;

b)  My educational background and knowledge and expertise in the fields of medicine and surgery and the specialties of anatomic pathology, clinical pathology and subspecialties of forensic medicine and pathology and pharmaceutical science/toxicology.

c)  The fact that the multiple blunt force (traumatic) injuries of the head, neck, trunk, and extremities suffered by the deceased, Matsolonia Myers, prior to her demise are consistent with the injuries seen in individuals who fall off a balcony (or from a considerable height).

**2. It is also my expert medical opinion, within a reasonable degree of medical certainty, that the neck and head injuries listed in the autopsy report and testified to by Dr. Blaine Y. Roffman, M.D., namely: (i) Hemorrhage along the right side of trachea and larynx; (ii) Hemorrhage on the posterior aspect of trachea and larynx; (iii) Superficial abrasions of midline of lower lip; (iv) Superficial scratch abrasions/"ladder-mark") of the right chin; are not caused by strangulation of the deceased by her son, Stephen M. Pullens, as testified to by Dr. Blaine Y. Roffman, M.D.**

The basis for this opinion include(s):

a)  The fact(s) and information(s) that I obtained from my review of all the documents and records submitted to me;

b)  My educational background and knowledge and expertise in the fields of medicine and surgery and the specialties of anatomic pathology, clinical pathology and subspecialties of forensic medicine and pathology and pharmaceutical science/toxicology.

**3. It is my expert medical opinion, within a reasonable degree of medical certainty, that both the "hemorrhage along the right side of the trachea and larynx" and the "hemorrhage on posterior aspect of trachea and larynx" identified at autopsy and**

2

testified to by Dr. Blaine Y. Roffman, M.D., are consistent with common post-mortem artifact(s), described fully by Prinsloo and Gordon (Reference: <u>Prinsloo, I., Gordon I. Postmortem dissection artifacts of the neck and their differentiation from ante-mortem bruises. S. Afr. Med. J. 1951; 25: 358-61).</u>

In the absence of any other neck lesions, especially in the lateral and anterior parts of the neck, no reliance can be placed on such hemorrhage(s). They tend to develop more as the post-mortem interval lengthens, and even releasing the venous pressure in the neck by removal of the brain, or opening the jugular veins early, does not ensure its absence. Another usual artifact in the neck, is "banding" of the esophagus, especially when the tissues are congested. These "bands" are caused by post-mortem hypostasis and are common also in non-trauma autopsies, but have been misinterpreted by in-experienced pathologists as evidence of strangulation.

Further, it is well-settled in the field of forensic medicine and pathology that resuscitation efforts, related to intubation(s), such as, performed on Matsolonia Myers prior to her demise, may produce artifactual oral injury, peri-and pharyngeal injury, and tracheal and peri-tracheal and peri-laryngeal injuries that are misinterpreted by in-experienced pathologists as evidence of strangulation. The hemorrhages testified to and observed by Dr. Roffman are all part of these artifact(s).

<u>(Reference: Raven, KP, Reay DT, Harruff, RC. Artifactual injuries of the larynx produced by resuscitative intubation. Am. J. Forensic Med. Pathol., 1999; 20 (1): 31-6).</u>

The basis for this opinion include(s):

a) The fact(s) and information(s) that I obtained from my review of all the documents and records submitted to me;

b) My educational background and knowledge and expertise in the fields of medicine and surgery and the specialties of anatomic pathology, clinical pathology and subspecialties of forensic medicine and pathology and pharmaceutical science/toxicology.

**4. It is my expert medical opinion, within a reasonable degree of medical certainty, that Matsolonia Myers, deceased, was not strangled and she did not lose consciousness due to strangulation as testified to by Dr. Blaine Y. Roffman, M.D.**

The basis for this opinion include(s):

a) The fact(s) and information(s) that I obtained from my review of all the documents and records submitted to me;

3

b) My educational background and knowledge and expertise in the fields of medicine and surgery and the specialties of anatomic pathology, clinical pathology and subspecialties of forensic medicine and pathology and pharmaceutical science/toxicology.

c) The fact that the autopsy performed by Dr. Blaine Y. Roffman, M.D., failed to reveal any of the following scintilla or hall-marks of homicidal strangulation – (i) bruises or abrasions of the skin of the neck; (ii) hemorrhages of the neck skeletal muscles; (iii) injuries of the hyoid bone or laryngeal cartilages (iv) absence of petechial hemorrhages of the conjunctivae and sclerae of both eyes; (v) petechial hemorrhages of the laryngeal mucosa; and (vi) suffusion and hemorrhages of the posterior tongue and even intramuscular hemorrhages of the tongue, etc. Furthermore, the face and the minor blunt force traumatic injuries of the head are only consistent with injuries from a fall off the balcony and thereby suffering those minor injuries on her day down from the balcony.

I shall testify to the above-listed fact(s) and opinion(s) in any court of law. Please feel free to contact me if you have any further questions.

Sincerely,

Matthias I. Okoye, M.D., J.D., FRCPI
Director
Clinical Associate Professor of Forensic Medicine & Pathology
Creighton University School of Medicine
Omaha, Nebraska

MIO/smk

4

TELEPHONIC DEPOSITION OF BARRY BATES, B.S.E., Ph.D.    AUGUST 21, 2018

STATE vs PULLENS

**33**

Q. Okay. So your memory from your discussions back in 2005 are all based on an invoice that you submitted to the Omaha Police Department; is that correct?

A. And a few sketchy notes, yes.

Q. Okay. And what do you mean by "sketchy notes"? Where did you find those?

A. They're in my file. I think I referred to some of them. Let me see, I'll have to look. Well, there's some sketchy notes. Okay, it's difficult to get up on the rail unassisted. Dead weight versus struggling weight. If he came up from behind, she would go over forward, not backwards. And then I have a note, my opinion is the event was she went over backward, not forward.

Q. Okay. My question was just simply --

A. I have -- I have a note --

Q. Dr. Bates, I'm not asking you to read the notes. I just asked you where they came from.

A. They came from my files.

Q. Okay. And so what I was getting at was, so in preparation for today, the events that occurred from 2005 are just based, then, on your memory, an invoice, and sketchy notes; is that correct? Yes or no?

A. That is correct. That is correct, yes.

Q. Thank you.

**34**

A. That's what I said right at the beginning.

Q. Okay. And at the time you spoke with the Omaha Police Department, do you know if the defendant had been arrested, or was he still fleeing from law enforcement in Switzerland?

A. It's my understanding, my recollection, from the police report -- or, no, from a note from Stephen, that he wasn't arrested for a couple of years after the incident.

Q. So is it possible that they didn't want a report from you because they hadn't even arrested the defendant, and they didn't know if they would ever be able to do so?

A. It's possible. If I had those E-mails that were sketchy about his travel and about all sorts of things, and I don't recall.

Q. Okay. Thank you, Dr. Bates, it was just a yes or no.

And then with regard to this case, you said you looked at select police reports, an autopsy report, and photographs, correct?

A. That's the information -- well, that's the information I had that was supplied to me, yes.

Q. Okay. Did you review the transcript from the trial?

A. I was never given that, no.

Q. Do you think that would be relevant?

**35**

A. It might be. It could be.

Q. How could it not be?

A. Well, the fact that I don't think she was strangled. There's documentation from one doctor, and my analysis suggests that she wasn't -- she was conscious, not unconscious. That whole theory of strangulation and what happened due to the interactions between Stephen and a strangulated person --

Q. Okay. Dr. Bates, my question is --

A. -- it would be interesting, but I don't know that it would be relevant.

Q. Right. My question is, as an expert, at the time Mr. Dunn contacted you, you knew that there had been a trial because the defendant is convicted, and he's incarcerated, correct?

A. Outside -- would you repeat that? At the time the defense --

Q. At the time Mr. Dunn, D-U-N-N, contacted you in 2009, you knew that the defendant had been convicted of this crime, correct?

A. I knew that considerably -- I knew that -- when did I know that? Yeah, okay, in 2009, yeah, is when I found out that he had been convicted.

Q. Right. And prior to -- and then you wrote this report in 2013, correct?

**36**

A. Yes.

Q. As an expert, did you ask for a transcript of the trial testimony?

A. No.

Q. And as an expert, do you think that the testimony of witnesses, and their observations, would be helpful to coming to a correct opinion in this case?

A. Well, maybe.

Q. Okay.

A. Again, it goes back to the idea of conscious, unconscious, strangulation, and in my opinion, the whole -- the whole prosecution of strangulation is incorrect.

Q. Okay. Well, that actually wasn't my question at all. Again, I was just asking you about you being an expert, and why you would not have asked for the trial transcript, and you said -- you just testified that maybe that would have been important or relevant, correct?

A. I think that's what I said.

Q. That is what you said.

All right. And do you know whether or not the defendant testified in his own defense in this case?

A. I don't recall.

Q. Okay. And wouldn't it be --

**37**

A. I might have a note on that, but I don't recall.

Q. And wouldn't it be relevant to know -- if there are two people involved in this case, and one is dead, don't you think it would be helpful to know what the other person said happened in trial, under oath?

A. Yes, if what he told me was incorrect, was not the truth, then it would be -- it would -- it could influence my -- it could influence my opinion on some aspects, but not on the conscious/unconscious part.

Q. Okay. Well, the defendant testified in his own defense, and he is the only person living that was there on this evening, and he testified, under oath, as to his version of what occurred with regard to his mother. So my question is, wouldn't that transcript or testimony be relevant into your determination on how Ms. Meyers landed on that evening?

A. Yes. It would help me compare -- it would be another comparison, another input in the information on how the accident occurred that I have.

Q. All right. And one of your opinions in this case is that she fell, and she was not in an unconscious state; she was conscious, in fact, correct?

A. Yes.

Q. And a big emphasis on your determination with regard to that, on Page 5, is with regard to the documentation of

**38**

her arm and hand position, correct?

A. Arm, hand, and head.

Q. Okay. And so that's the crux of your opinion, with regard to her being conscious, is based on the positioning of her arms and her head, correct?

A. Yeah, based upon the laws of physics and engineering principles.

Q. But, I mean, it's based on what you read in the reports as to where her body was positioned, correct?

A. The way -- yes, yes, the way her body was positioned came from the police report.

Q. Okay. Do you know how Ms. Meyers was found? Do you know what the first responders observed when they found her?

A. I think I read about that, but I couldn't tell you right now.

Q. Would that be relevant in your determination if it's based on the positioning of her arms and hands -- I mean, her arms, hands, and head?

A. Okay. I would -- if their report came before the police report, then it could be relevant. If she was moved by the first responders, or the police documented her body position, then that could be relevant.

Q. Right. That's a big issue, correct?

A. I assumed that the police were, in fact, honest and

**39**

truthful. I'm sorry, I made that assumption.

Q. Well, I'm not really sure what you mean by that. The police are honest and truthful. What I'm getting at is during the trial, the initial responder testified that there was a 911 call. He came to the back of the apartment complex, and he found the defendant laying on his mother, weeping, and then when he observed him, there was no tears, and he documented that it was a very odd situation, but that the defendant was laying completely on top of his mother when he arrived. Were you aware of that?

A. I don't know about the word "completely", but I was aware, and I read in the police report that he was lying on her.

Q. So it's not the police being untruthful, I'm just asking if you were aware that, during trial, the first responder testified that he observed the defendant laying on top of his mother, and asked him to get off of her so he could administer First Aid, if necessary. You were aware of that then?

A. I was aware that he was -- yes, I recall that.

Q. And so if he's laying on his dead mother, wouldn't it be possible, then, that her arms and head moved, based on him laying on her?

A. Not really, no.

**40**

Q. So your testimony is that -- okay. You said "not really". So your testimony is that if Ms. Meyers, an elderly woman, who was laying on the ground, and the defendant comes and lays on top of her, and we don't know how long he was there, that would not have manipulated or changed the positioning of her body?

MS. MATHIAS: I'm going to object on form of the question.

A. I don't think -- I don't think -- given the position that her arms are documented in in the police report, given a person lying on top of her, her arms would not have -- very unlikely that they could have been moved into the position that they would have been in had she fallen in an unconscious state.

Q. (BY MS. BENSON) So it's your testimony it's possible for him to have laid on her, and her body position to not have moved at all?

A. No, I didn't say that. I said her arms would not be in a position that was consistent with an unconscious fall versus the position that they were found in, or reported in by police. That difference would not be the result -- or it's highly unlikely it could be the result of a person lying on top of her.

Q. Okay. And your report never acknowledges that the defendant was laying on her, corre

Exhibit AH

Neb. Rev. Stat.

(3 pages)

### § 2-103. General formatting and service rules.

This rule governs the standard form for all documents filed in the appellate courts and sets forth service requirements for motions and briefs. Form and formatting requirements for bills of exceptions are found in § 2-105.01. Except as otherwise required to comply with the Americans with Disabilities Act (ADA), and except for any Nebraska Supreme Court forms promulgated or last amended prior to the effective date of this rule, the following rules apply: · ·

(A) Motions, petitions, briefs, and other documents, except bills of exceptions. The standard form for all documents, including motions, petitions, and briefs shall be as follows:

(1) All documents shall be on a page size measuring 8 ½ by 11 inches, in portrait mode. Electronically filed documents shall be in a converted PDF (fully text searchable), rather than only a scanned image PDF format. All electronically filed documents shall be easily readable. Documents that are not easily readable may be stricken by the appellate court.

(2) Documents permitted to be filed in paper form shall follow the same formatting set forth in this rule.

(3) Text shall be aligned to the left side and not justified. Margins shall be set to 1.5 inches on all sides, and lines shall be spaced at 1.15 or 1.2. Extra line spacing is allowed before headings and between paragraphs. Footnotes are not permitted.

(4) Preferred fonts shall be Century or Century Schoolbook. Other allowed fonts are Times New Roman, Baskerville Old Face, Book Antiqua, or Palatino, and shall be set no less than 12 nor more than 13 point. Type shall not be underscored, but may be *italicized* or **boldfaced** for emphasis.

(5) Except as specifically allowed below in (a) through (g), hyperlinking in appellate court documents is prohibited. Hyperlinking is allowed and encouraged as follows:

(a) The use of internal hyperlinks and bookmarks;

(b) To the official Transcript filed in the appellate court;

(c) To the official Bill of Exceptions of the trial court or lower appellate court;

(d) To the official Nebraska Reports or Nebraska Appellate Reports. The user shall hyperlink to the official Nebraska Judicial Branch website for Nebraska Reports or Nebraska Appellate Reports (**https://www.nebraska.gov/apps-courts-epub/**);

(e) To the official Nebraska Laws, Bills, and legislative history. The user shall hyperlink to the official Nebraska Legislative website for Nebraska Laws, Bills, and legislative history (**https://nebraskalegislature.gov/**);

(f) To the official rules of the Nebraska Supreme Court. The user shall hyperlink to the official Nebraska Judicial Branch website for court rules (**https://supremecourt.nebraska.gov/supreme-court-rules**).

(g) Hyperlinking shall not detract from the content.

(6) For additional formatting specific to briefs filed in a case or with a motion, see **subsection (C)** below.

(B) General Filing and Service of Motions and Briefs.

(1) The motion and proof of service shall be filed with the appellate court and a copy shall be served upon the opposing party or the attorney of record. Service and proof of service shall be made as provided in **Neb. Ct. R. Pldg. §§ 6-1105(b)** and **6-1106(e)**, and **Neb. Ct. R. § 2-205**.

(2) Service of a copy of the brief shall be made either on the opposing party or the attorney of record for the party and upon all other parties participating in the appeal. Service and proof of service shall be made as provided in **Neb. Ct. R. Pldg. §§ 6-1105(b)**and **6-1106(e)**, and **Neb. Ct. R. § 2-205**.

(3) Service requirements for other filings are found in the specific rule section governing such filings.

(C) Briefs. The standard form for all briefs shall be as set forth in **subsection (A)** above with the following additions:

(1) Cover. The cover on all briefs shall show the appellate court case number; the case caption listing the plaintiff first (regardless of who is appellant); the county from which the case was brought; the name of the trial judge; the name, address, city, state, zip code, telephone number, email address, and Nebraska attorney identification number of the attorney filing the brief (the name of the law firm, if any, may also appear); and the name of the party for whom the brief is filed. If a party or parties represent themselves, it shall contain the above information except for the attorney and firm information. The cover of the brief shall serve as the title page, and no additional title page may be contained within the brief.

(2) Page numbering for briefs. Page numbering shall begin with the cover page as page one. Numbering shall be displayed in the bottom margin on every page except the cover page.

(3) Word and page limitations for briefs.

(a) Briefs may not exceed the following word limitations: original submission, 15,000 words. For appellant, this includes a combined total of appellant's brief, reply brief, and answer brief to cross-appeal. For appellees and cross-appellants, this includes a combined total of appellee's brief, brief on cross-appeal, and reply brief to answer brief on cross-appeal. If the appellee asserts a cross-appeal as provided in **§ 2-109(D)**, the word count limits per party shall be increased to 18,000.

(b) For briefs in support for motions for rehearing, other briefs in support of motions, and briefs of amicus curiae, 3,800 words.

(c) All portions of the brief, including the cover page, table of contents, and table of authorities, as well as signature blocks, count toward the maximum word count.

(4) Certificate. The final page of all briefs shall include a certificate that the brief complies with the word count as required by this rule. The person preparing the certificate may rely on the word count of the word-processing software used to prepare the brief. The certificate must state the name and version of the word processing software used to

prepare the brief, state that the brief complies with the typeface requirements of this rule, and state the total number of words in the brief. The certificate shall not count toward word limits.

(5) Paper filed briefs may only be filed when the self-represented party is not a registered user of the court-authorized service provider. Paper briefs shall be bound by a single paper clip or binder clip in the upper left-hand corner only and shall not be stapled. Paper briefs shall comply with all formatting requirements of § 2-103(A) unless typewritten. If typewritten, paper briefs shall not exceed 50 pages total on original submission, and 15 pages on briefs in support of a motion for rehearing. Typewritten briefs shall be in nothing smaller than 12-point type and lines shall be double spaced, and pages shall be sequentially numbered as provided in **§ 2-103(C)(2)** above. Service and proof of service of paper filed briefs shall be as provided in **§ 2-103(B)(2)**.

(6) All briefs, together with proof of service, shall be filed with the appellate court on or before the date the brief is due.

(7) General rules for preparation and content of briefs are found at **§ 2-109(C) and (D)**.

*Rule 3(B) amended February 22, 2001. Renumbered and codified as § 2-103, effective July 18, 2008; § 2-103 amended June 9, 2021, effective January 1, 2022; § 2-103 amended November 17, 2021, effective January 1, 2022.*

Exhibit AI

## NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES
## INMATE INTERVIEW REQUEST

TO: C.O Cooper / Mailroom    DATE: 6/4/25

FROM: Stephen Pullers 69693 RTC    AI L 19
NAME / NUMBER    FACILITY    LOCATION

WORK LOCATION: _____ UNIT STAFF: _____

MESSAGE: Can you confirm that the travel time for mail Lincoln to Lincoln or Lincoln to omaha is up to 10 days - for incoming or outgoing mail.

Please.

Signature

ORIGINAL – DCS Employee
YELLOW – Inmate
Both copies need to be submitted for response.

REPLY: Yes

6-6-25
Date

Cooper
Signature

DCS-A-adm-013  (rev. 1/2017)

Exhibit AJ

NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES

# INMATE INTERVIEW REQUEST

TO: Mailroom                                          DATE: 3/13/25

FROM: Stephen Phillips 69673    RTC       A1 L 19
      NAME / NUMBER                FACILITY      LOCATION

WORK LOCATION: _____ UNIT STAFF: _____

MESSAGE: _____Please send least expensive

way possible.

Also- can you tape top & Bottom

so contents dont slip out

Thank you

Brief NSC

Signature

ORIGINAL – DCS Employee
YELLOW – Inmate
Both copies need to be submitted for response.

REPLY: 7.31, Sent out today

3/18/25
Date

HD
Signature

DCS-A-adm-013  (rev. 1/2017)

ME-04-496
Myers, Matsolonia
Age: 73 years
Black Female

DOB— 1/28/31

AUTOPSY PERFORMED AT:
  Douglas County Morgue
AUTOPSY AUTHORIZED BY:
  Tom Haynes
  Acting Douglas County Coroner
TIME OF AUTOPSY:
  8:00 a.m. 12-14-04
PROSECTOR:
  B. Y. Roffman, M.D.

**GROSS DIAGNOSES:**
Fractures of third through twelfth ribs, left.
Fractures of second through twelfth ribs, right.
Left hemothorax (1500 cc).
Hemopericardium (25 cc).
Laceration of tip of left ventricle.
Multiple fracture-lacerations of anterior and posterior surfaces of right and left lobes of liver.
Maceration of tip of left lobe of liver.
Bilateral periadrenal hemorrhage.
Peripancreatic hemorrhage.
Closed fracture of right femur superior to right knee.
Fracture of right tibia distal to right knee.
Superficial abrasions of midline of lower lip.
Superficial scratch abrasions of right chin.
Hemoperitoneum (100 cc).
Intraparenchymal hemorrhages of liver.
Hemorrhage along the right side of trachea and larynx.
Hemorrhage on posterior aspect of trachea and larynx.
History of fall off balcony.

**SUMMARY:**
The significant autopsy findings are listed above. A toxicology report is attached showing the blood ethanol level to be less than 0.010 g/100 mL. The blood immunoassay screen was negative for the listed drugs.

The cause of death of this 73-year old black female is attributed to the multiple internal injuries as listed above, secondary to a fall off of a balcony.

Blaine Y. Roffman, M.D.

BYR/car



EXHIBIT
AS

/

ME-04-496

Exhibit A5 -1-

## GROSS

**EXTERNAL EXAMINATION:** The body arrives in a white plastic bag with the seal number 4126. The body is identified by an attached name tag. This is the body of a 73-year old black female measuring 64 inches in length and weighing an estimated 200 pounds. The body is clothed in a blue and white hospital gown. The hands are in paper sacks. A moderate amount of postmortem rigidity is present. Lividity is present in the posterior aspect of the body. The scalp is covered by grey-white hair. The pupils are round, regular and equal, measuring 3 mm, bilaterally. The irides are brown and the sclerae are clear. The conjunctivae are clear. Teeth are present and in good repair. In the inferior aspect of the right orbital area, there is a superficial area of excoriation, measuring 2.8 x 1.2 cm, and 1 cm above the right eyebrow, there is a 1.0 x 0.5 cm area of pinkish discoloration. An IV is present in the left antecubital fossa. There are three superficial abrasions in the midline of the lower lip, measuring 0.3, 0.5 and 0.3 cm, respectively, and they have a vertical configuration. There is a superficial scratch abrasion over the right chin, measuring up to 2.5 cm in length.

**PRIMARY INCISION:** The usual Y-shaped incision is made revealing a panniculus of 2.8 cm at the umbilicus.

**PERITONEAL CAVITY:** The abdominal viscera have their respective anatomic relationships and there is approximately 100 cc of clotted blood and liquid blood in the peritoneal cavity.

**PLEURAL CAVITIES:** Each lung lies within its respective pleural cavity. There is approximately 1500 cc of liquid blood in the left pleural cavity. There are fractures of

ME-04-496                                                                                      -2-

the third through twelfth ribs on the left, and the second through twelfth ribs on the right.

**PERICARDIAL CAVITY:** The heart lies free in the pericardial cavity in approximately 25 cc of blood. The great vessels are noted to enter and leave in the usual anatomic fashion. The pulmonary artery is incised in situ and no antemortem thrombi are detected.

**HEART:** The heart weighs 300 grams and has its normal appearance. The coronary arteries are serially transected and are soft and pliable throughout. There is a laceration of the tip of the left ventricle which extends into the left ventricular chamber. The heart is opened in the direction of blood flow with the right ventricle measuring 0.3 cm and the left ventricle measuring 1.7 cm in greatest thicknesses. No other abnormalities of the cardiac chambers or valves are detected.

**LUNGS:** The right lung weighs 500 grams and the left lung weighs 320 grams. The bronchi and pulmonary vessels are not remarkable. The cut surfaces of both lungs have a pink-red appearance.

**SPLEEN:** The spleen weighs 190 grams and is covered by its normal capsule. The cut surface has a red-pink appearance.

**LIVER:** The liver weighs 1600 grams and has a red-brown color. There are multiple fracture-lacerations of the anterior and posterior surfaces of the right and left lobes of the liver, and maceration of the tip of the left lobe of the liver. On the undersurface of the liver is a smooth, thin-walled gallbladder containing 5 cc of bile. No calculi are demonstrated. The cut surface of the liver has a red-brown appearance and shows intraparenchymal hemorrhage, as well.

-2-

Exhibit AS

ME-04-496                                                                                              -3-

**ADRENAL GLANDS:** Bilateral periadrenal hemorrhage is noted, more marked on the left side. The cut surfaces are unremarkable.

**KIDNEYS:** The ureters take their usual course to the urinary bladder which is devoid of urine. The right kidney weighs 150 grams and the left kidney weighs 130 grams. The capsules strip with ease, bilaterally. The cortical medullary markings are distinct, measuring up to 8 mm, bilaterally.

**INTERNAL GENITALIA:** Two ovaries, two fallopian tubes and a uterus and cervix are present and are within normal limits.

**GASTROINTESTINAL TRACT:** The gastrointestinal tract is examined from rectosigmoid to mid esophagus. The stomach is opened and contains approximately 100 cc of green-grey fluid. The mucosa is not remarkable.

**PANCREAS:** The pancreas weighs 70 grams and shows peripancreatic hemorrhage. The normal lobular architectural pattern is intact.

**HEAD:** The scalp is incised via the usual intermastoid incision and the scalp is reflected anteriorly and posteriorly. A portion of the calvarium is removed. The brain is removed and weighs 1210 grams. The dura is stripped and no evidence of fracture or hemorrhage is noted. The foramen magnum is palpated and no fractures or dislocations are present. The convolutions and sulci of the brain are not remarkable and the Circle of Willis is intact. Multiple coronal sections of the brain are then taken and no additional abnormalities are detected.

**TRACHEA AND LARYNX:** The trachea and larynx are removed en bloc. There is hemorrhage along the right side of the trachea and larynx, and the posterior aspect.

Exhibit AS

ME-04-496                                                                                              -4-

No evidence of fracture is noted.  The lumen is patent throughout and no evidence of

hemorrhage is noted.

4:26-cv-03026-JFB-PRSE     Doc # 1     Filed: 02/02/26     Page 86 of 107 - Page ID # 86

*Exhibit AK*
*(11 Pages)*

*Indian J. Anaesth. 2005*; 49 (4) : 308 - 318

# COMPLICATIONS OF ENDOTRACHEAL INTUBATION AND OTHER AIRWAY MANAGEMENT PROCEDURES

## Dr. Divatia J. V.[1]   Dr. Bhowmick K.[2]

## Introduction

Airway management is a fundamental aspect of anaesthetic practice and of emergency and critical care medicine. Endotracheal intubation (ETI) is a rapid, simple, safe and non surgical technique that achieves all the goals of airway management, namely, maintains airway patency, protects the lungs from aspiration and permits leak free ventilation during mechanical ventilation, and remains the gold standard procedure for airway management. There are also several alternatives to ETI, both for elective airway management as well as for emergency airway management when ETI is difficult or has failed. These devices include the laryngeal mask airway and the combitube. Both ETI and the use of the other airways are associated with complications, some of them life threatening. It is essential for anaesthesiologists to be aware of these complications, and to have an effective strategy to prevent and manage these complications when they arise. A large number of complications have been described. It is beyond the scope of this article to deal with each in detail; emphasis will be laid on the major, potentially life threatening and preventable complications.

## Complications associated with ETI

### Predisposing factors for complications[1]

The incidence and occurrence may depend on several factors. These include:

### Patient factors

1.  Complications are likely in infants, children and adult women, as they have a relatively small larynx and trachea and are more prone to airway oedema.

2.  Patients who have a difficult airway are more prone to injury as well as hypoxic events.

3.  Patients with a variety of congenital as well as chronic acquired disease may experience either difficult

intubation or may be more prone to physical or physiological trauma during intubation.

4.  Complications are more likely during emergency situations.

### Anaesthesia related factors

The anaesthesiologists:

1.  The knowledge, technical skills and crisis management capabilities of the anaesthesiologists play a vital role in the occurrence and outcome of complications during airway management.

2.  A hurried intubation, without adequate evaluation of the airway or preparation of the patient or the equipment is more likely to cause damage.

### Equipment

1.  The shape of the standard endotracheal tube (ETT) results in maximal pressure being exerted on the posterior aspect of the larynx. The degree of damage to these areas depends on the size of the tube and the duration of intubation.

2.  Use of stylets and bougies predispose to trauma.

3.  Additives to plastic may provoke tissue irritation.

4.  Sterilization of plastic tubes with ethylene oxide may lead to production of toxic ethylene glycol if adequate time for drying has not been allowed.

5.  Cuff related injuries might occur with the use of high pressure cuffs or inappropriate use of low pressure cuffs.

Complications that may be associated with ETI[2] are listed in Table 1. Flemming classifies hazards of ETI as those that require immediate recognition and management, those related to tissue erosion and healing, and those of lesser significance such as minor trauma.[1]

## I. Complications requiring immediate recognition and management

### Failed intubation

The difficult airway and failed intubation encompass a spectrum including difficult mask ventilation, difficult laryngoscopy, difficult intubation and failed intubation. The most dreaded situation is a cannot-ventilate-cannot-

1.  M.D., Prof., Officer-in-Charge, Critical Care
2.  M.D., Sr. Registrar
    Department of Anaesthesia, Critical Care and Pain
    Tata Memorial Hospital, Dr. E. Borges Marg,
    Parel, Mumbai - 400012.
    **Correspond to :**
    Dr. J. V. Divatia
    E-mail : jdivatia@vsnl.com

| Table - 1 : Complicaion of ETI[2] | |
|---|---|
| **At the time of intubation** | **While the ETT is in place** |
| Failed intubation | Tension pneumothorax |
| Spinal cord and vertebral column injury | Pulmonary aspiration |
| Occlusion of central artery of the retina and blindness | Airway obstruction |
| Corneal abrasion | Disconnection and dislodgement |
| Trauma to lips, teeth, tongue and nose | Tracheal tube fire |
| Noxious autonomic reflexes | Unsatisfactory seal |
| Hypertension, tachycardia, bradycardia and arrhythmia | Leaky circuits |
| Raised intracranial and intraocular tension | Swallowed ETT |
| Laryngospasm | |
| Bronchospasm | |
| Laryngeal trauma | |
| Cord avulsions, fractures and dislocation of arytenoids | |
| Airway perforation | |
| Nasal, retropharyngeal, pharyngeal, uvular, laryngeal, tracheal, oesophageal and bronchial trauma | |
| Oesophageal intubation | |
| Bronchial intubation | |

| During extubation | After intubation |
|---|---|
| Difficult extubation | Sore throat |
| Cuff related problems | Laryngeal oedema |
| ETT sutured to trachea or bronchus | Hoarseness |
| Laryngeal oedema | Nerve injury |
| Aspiration of oral or gastric contents | Superficial laryngeal ulcers |
| | Laryngeal granuloma |
| | Glottic and subglottic granulation tissue |
| | Laryngeal synechiae |
| | Vocal cord paralysis and aspiration |
| | Laryngotracheal membrane |
| | Tracheal stenosis |
| | Tracheomalacia |
| | Tracheo-oesophageal fistula |
| | Tracheo-innominate fistula |

intubate (CVCI) situation in an apnoeic anaesthetized patient.[3,4] This is a brain and life threatening emergency occurring in about 1in 10,000 anaesthetics. Failure to achieve oxygenation will result in death or hypoxic brain damage. Repeated attempts at intubation result in more morbidity, and the number of attempts should be restricted to three.[5] In an analysis of 1541 claims,[6] there were 522 (34%) adverse

respiratory events. Death or brain damage occurred in 85% of these cases. The main problems were inadequate ventilation (38%), substandard care (90%), oesophageal intubation (18%) and failure to identify problem (48%). The approach to a difficult airway and the management of the difficult airway as well as failed intubation has been outlined in the ASA difficult airway algorithm.[3,4] It is beyond the scope of this article to discuss the algorithm in detail. Methods of emergency ventilation in a CVCI situation include use of the laryngeal mask, combitube or transtracheal jet ventilation. Cricothyrotomy (not tracheostomy) is the preferred method of surgical access to the airway in an emergency such as a CVCI problem. Complications associated with the laryngeal mask and combitube are detailed in a later section. The major problem with jet ventilation is the risk of barotrauma due to pressure of the oxygen jet.[7,8] The risk increases if the airway is obstructed. The ventilatory rate should be restricted to the minimum required to prevent life threatening hypoxia (4-6/min) and a cricothyrotomy or tracheostomy undertaken without delay. A second 20G cannula can be inserted to vent the expired gases.

**Oesophageal intubation**

Prompt recognition of oesophageal intubation is vital to prevent hypoxia in the apnoeic patient. It may be recognized by gurgling sounds over the epigastrium on auscultation, abdominal distension and absence of breath sounds on the thorax. However all such clinical tests are flawed, and precious lives and brains have been lost by relying on clinical signs of oesophageal intubation. The only certain method of confirming correct placement of the ETT is to visualise its passage though the vocal cords; unfortunately this is not possible during a difficult intubation, a common situation in which oesophageal intubation occurs. End tidal $CO_2$ monitoring is essential to confirm tracheal placement of the ETT. Passage of a fibreoptic bronchoscope through the ETT and visualization of the tracheal rings and carina also confirms tracheal placement, but is not universally available. Hypoxemia occurring soon after ETI may be due to unrecognised oesophageal intubation. Every attempt should be made to confirm correct placement. There may sometimes be difficulty in deciding whether the tube has been correctly placed; if there is any doubt, the tube should be withdrawn and reintroduced. The old maxim "when in doubt, take it out" still holds true.

**Bronchial intubation**

Endobronchial intubation occurs if too long a tube is used and inserted into one of the mainstem bronchi. Endobronchial intubation is most common when the distance for the tube tip to be placed properly above the carina yet

INDIAN JOURNAL OF ANAESTHESIA, AUGUST 2005

below the vocal cords is minimal, as in small children. Standard formulae for the correct length of the ET tube to be inserted may serve as useful guidelines. The unintubated lung does not contribute to gas exchange, and the large volume of blood flowing through this lung results in a substantial right to left shunt resulting in hypoxia. In addition, the intubated lung is hyperinflated, receiving the entire tidal volume, predisposing to overdistension and barotrauma. Signs are those of arterial hypoxaemia, including cyanosis and laboured breathing. In addition, uptake of the inhalation anaesthetic agent may be impaired, resulting in an unexpectedly light plane of anaesthesia. When endobronchial intubation is discovered, the ETT should be withdrawn several centimetres and the lungs inflated to expand atelectatic areas. Fiberoptic bronchoscopy is the optimal diagnostic tool. The clinician must be extremely careful when withdrawing the tube in awkward positions or in the difficult airway. Note also that properly placed tubes may change their position during head movement or repositioning of the patient.[9]

### Spinal cord and vertebral column injury

Extension of the cervical spine during laryngoscopy may cause trauma to the spinal cord resulting in quadriplegia. This is more likely in patients with cervical spine fractures or malformations, tumours or osteoporosis. In patients with suspected instability of the cervical vertebrae, the head must be maintained in a neutral position during laryngoscopy and intubation at all times; hyperextension is strictly avoided. The head may be stabilised by in-line manual stabilisation by an assistant. Alternative techniques of airway management that do not involve neck manipulation, such as fibreoptic intubation may be considered.

### Noxious autonomic reflexes

Hypertension, tachycardia, arrhythmias, intracranial and intraocular hypertension

Laryngoscopy and ETI produce reflex sympathetic stimulation and are associated with raised levels of plasma catecholamines, hypertension, tachycardia, myocardial ischemia, depression of myocardial contractility, ventricular arrhythmias and intracranial hypertension.[10] Hypoxia and hypercarbia aggravate the autonomic response. The magnitude of the pressor response is related to the duration of laryngoscopy, and may be severe during a difficult intubation with multiple, prolonged attempts at laryngoscopy and intubation. These responses may be particularly deleterious in patients with hypertension, IHD, myocardial dysfunction and raised intraocular and intracranial pressure. In patients with limited coronary or myocardial reserve, myocardial ischemia or failure may follow. The patient with limited intracranial compliance or an intracranial vascular anomaly may suffer serious intracranial hypertension or haemorrhage.

These responses, which also occur during tracheal extubation and suction, can be minimized by rapid, smooth ETI with adequate topical anaesthesia, analgesia, sedation and perhaps the use of muscle relaxants to prevent coughing and bucking during the procedure.

Drugs that tend to block the response to airway instrumentation may be used to blunt these noxious reflex responses. These include fentanyl 3 to 4 mgkg$^{-1}$, alfentanil, lignocaine 1.5 mgkg$^{-1}$ i.v, a small dose of beta antagonist, sublingual nifedipine or intravenous nitroglycerine

### Bronchospasm

The presence of an ETT in the trachea produces reflex bronchoconstriction.[11] Bronchospasm may be especially severe in the lightly anaesthetized patient with reactive airways. Bronchospasm may be blunted by the prior administration of anticholinergics, steroids, inhaled b$_2$-agonists, lignocaine (topical, nerve block, intravenous), and narcotics. After intubation, deepening anaesthesia with intravenous or inhaled agents and the administration of inhaled or intravenous b-agonists are helpful. It is important to ensure that the audible wheezing is not due to mechanical obstruction of the tube or other causes, such as tension pneumothorax, or heart failure.

### Drying of mucosa and effects on mucociliary function

The ETT bypasses the humidifying mechanisms in the nose and upper trachea. Inadequate humidification leads to drying of secretions, depressed ciliary motility and impaired mucous clearance. The ETT also provides a surface for pathogenic organisms from the gastrointestinal tract and oropharynx to adhere to and provides direct access for these organisms into the respiratory tract.[12]

### Laryngospasm

This may result from attempted intubation of the trachea under light anaesthesia. This can result in hypoventilation, inability to ventilate the lungs and hypoxia, and must be corrected by rapidly deepening the plane of anaesthesia or by giving a muscle relaxant.

### Acute traumatic complications

Injury to the lips, teeth, tongue, nose, pharynx, larynx, trachea and bronchi can occur during laryngoscopy and intubation. Traumatic complications have been extensively described in two excellent reviews.[13,14] Most traumatic complications do not result in major morbidity or mortality. However, some require immediate recognition and management. In a review of closed 4,460 claims,[15] airway injuries accounted for 6%. The most frequent sites of injury were larynx (33%), pharynx (19%), and oesophagus (18%). Tracheal and oesophageal injuries were more frequent with difficult intubation. Difficult intubation, age

older than 60 yr and female gender were associated with claims for pharyngo-oesophageal perforation.

### Oesophageal, tracheal and bronchial perforation

Oesophageal perforation can occur with attempts at intubation, especially in patients with a difficult airway or multiple attempts. Subcutaneous emphysema may be noticed soon after intubation. Later, neck pain, difficulty in swallowing, neck erythema, and oedema may occur. Mediastinitis leading to sepsis may result in death or serious morbidity. Placement of a nasogastric tube has also been associated with oesophageal perforation.

Tracheal laceration may occur due to overinflation of the ETT cuff, multiple intubation attempts, use of stylets, malpositioning of the tube tip, tube repositioning without cuff deflation, inadequate tube size, vigorous coughing, and nitrous oxide in the cuff. The risk is also greater in patients with tracheal distortion caused by neoplasm or large lymph nodes, weakness in the membranous trachea (seen in women or the elderly), chronic obstructive lung disease, and corticosteroid therapy.

Endobronchial injury can occur with instrumentation of the bronchi. Endotracheal tube guides or tube changers have been associated with endobronchial rupture.[16] Placement of double-lumen ETTs has also been associated with tracheobronchial rupture.[17]

Airway perforation may occur anywhere from the nose to the trachea. It may admit air into unusual locations and manifest as subcutaneous emphysema, pneumomediastinum and pneumothorax. When these occur, a search must be made for such perforations, including by bronchoscopy. Nitrous oxide should be discontinued when pneumothorax or pneumomediastinum is suspected. In awake patients, cough, hemoptysis and cyanosis may occur.

### Tension pneumothorax

This can lead to severe hypoxia and hypotension, and can occur after airway perforation during intubation or due to barotrauma during IPPV. It must be suspected either when there is unexplained hypoxia and hypotension, or when they occur with any of the signs of airway perforation. Airway pressure is increased, ventilation of the lungs may be difficult, breath sounds are absent on the affected side with a mediastinal shift to the opposite side, there is a hyper resonant note on percussion, and breath sounds are diminished or absent. An urgent X-ray chest confirms the diagnosis, but in the presence of cardiorespiratory compromise, the pneumothorax must be urgently decompressed by inserting a wide bore cannula in the 2nd interspace on the affected side.

### Disconnection and dislodgement

Accidental dislodgment of the ETT during anaesthesia is a potentially lethal complication. Extension of the neck may cause cephalad movement of the ETT tube. Poor or loose fixation of the tube, excessive movement of the head during surgery, inadequate access to the tube during head and neck surgery or neurosurgery and heavy connectors producing drag on the circuit and ETT may lead to dislodgement. It can be detected rapidly if airway pressure and capnography are being continuously monitored. In the intensive care unit, the longer a tube stays in-situ, the greater the chances of kinking, blockade and unplanned extubation, leading to hypoventilation and hypoxia. Unplanned extubations have reported an incidence ranging from 0.3–30 %.[18,19] Inadequate sedation, agitation, inadequate nursing supervision and inadequate fixation of the ETT predispose to accidental extubations in the ICU.[20]

### Failure to achieve satisfactory seal

Inadequate cuff seal is a common problem, leading to hypoventilation during Mechanical Ventilation (MV) and aspiration of gastric contents. The common causes of leak during MV and their solutions are outlined in Table-2. More serious causes[21] include tracheomalacia and tracheo-oesophageal fistula [TEF]. Inflation of the cuff leads to weakening of tracheal cartilage and widening of the trachea. Progressively increasing volumes of air are then required to maintain cuff seal.

**Table - 2 : Common problems leading to leak during mechanical ventilation.[21]**

| Problem | Solution |
|---------|----------|
| Eccentric cuff inflation | Check cuff before insertion |
| Incorrect cuff position, cuff at or above vocal cords | Check and adjust ETT position, ensure cuff is in mid-trachea |
| Size of ETT is too small | Change ETT, insert a larger ETT |
| Leak in inflation valve | Attach 3-way stopcock and keep closed to maintain seal |
| Leak in pilot balloon or valve | Cut the connecting tube distal to leaking part housing and insert 22G needle with 3-way stopcock into remaining tubing |
| Leaking cuff, usually damaged by teeth, nasal bone or Magill forceps | Change ETT |

### Obstruction of the tube[2,9]

This can be due to a number of reasons :

1. Biting of the ETT.

2. Kinking of the ETT.

3. Obstruction by material in the lumen of the tube. This includes inspissated secretions, blood clots, nasal turbinates, adenoids or a variety of foreign bodies.

4. Defective spiral embedded tubes. During manufacture, air bubbles may form between layers. Blebs form when these are steam sterilized with vacuum. Diffusion of nitrous oxide into these blebs causes dissection of the walls with compression of the lumen.

5. Impaction of the tip of the tube against the tracheal wall may result in respiratory obstruction, particularly where the trachea contains a sharp bend, such as the thoracic inlet. The Murphy's eye, incorporated into many modern tubes, permits airflow to take place, even if this has occurred.

6. Herniation of the cuff over the lumen of the tube may occur if the cuff of an old, perished tube is over inflated. This, again, will cause respiratory obstruction.

7. Compression of the lumen of the tube by the cuff may be caused by over inflation of the cuff or by gradual diffusion of nitrous oxide onto the cuff during the course of anaesthesia. This problem is more common when silicone rubber tubes are used.

Obstruction of the ETT may manifest as increased resistance to ventilation, high airway pressures and 'wheeze'. A blocked tube is an important cause of intraoperative bronchospasm and must be ruled out before bronchodilator therapy is given. ETT obstruction may be prevented by careful attention to the type of ETT, inspection and checking of the ETT and cuff prior to use, and by humidification of inspired gases. When ETT obstruction is diagnosed, visual inspection, passage of a suction catheter (or preferably a fiberoptic bronchoscope) along with cuff deflation and 90° rotation of the tube will rule out several of these possibilities. If patency cannot be restored, the ETT should be removed and replaced, if necessary over a tube exchanger.

### Aspiration of gastric contents

While a cuffed tube protects the lungs from aspiration of foreign material, aspiration does occur. The high volume low pressure cuff has folds even after inflation through which fluid can pass into the trachea and lungs. The presence of spontaneous ventilation, accumulation of fluid above the cuff, a head up position and the use of uncuffed tubes or cuff leakage increase the chances of aspiration.

### Fire during laser surgery[9]

Fires are a danger associated with the increasing use of lasers for airway and oral surgery. Steps that may be taken to reduce this extremely serious hazard include:

1. Using special laser tubes, which may be made of jointed metal or clear plastic (with no radiopaque strip), or a plain red rubber tube, but not a conventional plastic tube.

2. Wrapping exposed portions of the tube with aluminium tape.

3. Inflating the cuff of the ETT with saline instead of air.

4. Packing wet pledgets between the ETT and larynx and covering the external part of the ETT with wet drapes.

5. Use of helium-oxygen mixtures that are less supportive of combustion than oxygen alone or oxygen-nitrous oxide mixtures.

When a fire in the airway occurs, the flow of oxygen must be immediately stopped, saline poured on the ETT and the trachea extubated. Surgery is stopped, the trachea is reintubated and the patient given humidified oxygen. The airway should be examined for burn injury and for any missing fragments of the ETT or its wrapping.

### Difficult extubation[10]

1. The cuff may fail to deflate. It can be punctured by a needle placed through the cricothyroid membrane after the cuff is raised to this level.

2. More serious and somewhat unusual causes of difficult extubation include fixation of the ETT or pilot tube by a Kirshner (K) wire used in head and neck surgery or a suture placed from the pulmonary artery through the trachea into the ETT. The nature of the surgical procedure must be kept in mind when a tube will not come out after cuff deflation or rupture, so as to avoid trauma from vigorous extubation attempts. Direct or fiberoptic examination may be required.

### Complications of extubation[10]

Airway obstruction, laryngospasm, and aspiration can occur. After intubations lasting 8 hours or more, airway protection may be impaired for 4 to 8 hours.

Sore throat is a complication of anaesthesia that may have pharyngeal, laryngeal, and/or tracheal sources and may occur in the absence of ETI. Factors that may affect the incidence of sore throat include area of cuff trachea contact, use of lignocaine ointment and size of the ETT, and the use of succinylcholine. Cuffs with a longer cuff trachea interface appear to cause a higher incidence of sore throat. The incidence of sore throat may also be related to intracuff pressures. The mechanism for succinylcholine-related sore throat is postulated to be myalgias due to fasciculations of peripharyngeal muscles. Sore throat is a minor side effect that should resolve within 72 hours; it should not be a factor in determining whether ETI is required.

Hoarseness is another minor side effect correlated with ETT size that should be investigated if persistent.

*DIVATIA, BHOWMICK* : ENDOTRACHEAL INTUBATION : COMPLICATIONS                    313

### Laryngeal oedema[10]

Subglottic oedema is particularly more common in children, as the nonexpandable cricoid cartilage is the narrowest part of the pediatric airway. Oedema may also be uvular, supraglottic, retroarytenoid, or at the level of the vocal cords, and is manifested by inspiratory stridor. Diminished stridor may represent total airway obstruction and movement of air must be repeatedly confirmed. The contributing factors to the production of laryngeal oedema include too large a tube, trauma from laryngoscopy and/or intubation, excessive neck manipulation during intubation and surgery, excessive coughing or bucking on the tube, and present or recent upper respiratory infection. The prophylactic use of steroids before extubation to reduce oedema is an unproven but frequently utilized treatment if the likelihood of postextubation stridor is suspected. Treatment includes warmed, humidified oxygen, nebulized racemic epinephrine (0.25 to 1 ml), and I.V. dexamethasone (0.5 mgkg⁻¹ up to 10 mg). If obstruction is severe and persistent, reintubation must be considered.

### Acute traumatic complications of lesser significance[13,14]

### Dental injury

Incidence of dental injury ranges from 1:150 to 1:1000, to as little as 1:9000.[22] The upper incisors are usually involved. Risk factors include preexisting poor dentition and one or more indicators of difficult laryngoscopy and intubation.[23] When dental trauma occurs, the loose tooth should be recovered to ensure that aspiration of the tooth does not occur. The avulsed tooth should be placed in saline and immediate dental consultation should be obtained for possible reimplantation. A partial or complete dental fracture should be evaluated by an oral surgeon postoperatively. Details of the injury should be well documented in the anaesthetic record and chart and the patient informed of the injury.

### Nasal injury

Nasotracheal intubation is frequently used in head and neck surgery. Patients with basilar skull fractures or severe facial trauma should not have nasal tubes passed as there exists a danger of inadvertent cranial intubation.

Epistaxis is a common problem, caused by the tip of the ETT traumatizing nasal and pharyngeal mucosa. This may be more common and dangerous in patients with coagulopathy or those receiving anticoagulants. Nasal intubation is relatively contraindicated in such patients.

Attempted passage of a nasotracheal tube can create false submucosal passages. These can progress to retropharyngeal abscesses.

Turbinates, adenoids, and tonsils can also be traumatized. Prolonged nasal intubation can lead to pressure necrosis of the nostrils and septum. Nasal septal abscesses, retropharyngeal abscesses and paranasal sinusitis can occur after intubation. Paranasal sinusitis[24] occurs due to injury to the sinus ostia followed by oedema, obstruction and infection. It may present as unexplained fever or purulent discharge, is often refractory to antibiotics and may lead to intracranial infection or septicaemia.[25]

### Pharyngeal trauma

Necrosis and perforation of the pharynx may present in the immediate postoperative period with subcutaneous crepitus, fever, tachycardia, and odynophagia. Most lacerations of the oropharynx can be treated conservatively. A haematoma should be treated with antibiotics, but if it is large, consideration should be given to drainage. The patient must avoid oral feeds for at least 48 hours and intravenous broad-spectrum antibiotics should be prescribed. Larger perforations may need surgical repair.

### Temporomandibular joint injury

Patients tend to be healthy females below 60 years of age. Preexisting temporomandibular disease may be present in a small percentage. The dislocation usually is detected at the time of procedure and the jaw is locked in an open position and cannot be closed. Immediate reduction of the dislocated TMJ should be performed and this can be achieved easily. Patients with continual symptoms referable to the joint should receive an oral surgery consultation for possible treatment with an occlusal appliance.

### Tongue injury

Macroglossia occurs due to prolonged compression by an ETT or oral airway, leading to ischemia and venous congestion. Obstruction of the submandibular duct by an ETT may lead to massive tongue swelling.[26] Compression injury to the lingual nerve during difficult intubation leading to loss of sensation has been reported.

### Laryngeal trauma

### Vocal cord paralysis

In the subglottic larynx, an anterior branch of the recurrent laryngeal nerve enters between the cricoid and the thyroid cartilage, innervating the intrinsic muscles of the larynx. An inflated cuff at this location can compress the nerve between the cuff and the overlying thyroid cartilage, causing injury.[27,28] Bilateral injuries present considerably more risk and frequently require emergency reintubation or tracheostomy. Unilateral injury to a

INDIAN JOURNAL OF ANAESTHESIA, AUGUST 2005

recurrent laryngeal nerve prevents abduction of the ipsilateral vocal cord; therefore, it becomes fixed in the adducted position. This is associated with hoarseness, usually noted immediately in the postoperative period. Recurrent nerve injury can be prevented by avoidance of overinflation of the ETT cuff, and prevention of excessive tube migration during anaesthesia. Vocal cord paralysis is usually associated with spontaneous recovery over days to months.

### Arytenoid injury

Arytenoid dislocation is another well described cause of laryngeal injury that can occur after traumatic intubation[29] as well as with routine elective intubation.[30]

### II. Complications related to tissue erosion and healing

**Laryngeal injury** : Occurs due to ischemic injury resulting from high pressures generated [upto 400 mmHg] when the round ETT presses on the pentagonal structure of the larynx, especially at the vocal processes of the arytenoids and the cricoid ring.[31]

**Ulcerations or erosions of the larynx** : Are common even after a short duration of intubation, and progress with the length of intubation. They are most commonly found on the posterior part of the larynx and anterior and lateral aspects of trachea, corresponding to the position of the convex curve of the ETT, the tip and the cuff. Superficial ulcers heal rapidly. Deeper ulcers may result in scarring or erosion of a blood vessel and haemorrhage.

**Granuloma of the vocal cords** : May develop from an ulcer, when granulation tissue forms and forms a sessile lesion. The incidence varies from 1: 800 to 1: 20000. Patients may be asymptomatic, or have hoarseness, pain and discomfort in the throat, chronic cough and haemoptysis. Persistent symptoms after intubation need an ENT consult and strict voice rest. Granulomas usually heal spontaneously. Surgical intervention is required only if the lesion is pedunculated or the patients develops respiratory obstruction.

**Laryngotracheal membrane** : Is an uncommon but potentially fatal complication due to respiratory obstruction. The symptoms of respiratory obstruction occur 24-72 hours after extubation. Diagnosis is made by direct laryngoscopy or bronchoscopy. Treatment is removal by suction.

**Delayed tracheal injury** : Is almost always cuff related, and can be minimized by use of low pressure cuffs and meticulous cuff management. The incidence of laryngotracheal complications can be further reduced by use of appropriate sized ETTs made of nontoxic plastic. Drag on the ETT by ventilator tubing should be avoided and excessive ETT movement reduced by use of swivel connectors. Local and systemic sepsis should be aggressively treated and corticosteroids used only when indicated.

**Tracheal stenosis** : Intracuff pressure is transmitted laterally against the wall of the trachea. Ischemia and eventual necrosis occur when the lateral tracheal wall pressure exceeds the capillary perfusion pressure of about 25 mmHg. Necrosis of the tracheal mucosa leads to sloughing and ulceration of the mucosal membrane, exposing tracheal cartilage. Continued ischemia may be followed by partial or complete destruction of cartilaginous tracheal rings and loss of the structural integrity of the affected tracheal segment, leading to tracheal dilatation. Healing of the injured tracheal segment during any stage of this process may lead to a tight fibrous stricture (tracheal stenosis). These can be prevented by proper management of low pressure cuffs. Only high volume, low pressure cuffs must be used, and the cuff inflated to pressure not exceeding 25 mmHg or 30 cm $H_2O$. Overinflation of these cuffs causes them to function just like high pressure cuffs. It is therefore essential to inflate only as much air as is required to just seal the air leak during IPPV (minimal inflation technique), and to check the intracuff pressure with a cuff-pressure manometer.

### Complications of tracheostomy

Two types of tracheostomy (TR) are now performed – open or surgical tracheostomy, and percutaneous tracheostomy. The complications of TR[32-34] are summarized in Table 3. Some of these are:

| Table - 3 : Complications of tracheostomy |
| --- |
| **A .    Complications during surgery** |
| Haemorrhage |
| Pneumothorax and pneumomediastinum |
| Cardiorespiratory arrest |
| Recurrent laryngeal nerve injury |
| **B .    Immediate postoperative complications** |
| Haemorrhage |
| Subcutaneous emphysema |
| Displacement and obstruction of the tube |
| Swallowing problems |
| **C .    Late complications** |
| Tracheal stenosis: at the stoma or at the level of the cuff |
| Tracheomalacia |
| Tracheo-oesophageal fistula |
| Tracheo-innominate fistula |

1. **Pneumothorax** : Occurs in about 4% of adult TRs and is more common during emergency or difficult TR, especially when the airway is obstructed and the patient's inspiratory efforts draw in a large volume of air into tissue planes. False passage of the tracheostomy tube (TT) in the anterior paratracheal tissue followed by mechanical ventilation (MV) leads to similar complications. Tension pneumothorax may lead to cardiac arrest. A chest X ray must be taken after TR and if pneumothorax is present, it should be promptly treated by drainage and underwater seal. Subcutaneous emphysema can be prevented by using a cuffed TT and by not suturing the wound very tightly.

2. **Cardiorespiratory arrest** : The respiratory drive and massive sympathetic stimulation occurring due to hypercarbia and hypoxia in patients with severe airway obstruction are suddenly removed when TR is performed, leading to respiratory arrest and cardiovascular collapse. The patient usually recovers completely with MV, fluid resuscitation and inotropic support. Negative pressure pulmonary oedema[36] may also occur minutes to hours after airway obstruction is relieved by TR [or ETI]. It responds well to treatment.

3. **Inability to insert the TT** : Can result in severe hypoxia and death. During TR, the ETT should never be withdrawn completely from the larynx until it is confirmed that the TT is in the trachea. The TR tract takes 37 days to form. If in this period, the TT needs to be reinserted, there is a real danger of being unable to reinsert the tube or of inserting it into the paratracheal space. A pad must be placed under the shoulders to bring the trachea up in the neck and a tracheal dilator used to introduce the TT. ETI may be necessary to secure the airway if the TT cannot be replaced. A Bjork flap [an inverted 'U' shaped flap of anterior tracheal wall cut and sutured to the skin] may permit easier reinsertion of the TT before the tract has formed, but may be associated with a higher incidence of stomal stenosis.

4. **Trachea stenosis and tracheomalacia** : Can be prevented by proper management of low pressure cuffs. The incidence of stomal stenosis can be reduced by not making a large stoma and by use of lightweight, mobile, swivel connectors to minimize mechanical trauma.

5. **Tracheo-oesophageal fistula** : May occur due to injury to the posterior tracheal wall during TR, but is more often the result of high cuff pressures, and is often aided by a nasogastric tube pinched between the oesophagus and posterior tracheal wall.

6. **Tracheo-innominate fistula**[37] : Is a dreaded complication of TR, the patient exsanguinating to death in minutes. It is a major cause of haemorrhage occurring 48 hours after TR and occurs either due to direct contact between the innominate artery and TT in case of low TR [below the 4 th tracheal ring] or to high cuff pressures leading to necrosis of the anterior tracheal wall followed by erosion of the arterial wall. Major haemorrhage may be preceded by 'warning bleeds' and the TT may be seen to be pulsating. Haemorrhage may be controlled by hyperinflating the cuff to occlude the opening in the artery. If this is unsuccessful, the artery can be compressed anteriorly after incising the skin over the sternal notch while the patient is transported to the operating room. Immediate surgery is required to salvage the patient.

### Complications of percutaneous tracheostomy

The incidence of complications reported with PCT varies from 3-25%, In three large series using the Ciaglia technique, perioperative complications were reported in 8-11% of patients.[38-40] The published incidence of perioperative complications with the guidewire dilating forceps (GWDF) technique[41-43] ranges from 0-24%. Fikkers and Ambesh found no major differences between the GWDF and the Blue Rhino techniques,[44,45] except perhaps for a slightly increased bleeding with the GWDF.[45] In a meta analysis of percutaneous tracheostomy trials (n=27; patients) 1817 perioperative complications occurred in 10%, including deaths in 0.44% and serious cardiorespiratory events in 0.44% patients, whereas postoperative complications occurred in 7% of patients.[46] The main perioperative complications of PCT include bleeding, pneumothorax, and posterior tracheal injury. Posterior tracheal injury may be confined to the mucosa, or may involve the entire posterior wall, and more seriously, result in a tracheo-oesophageal fistula. It has been suggested that visualization by fibreoptic bronchoscopy of tracheal puncture and dilatation can substantially reduce the incidence of such complications.[47,48] Endoscopic guidance ensures midline placement, prevents paratracheal tube placement and avoids inadvertent injuries. Complications during percutaneous tracheostomy have been classified[46] as major, intermediate and minor (table 4).

**Table - 4 : Complications of percutaneous tracheostomy**

| Major | Intermediate | Minor |
|---|---|---|
| Death or cardiac arrest | Hypoxemia | Minor Haemorrhage |
| Pneumothorax | Bleeding (requiring | Subcutaneous |
| Post tracheal tear | surgical intervention, | emphysema |
| Tracheo-oesophageal fistula | blood transfusion or | Pretracheal dilatation |
| Intratracheal haemorrhage | hemoglobin fall | Puncture of ETT cuff |
| Pulmonary aspiration of blood | > 2gm%) | Arterial puncture |
| Obstruction or displacement | Posterior tracheal | |
| of the tube | wall injury | |
| Sepsis | Conversion to surgical | |
| Tracheal stenosis | tracheostomy | |
| | Abandoned procedure | |

### Complications with the laryngeal mask airway

The laryngeal mask airway (LMA) has become an increasingly popular alternative to the face mask and ETT as a means of providing a secure airway for patients undergoing elective surgical procedures requiring general anaesthesia. However, the use of LMA is not free of complications. These have been reviewed by Pollack.[49] Complications resulting from use of the LMA in the OR are known to be rare. In a series of more than 11,000 patients of all ages over a 2-year period, there was a 0.15% airway management complication rate, and none of these 18 patients required intensive care.[50]

### Malplacement and aspiration

The commonest and the most important are regurgitation of gastric content and chances of aspiration. Brimacombe conducted a meta analysis of the published literature and found an incidence of aspiration in 2/10,000 patients, which is similar to that recorded during general endotracheal anesthesia.[51] The LMA has been shown to cover both the laryngeal inlet and the oesophagus, thus forming a potential direct communication between the two. Moreover LMA does not reliably provide an airtight seal around the larynx and may not protect the airway from aspiration of gastric contents, if there is regurgitation into pharynx. The chance of regurgitation and aspiration while using LMA is present both during spontaneous and mechanical ventilation. The incidence of regurgitation varies from 0.08 to 23%.[52-53] Mechanical ventilation with an LMA may encourage the risk of reflux and aspiration more, by causing gastric insufflations and increased intragastric pressure.[54] Regurgitation is considered to occur more often during certain surgical procedures, such as laparoscopic surgery in gynaecological patients. This is thought to be due to lithotomy position with head down tilt which increases intra abdominal pressure,[55] there is also the possibility that the LMA induces a reduction of lower oesophageal sphincter tone.[56] Malplacement and improper seating of the LMA above the airway opening clearly increases the risk of gastric distension and subsequent aspiration, as does positive pressure

ventilation through the LMA. There are case reports of aspiration even with Proseal LMA.[57]

Inadequate patient anaesthesia may result in coughing, gagging, and bucking on attempted LMA insertion. This may be particularly hazardous in the patient with suspected intracranial or cervical spine injury. If coughing and gagging occur during attempted insertion, the mask should be removed and anaesthesia should be deepened. If they occur with the mask in situ, anaesthesia should be deepened and the mask should be left in place. Direct trauma to pharyngeal and upper airway structures typically may result from poor insertion technique.

Malplacement of the LMA, with migration of the LMA tip into the glottic aperture, may also induce bronchospasm. Ventilation through an LMA in these patients may be inadequate because high positive pressure ventilation results in air leak around the laryngeal mask.

### Pressure induced lesions

The next important complication, which has been reported, is lingual nerve injury, both unilateral and bilateral. The course of lingual nerve after it branches out of posterior trunk of mandibular nerve is such that the various manoeuvers undertaken during the insertion of LMA and in maintaining its position can injure it. The nerve is vulnerable to compression as it travels between the pterygoids or between the medial pterygoid and the mandible. Compression injury between the pterygoids may occur secondary to mandibular retraction.[58] Prolonged anterior displacement of the mandible, as in the jaw thrust manoeuver, has also been implicated in lingual neuropraxia. The LMA can also cause nerve injury probably by direct compressions of the nerves. When the laryngeal mask is correctly placed, the distal tip lies in the hypopharynx at the upper oesophageal sphincter, the proximal base lies just under the tongue base with sides facing the pyriform fossa.[59] In this position the cuff may compress the lingual nerves as they lie on the inner aspect of the mandible covered only by the mucus membrane.[60]

Tongue cyanosis and swelling has also been reported after the use LMA.[61] The probable cause may be occlusion of lingual artery bilaterally by the cuff of LMA when the arteries enter the base of tongue. It may be due to malpositioning or due to size of LMA.

The incidence of recurrent nerve paralysis has also occurred by the use of LMA. The probable cause may be the compression of the nerve by increased cuff pressure of the LMA at the point where the nerve enters into the larynx passing behind the thyroid and cricoid cartilage.

Cuff volume also influences postoperative sore throat and dysphagia. The incidence of sore throat has

also been found to be higher in case of LMA than that of ETT. It has been found that sore throat incidence is less with Soft-Seal LMA than classic LMA.[62] Nitrous oxide tends to diffuse less into the Soft Seal cuff during anaesthesia.

### Complications of using the esophageal tracheal combitube (ETC)

The combitube has been widely accepted as an airway device for out-of hospital Cardio pulmonary and cerebral recuritation (CPCR) but has not been accepted into routine anaesthesia practice. The main limitation of the ETC in routine anaesthesia is the potential risk of trauma.

Oesophageal and pharyngeal perforation leading to subcutaneous emphysema, pneumomediastinum and pneumoperitoneum has been reported in association with out of hospital airway rescue.[63,64] Bleeding (36-45%), sore throat (16-46%) and dysphagia (8-68%) have been reported in association with routine anaesthesia.[65,66] Possible mechanisms for trauma are direct injury during placement or high pressures exerted against the surrounding mucosa.

The chances of direct injury during the placement of ETC are due to the following reasons:

1. ETC is a large and stiff tube with an anterior curvature, a design that might cause injuries by bulging the anterior wall of oesophagus. Laceration has been observed on the anterior wall only.

2. Technique of blind insertion with out visualization of the passage of the ETC into the pharynx and into the proximal oesophagus opening may also promote injuries.

The volume of both the proximal and the distal cuffs determines the pharyngeal, oesophageal and tracheal mucosal pressures. Pharyngeal mucosal perfusion is progressively reduced when mucosal pressure increases from 34 to 80 cmH$_2$O.[67] In the pharynx and in the oesophagus the pressure will be highest posteriorly because the posterior surface is adjacent to the rigid vertebral bodies.[68] In the pharynx the ETC can potentially impair the perfusion in the anterior, lateral and posterior wall when the proximal cuff volume increases from 40 to 70 ml, 50 to 80ml, and 30 to 50 ml respectively.[68] These volume frequently exceed the minimal volume required to form an oropharyngeal leak pressure of 30 cm H$_2$O.

In the oesophagus perfusion would be potentially impaired in the anterior, lateral and posterior oesophagus when distal cuff volume increases from 12 to 18 ml, 12 to 20 ml and 4 to 8 ml respectively. Likewise tracheal mucosal perfusion is progressively reduced when mucosal pressure increases from 30 to 50 cmH$_2$O. Tracheal perfusion would be potentially impaired in the anterior, lateral and posterior trachea, when distal cuff volume increases from 4 to 6 ml, 8 to 10 ml and 10 to 12 ml, respectively. Thus at the recommended inflation volume for the pharyngeal (85 ml) and oesophageal cuffs (10-15 ml), mucosal pressure would be potentially higher than perfusion pressure posteriorly.[68]

In the pharynx, the increased pressure may cause bleeding and sore throat and would perhaps predispose to pharyngeal perforation. Likewise, in the oesophagus these high pressures may cause dysphagia and may predispose to oesophageal rupture.

### References

1. *Flemming DC.* Hazards of tracheal intubation, in Orkin FK, Cooperman LH. Complications in Anaesthesiology 1983; JB Lippincott Co., Philadelphia.

2. *Dorsch JA, Dorsch SE.* Understanding anaesthesia equipment: construction, care and complications, 3rd ed. Baltimore: Williams and Wilkins, 1994.

3. American Society of Anesthesiologists: Practice guidelines for management of the difficult airway. Anesthesiology 1993; 78: 597-602.

4. American Society of Anesthesiologists Task Force on Difficult Airway Management. Practice guidelines for management of the difficult airway. Anesthesiology 2003; 98: 1269-77.

5. *Mort TC.* Emergency tracheal intubation : Complications associated with repeated laryngoscopic attempts. Anesth Analg 2004; 99: 607-13.

6. *Caplan RA, Posner KL, Ward RJ, Cheney FW.* Adverse respiratory events in anesthesia: A closed claims analysis. Anesthesiology 1990; 72: 8280-33.

7. *Benumof JL, Scheller MS.* The importance of transtracheal jet ventilation in the management of the difficult airway. Anesthesiology 1989; 71: 769-78.

8. *Smith RB, Schaer WB, Pfaeffle H.* Percutaneous transtracheal ventilation for anaesthesia and resuscitation : A review and report of complications. Can Anaesth Soc J 1975; 22: 607-12

9. Complications of endotracheal intubation. http:/www.frca.co.uk/ article.aspx?articleid=100165 accessed on 27/7/05

10. *Gal TJ.* Airway management. In: Miller RD, editor. Anesthesia, 6th edition. Philadelphia : Elsevier, 2005; vol. 2: 1617-52.

11. *Habib MP.* Physiologic implications of artificial airways. Chest 1989; 96: 180-84.

12. *Levine SA, Niederman MS.* The impact of tracheal intubation on host defenses and risks for nosocomial pneumonia. Clin Chest Med 1991; 12: 523-43.

13. *Weber S.* Traumatic complications of airway management. Anesthesiology Clin N Am 2002; 20: 503-512.

14. *Loh KS, Irish JC.* Traumatic complications of intubation and other airway management procedures. Anesthesiology Clin N Am 2002; 20: 953-969.

15. *Domino KB, Postner KL, Caplan RA, Cheney FW.* Airway injury during anesthesia. Anesthesiology 1999; 91: 1703-11.

16. *Seitz PA, Gravenstein N.* Endobronchial rupture from endotracheal reintubation with an endotracheal tube. J Clin Anesthesia 1989; 1: 214.

17. *Wagner DL, Gammage GW, Wong ML.* Tracheal rupture following insertion of a disposable double-lumen tube. Anesthesiology 1985; 63: 698.

18. *Kapadia FN, Bajan KB, Raje KV.* Airway accidents in intubated ICU patients: An epidemiological study. Critical Care Medicine 2000; 28: 659-664.

19. *Amato MRP, Barbas CSV, Medeiros DM et al.* Effect of protective ventilator strategy on mortality in acute respiratory distress syndrome. N Eng J Med. 1998; 338: 347-354.

20. *Chatterjee A, Islam S, Divatia JV.* Airway accidents in a surgical ICU. Indian Journal of Crit Care Med 2004; 8: 36-39.

INDIAN JOURNAL OF ANAESTHESIA, AUGUST 2005

21. *Stone DJ, Bogdonoff DL.* Airway considerations in the management of patients requiring long-term tracheal intubation. Anesth Analg 1992; 74: 276-87.

22. *Lockhart PB, et al.* Dental complications during and after tracheal intubation. J Am Dent Assoc 1986; 112: 480.

23. *Warner ME, Benenfeld SM, Warner MA, Schroeder DR, Maxson PM.* Perianesthetic dental injuries: frequency, outcomes, and risk factors. Anesthesiology 1999; 90: 1302-05.

24. *Bach A, Boehrer H, Schmidt H, Geiss HK.* Nosocomial sinusitis in ventilated patients : Nasotracheal versus orotracheal intubation. Anaesthesia 1992; 47: 335-39.

25. *Deutschman CS, Wilton P, Sinow J, Dibbell D, Konstantinides FN, Cerra FB.* Paranasal sinusitis associated with nasotracheal intubation : A frequently unrecognized and treatable source of sepsis. Crit Care Med 1986; 14: 111-14.

26. *Heuhns TY, Yentis SM, Cumberworth V.* Apparent massive tongue swelling. Anaesthesia 1994; 49: 414.

27. *Ellis PD, Pallister WK.* Recurrent laryngeal nerve palsy and endotracheal intubation. J Laryngol Otol 1975; 89: 823-26.

28. *Cavo JWJ.* True vocal cord paralysis following intubation. Laryngoscope 1985; 95: 1352-9.

29. *Tolley NS, Cheesman TD, Morgan D, Brookes GB.* Dislocated arytenoid: an intubation-induced injury. Ann R Coll Surg Engl 1990; 72: 353-56.

30. *Frink EJ, Pattison BD.* Posterior arytenoids dislocation following uneventful tracheal intubation and anesthesia. Anesthesiology 1989; 70: 358.

31. *Bishop MJ, Weymuller EA, Fink BR.* Laryngeal effects of prolonged intubation. Anesth Analg 1984; 63: 335-42.

32. *Kirchner JA.* Tracheostomy and its problems. Surg Clin North Am 1980; 60: 1093-104.

33. *Myers EN, Carrau RL.* Early complications of tracheostomy: Incidence and management. Clin Chest Med 1991; 12: 589-95.

34. *Wood DE, Mathisen DJ.* Late complications of tracheotomy. Clin Chest Med 1991; 12: 597-609.

35. *Heffner JE, Miller KS, Sahn SA.* Tracheostomy in the intensive care unit Part 2: Complications. Chest 1986; 90: 430-35.

36. *Lang SA, Duncan PG, Shephard DAE, Ha HC.* Pulmonary oedema associated with airway obstruction. Can J Anaesth 1990; 37: 210-18.

37. *Jones JW, Reynolds M, Hewitt RL, Drapanas T.* Tracheo-innominate artery erosion : Successful surgical management of a devastating complication. Ann Surg 1976; 184: 194-203.

38. *Toursarkissian B, Zweng TN, Kearney PA et al.* Percutaneous dilational tracheostomy: report of 141 cases. Annals of Thoracic Surgery 1994; 57: 862-67.

39. *Marx WH, Ciaglia P, Graniero KD.* Some important details in the technique of percutaneous dilational tracheostomy via the modified Seldinger technique. Chest 1996; 110: 762-66.

40. *Petros S, Engelmann L.* Percutaneous dilatational tracheostomy in a medical ICU. Intensive Care Medicine 1997; 23: 30-34.

41. *Griggs WM, Myburgh JA, Worthley LI.* A prospective comparison of a percutaneous tracheostomy technique with standard surgical tracheostomy. Intensive Care Medicine 1991; 17: 261-63.

42. *Divatia JV, Kulkarni AP, Upadhye SM, Sareen R, Patil VP.* Percutaneous tracheostomy in the Intensive Care Unit : Initial Experience. Indian Journal of Critical Care Medicine 1998; 2: 6-11.

43. *Escarment J, Suppini A, Sallaberry M et al.* Percutaneous tracheostomy by forceps dilation: report of 162 cases. Anaesthesia 2000; 55; 2: 125-130.

44. *Fikkers BG, Staatsen M, Lardenoije SGGF, van den Hoogen FJA, van der Hoeven JG.* Comparison of two percutaneous tracheostomy techniques, guide wire dilating forceps and Ciaglia Blue Rhino: a sequential cohort study. Crit Care 2004; 8: R299-R305.

45. *Ambesh SP, Pandey CK, Srivastava S, Agarwal A, Singh DK:* Percutaneous tracheostomy with single dilatation technique: a prospective, randomized comparison of Ciaglia Blue Rhino versus Griggs' guidewire dilating forceps. Anesth Analg 2002; 95: 1739-1745.

46. *Dulguerov P, Gysin C, Perneger TV, Chevrolet JC.* Percutaneous or surgical tracheostomy: a meta-analysis. Critical Care Medicine 1999, 27; 1617-1625.

47. *Paul A, Marelli D, Chiu RCJ et al.* Percutaneous endoscopic tracheostomy. Annals of Thoracic Surgery 1989; 47: 314-15.

48. *Winkler WB, Karnik R, Seelman O et al.* Bedside percutaneous dilational tracheostomy with endoscopic guidance: Experience with 71 patients. Intensive Care Medicine 1994; 20: 476-79.

49. *Pollack CV, Jr.* The laryngeal mask airway: a comprehensive review for the emergency physician. J Emerg Med 2001; 20: 53-66.

50. *C. Verghese and JR. Brimacombe.* Survey of laryngeal mask airway usage in 11,910 patients: Safety and efficacy for conventional and nonconventional usage. Anesth Analg 1996; 82: 129-133.

51. *Brimacombe JR, Berry A.* The incidence of aspiration associated with the laryngeal mask airway: A meta-analysis of published literature. J Clin Anesth 1995; 7: 297-305.

52. *Barker P, Murphy P, Langton JA, Rowbotham DJ.* Regurgitation of gastric contents during general anaesthesia using laryngeal mask airway. Br J Anaesth 1992; 69: 314-315.

53. *Verghese C, Smith TGC, Young E.* Prospective survey of the use of the laryngeal mask airway in 2359 patients. Anaesthesia 1993; 48: 58-60.

54. *Akhtar TM, Street MK.* Risk of aspiration with the laryngeal mask. Br J Anaesth 1994; 72: 447-50.

55. *Mikatti NE, Luthra AD, Healy TEJ, Mortimer AJ.* Gastric regurgitation during general anaesthesia in different positions with laryngeal mask airway. Anaesthesia 1995; 50: 1053-55.

56. *Rabey PG, Murphy PJ, Langton JA; et al.* Effect of the laryngeal mask airway on lower esophageal sphincter pressure in patients during general anaesthesia. Br J Anaesth 1992; 69: 346-48.

57. *Koay CK et al.* A case of aspiration using the Proseal laryngeal Mask airway. Anaesthesia Intensive Care 2003; 31: 123.

58. *Winter R, Munro M.* Lingual and buccal neuropathy in a patient in the prone position: A case report. Anesthesiology 1989; 71: 452-54.

59. *Asai T, Morris S.* The laryngeal mask airway: Its features, effects and role. Can J Anaesth 1994; 41: 930-60.

60. *Majumder S, Hopkins PM.* Bilateral lingual nerve injury following the use of the laryngeal mask airway. Anaesthesia 1998; 53: 184-86.

61. *Wynn LM, Jones KI.* Tongue cyanosis after laryngeal mask airway insertion. Anesthesiology 1994; 80: 1403.

62. *Van Zundert AA, Fonck K, Al-Shaikh B, Mortier E.* Comparison of the laryngeal mask airway- Classic with new disposable Soft Seal LMA in spontaneous breathing adult patients. Anesthesiology. 2003; 99: 1066-71.

63. *Vezina D, Lessar MR.* Complications associated with the use of esophageal tracheal combitube. Can J Anaesth 1998; 45: 76-80.

64. *Richards CF.* Piriform sinus perforation during esophageal tracheal combitube placement. J Emerg Med 1998; 16: 37-39.

65. *Oczenski W.* Complications following the use of combitube, endotracheal tube and laryngeal mask airway. Anaesthesia 1999; 54: 1161-65.

66. *Hartmann T, Krenn CG.* The esophageal tracheal combitube in small adult. Anaesthesia 2000; 55: 670-75.

67. *Brimacombe J.* Acomparison of pharyngeal mucosal pressure and airway sealing pressure with laryngeal mask airway in anaesthesized adult patients. Anesth Analg 1998; 87: 1379-82.

68. *Keller C, Brimacombe J, Boehler M, Loeckinger A, Puehringer F.* The influence of cuff volume and anatomic location on pharyngeal, esophageal and tracheal mucosal pressures with the esophageal tracheal combitube. Anaesthesiology 2002; 96: 1074-77.

Exhibit AL

Conference call w/Barry Bates 10/21/05 1400-1445/hrs
Matsolonia Myers homicide 70467E

Thinking about it, the first thing I want to determine or see if I could determine with reasonable probability was how she went off the balcony (???) orientation whether she went over started out facing the fall or with her back to the fall. A, and what I did was basically just look at the biomechanics of that type of fall. There are two aspects, there's one the rotation, how much she has to rotate to land on her chest. And the other, she has to re-orient her or she has to be re-oriented relative to North-South, to go over front first. Cause I feel pretty certain that she went over back first and that justifies. Besides reorienting herself, east-west to north-south, I think that's going to take a force that's off center. Basically,

LAR: I'm going to stop you for a second, I don't understand what you mean, re-orient, this is Leigh Ann.

Ok, if she just went over, just set her on the railing and pushed her, she'd end up with her head or feet, head/feet orientation perpendicular to the building.

LAR: Got it, OK.

And she doesn't end that way.

LAR: Right, I'm following now. Ok.

She ends up parallel. So if we push her over backwards or if she falls over backwards or whatever, she's got to rotate 90 degrees to (???) in that east/west, I think she'd be in the north/south parallel to the building orientation.

LAR: You got it.

So we need a force to accomplish that. My opinion right now is the most likely force that caused that, and it's consistent with at least what I have from the autopsy and we don't have, you know, if we had some better details, this might be easier. But it looks like is that she went over backwards for whatever reason, her right leg was restricted or restrained partially as she went back and that force of the right leg would be the kind of force that could be sufficient to as she falls to the 40 feet to re-orient her into that parallel position. That would be consistent with my opinion of a right broken femur. I don't really see any other place, easy place or logical place to break the femur but I don't know exactly how it was broken. It's just that her upper body, her chest injuries are so severe that it's hard to imagine her having landed on her leg first. That she'd have to pancake down to the ground and that's consistent with the indentation in the ground. And it's also consistent with 12 broken ribs on each side and all the other internal, torso damage. So there would be a logical factor in finding or getting a force to

EXhibit AL

re-orient would also be a force to possibly break the femur which is, you know, I got from the autopsy. So given that we know

LAR: Can I, I have a couple questions.

No, that's good.

LAR: Ok, so I followed that, is it your working backwards, would it be your opinion that if she did land right leg first, that the fall and the land, and the landing were responsible for breaking the femur, that that would absorb enough of the force that you would not likely have seen as severe of injuries to the chest area?

Yes, that's my opinion. And there are two aspects to that, one is you would've absorbed energy to break the leg and two, if the leg would've hit first, it would be very hard for the trunk to hit flat and extended. Because as the leg would hit, it would re-orient the trunk and it would bend the trunk around the leg.

LAR: Ok, you're talking what makes sense to me, um but, how, when you say very hard, do you mean impossible, unlikely,?

Highly unlikely.

LAR: Highly unlikely, ok.

I would say highly, highly unlikely.

LAR: You can tell I'm the lawyer.

Well, you know and I wouldn't say okay absolute.

LAR: And I don't want you to.

I mean, but, it seems to me that you can't get the nasty damage to the torso with any kind of a leg landing.

LAR: Ok

For two reasons, one, it would take some of the energy away and it would re-orient the body so that it would be just about impossible to land and pancake the trunk on the ground.

LAR: Do your opinions on those kinds of things change if you have an old person or a young person, that kind of stuff?

Well, one thing that I think supports my opinion on (???) the broken femur at the top you know from that force of holding the leg back is that she's an old person.

(EXHIBIT AM)

Causing zipper Impressions on her fac scratches mid-lip.

**9**

they think they fell, or why they fell, or what have you. In other words, one is a fact that usually can be documented by, in this case, a medical professional. The other is based upon the individuals involved, and their thoughts, and how they -- what they think happened, and whether that's consistent with human performance or not.

Q. Dr. Bates, were you asked, back in 2005, to consult on a case in Omaha, Douglas County?

A. Yes, I was contacted. I was contacted -- actually, it wasn't by the police, it was by, I think, an attorney, and that was in February of '05. Eventually, though, I worked with the City of Omaha Police Department, receiving information on the case, the Pullens case, and I worked with them over a period of time. I don't know, really, how it started. I don't have it documented because a lot of my notes were discarded after I was released from the case --

Q. Okay.

A. -- and I know that I had my last conference call on the 21st of October of 2005.

Q. Do you remember who initially contacted you?

A. I think, but I'm not sure, that it was -- I don't know if he's a lieutenant or just a policeman, Kozlisky, that's who I interacted with, and who sent me,

**10**

initially, sent me materials on the case.

Q. And Officer Kozlisky --

A. Eventually, Lieutenant Hayes, I think it was, I had a conversation with him toward the end of my period with the Omaha Police, and that would have been around that last -- you know, sometime around that last date. In fact, I think -- let me look here, see if I can find it. I still have -- I think I have it. I just have a conference call noted on the 21st of October, and that doesn't say who it was with.

Q. And, Dr. Bates, you mentioned that you're referring to something. What are you referencing, just so our record is clear?

A. I was looking at my invoice, my second invoice to the Omaha Police Department dated October 24, 2005, which details, summarizes my work on the case, and my fee, my bill.

Q. So when you were initially contacted by law enforcement in October of 2005, what were you specifically asked to consult on?

A. As best I can remember, well, it was definitely on the Stephen Pullens case. In fact, that his mother had been found dead on the ground outside of the apartment building, and they wanted me to -- initially, they wanted me, mostly, to review a lot of E-mails they had

**11**

for consistency or inconsistency, and then, eventually, we had conversations about fall scenarios and a little bit about what might have happened.

I don't remember all of the details because that's a long time ago, and I have had so much information since then, it's hard to put it all -- recall, specifically, but it was, basically, about the fall and the documentation in terms of E-mails that were collected, what the police felt were relative to the case.

Q. And, Dr. Bates, do you remember what materials were provided for you when you started consulting on the Stephen Pullens case?

A. I think I had some early police records. I don't know if I had all the police records or not. I don't remember, at that time, whether I had them or not. I do not recall, at that time, having the autopsy --

Q. Were you provided any photographs --

A. -- which I eventually obtained.

Q. So right now, I'm just focusing on what law enforcement originally gave you. Did they give you any photographs?

A. The photographs that I have on my computer are probably from the police, I would suspect. I don't know for a fact, because I had some original -- a number of sets

**12**

of photographs relative to the scene, the apartment and so forth, and I am pretty sure they were sent to me originally, but I'm not absolutely sure.

Q. And you mentioned that you had some -- you had police reports, but you're not certain that they were a complete set?

A. I just don't know, sorry. Fortunately, the set I have now is very complete. I think it might be totally complete, but it's got a lot of markings on it, and this set was definitely not provided by the police. This was a set that was provided indirectly through Mr. Pullens, when I requested it after he and I started communicating.

Q. And you also mentioned that you, to the best of your recollection, were not provided an autopsy report; is that correct?

A. I do not recall seeing -- I do not recall seeing the autopsy. Again, I couldn't say for sure. The autopsy itself actually wouldn't have -- it would have had value in terms of documenting the injuries, but it wouldn't have really led to a lot of factors which would have allowed to reverse engineering.

Q. Okay. And did law enforcement explain to you their theory of Ms. Meyers' cause of death?

A. Well, in the discussions we had,

ORIGINAL

EXHIBIT AO

OMAHA POLICE DEPARTMENT
SUPPLEMENTARY REPORT                    Page 12 of 15

RB#    E-70467 BF

| OFFENSE: | VICTIM: | ADDRESS: |
|---|---|---|
| DEATH | MEYERS, MATSOLONIA | 711 NORTH 92 COURT, #405 OMAHA, NE 68114 |

| ORIGINAL REPORT: | THIS REPORT: |
|---|---|
| MON / 13 DEC 2004 / 1755 | FRI / 9 SEP 2005 / MIDNIGHT |

| TYPED BY: | REPORTING OFFICER: |
|---|---|
| DRAKE, N. C779 / SAT / 16 SEP 2005 | CARDENAS JR, GEORGE R. #1579 |

that the purpose of this interview today was to attempt to get a more detailed statement from Captain BARTSCH regarding specifically what the patient looked like while she was lying on the ground upon Captain BARTSCH'S arrival.

At this time Captain BARTSCH supplied Reporting Officer CARDENAS with a Prehospital Care Report, which is a four page report, and appears to be an Omaha Fire Department Report. Reporting Officer CARDENAS observed on the upper right hand corner of this report, Incident Number 0031117, with the patient name of MEYERS. Captain BARTSCH advised Reporting Officer CARDENAS that this four page document was prepared by herself and is the notes regarding her observations and actions in this run.

At this time Reporting Officer CARDENAS asked Captain BARTSCH if she would like to review the paragraphs which were on Reporting Officer CARDENAS' Omaha Police Department Supplementary Report to assist her in refreshing her memory on the details which she supplied Reporting Officer CARDENAS with on this particular event. Reporting Officer allowed Captain BARTSCH to review her statement on Reporting Officer CARDENAS' Supplementary Report, while Reporting Officer CARDENAS read the Omaha Fire Department Prehospital Care Report supplied by Captain BARTSCH.

Upon completion of reading the report, Captain BARTSCH advised Reporting Officer CARDENAS that she remembered the incident with detail and, furthermore, she advised Reporting Officer CARDENAS that she was the first party to locate the patient. Captain BARTSCH then stated she remembered it was dark out and cooler outside on this particular evening. Captain BARTSCH stated that it was not well lit where the patient was located; furthermore she had located this patient on a grassy area on the east side of this building.

Captain BARTSCH stated that upon her first observation she observed a dark figure lying on the grass and didn't realize that it was two separate people. Upon walking up closer, at this time she observed that there was a black male on his knees, leaning over the patient, who was lying on her stomach on the ground behind this building. Captain BARTSCH stated this black male's arms were encompassing the patient's head and houlder area. Captain BARTSCH stated that she didn't suspect that this party's arms were touching the patient, just kind of on the ground encompassing the patient.



ORIGINAL

Exhibit AO

OMAHA POLICE DEPARTMENT
SUPPLEMENTARY REPORT                    Page 13 of 15

RB#    E-70467 BF

| OFFENSE: | VICTIM: | ADDRESS: |
|----------|---------|----------|
| DEATH | MEYERS, MATSOLONIA | 711 NORTH 92 COURT, #405<br>OMAHA, NE 68114 |

| ORIGINAL REPORT: | THIS REPORT: |
|------------------|--------------|
| MON / 13 DEC 2004 / 1755 | FRI / 9 SEP 2005 / MIDNIGHT |

| TYPED BY: | REPORTING OFFICER: |
|-----------|--------------------|
| DRAKE, N. C779 / SAT / 16 SEP 2005 | CARDENAS JR, GEORGE R. #1579 |

Captain BARTSCH stated that initially this black male appeared upset emotionally as she observed him as crying and sobbing and moaning quietly. Captain BARTSCH stated that during the course of her initial evaluation she remembered getting a brief look at this party's face, at which time she observed his eyes as containing tears, but advised Reporting Officer CARDENAS that these tears weren't running down this party's cheeks. Captain BARTSCH stated that she was capable of getting a close look at this party's face as she was kneeling down within approximately one foot of the party, who was over the female, who was lying on the ground, attempting to speak to this party. Captain BARTSCH stated that she asked this party, "What happened?" Captain BARTSCH stated she remembered the party didn't respond. Captain BARTSCH stated she repeated the question again in a more firm tone, at which time this party said, "She fell from the balcony." Captain BARTSCH stated she remembered that when this black male had said this she remembered his voice was crying or sobbing.

Captain BARTSCH stated at this time she told the party that he needed to move away from the patient. Captain BARTSCH stated that the party wasn't responsive to her command, so she pushed the party off of the patient. Reporting Officer CARDENAS asked Captain BARTSCH if this was difficult. Captain BARTSCH stated she don't remember. Captain BARTSCH stated all she remembered was that she pushed this party off of the patient.

Captain BARTSCH stated she observed the patient as lying on her stomach, with her right cheek on the ground, with her head pointing north, and her feet pointing south. Captain BARTSCH stated the patient's right arm was bent at the elbow, her right hand palm was pressing against the ground, and her right hand was above her head. Captain BARTSCH stated the patient's left arm was also bent at the elbow and her left hand palm was also pressing on the ground approximately in the area of the patient's cheek. Captain BARTSCH stated she didn't remember the exact finger placement of the patient. Captain BARTSCH stated she did remember that the patient's legs were both lying flat on the ground. Captain BARTSCH stated she didn't remember how the patient's feet were situated on the ground.

Reporting Officer CARDENAS asked Captain BARTSCH if she remembered the clothing the patient was wearing. Captain BARTSCH stated the patient was

UM-HSRI-77-8

Exhibit AP

STUDY OF IMPACT TOLERANCE

THROUGH FREE-FALL INVESTIGATIONS

FINAL REPORT

Richard G. Snyder

David R. Foust

Bruce M. Bowman

December 15, 1977

Prepared for

Insurance Institute for Highway Safety

Washington, D.C.

by

Highway Safety Research Institute

The University of Michigan

Ann Arbor, Michigan

Exhibit AP

**Technical Report Documentation Page**

| 1. Report No. UM-HSRI-77-8 | 2. Government Accession No. | 3. Recipient's Catalog No. | |
|---|---|---|---|
| 4. Title and Subtitle Study of Impact Tolerance Through Free-Fall Investigations | | 5. Report Date 15 December 1977 | |
| | | 6. Performing Organization Code | |
| 7. Author(s) Snyder, R.G., D.R. Foust, and B.M. Bowman | | 8. Performing Organization Report No. UM-HSRI-77-8 | |
| 9. Performing Organization Name and Address Highway Safety Research Institute The University of Michigan Ann Arbor, Michigan 48109 | | 10. Work Unit No. DRDA-77-1587-B1 | |
| | | 11. Contract or Grant No. 6604 | |
| 12. Sponsoring Agency Name and Address Insurance Institute for Highway Safety Washington, D.C. | | 13. Type of Report and Period Covered Final Report 15 May 1975-15 Dec. 1977 | |
| | | 14. Sponsoring Agency Code IIHS | |

15. Supplementary Notes

16. Abstract

This study has combined techniques of detailed investigation of selected human free-fall impacts and computer simulation of representative falls in order to expand knowledge of human impact tolerance. Of 2100 falls occurring in the U.S. and Canada, 110 cases were selected for on-site investigation of biomedical and biophysical factors. Seven head-first, two side-first, and three feet-first falls were then simulated using the MVMA 2-D Crash Victim Simulator. Children were generally injured less severely than adults under similar fall circumstances, and tended to land on their heads a greater proportion of the time. It was found that survival limits for children may be higher than previously believed. Body position at impact was a major factor in resulting injuries. In falls to rigid surfaces certain types of injury can be predicted on the basis of age and fall distance. For children under age 8 it is concluded that a constant acceleration of up to 350 G for 2.5-3 msec approaches the survival limit for head impacts. For children younger than 18 months the minimum limit tolerance level for reversible head injury may be reached when fall distance is somewhat greater than four feet.

| 17. Key Words Crash Victim, Free-fall, Impact Tolerance, Head Injury Criterion, Injury Scaling, Simulator, Biomechanical Scaling, Mathematical Modeling, Side Impact, Head Impact, Head Acceleration, Feet-first Impact | | 18. Distribution Statement Unlimited | | |
|---|---|---|---|---|
| 19. Security Classif. (of this report) Unclassified | | 20. Security Classif. (of this page) Unclassified | 21. No. of Pages 307 | 22. Price |

iii

*Exhibit A*

single pelvic fracture to a child occurred when a 12½ year female fell nearly 34 feet and landed feet-first, fracturing both pubic rami. Most pelvic fractures were caused by the subject impacting the hip in a side-first fall.

Persons who suddenly find themselves falling will often extend their arms. This action is thought to be reflex (Carlsöö and Johansson, 1962) and it resulted in many fractures to the upper extremities. A majority of upper extremity fractures were to bones in one wrist or to the radius and ulna of one arm. These fractures were about evenly divided between children and adults, and most were the result of landing on the side or in a sitting-type position. A few bilateral lower arm or wrist fractures were seen as the subject attempted to break a head-first fall, and a few other falls produced fractures of the proximal humerus or clavicle.

A majority of lower extremity fractures occurred to adults and teenagers, since they tended to land on their feet and sides. Five of the six lower extremity fractures noted in children were broken femurs resulting from knee impacts while falling sideways. There were no femur fractures noted in teenagers--fractures of the tibia and fibula of one leg were most common. The 12 fractures to adult lower extremities were evenly divided among bilateral lower leg and ankle breaks, fractures of one lower leg or ankle, and femur fractures. Most of these injuries occurred as a result of landing on the feet or knees.

3.  Prediction of Injury Severity. The velocity at which a falling body impacts a surface is determined by the height of the fall. It is of interest to know if impact velocity can be used to predict injury severity. The descriptor of injury severity that was initially selected was the Injury Severity Score, or ISS. The ISS, which was developed by Baker,

61

Exhibit A Q

## IN THE COUNTY COURT OF DOUGLAS COUNTY, NEBRASKA

STATE OF NEBRASKA,                    )    CASE NO.         CR 04 – 39214
                                      )
                        Plaintiff     )
                                      )
VS.                                   )    **ORDER TO DISMISS**
                                      )
STEPHEN M. PULLENS,                   )
                                      )
                        Defendant.    )

THIS MATTER comes before the Court on the oral motion of the Douglas County Attorney for an order dismissing the charge(s) in the above-captioned case without prejudice. The Court declined to issue an arrest warrant for the Defendant's arrest in December 2004. The Court being fully advised in the premises finds such an order should be entered.

IT IS THEREFORE ORDERED that the charge(s) in the above-captioned case are hereby dismissed without prejudice.

BY THE COURT:

_Susan M Bazis_
Douglas County Court Judge

FILED
CRIM/TRAF DIVISION

JUL 1 8 2010

By _____
Clerk of the
DOUGLAS COUNTY
OMAHA NEBRASKA

Brady
Violation

Order prepared and submitted by:

_Matthew M. Kuhse_
Matthew M. Kuhse,
Deputy Douglas County Attorney

4

Name Stephen Pullens
(First) (Last)
Number# 69693
Reception & Treatment Center (NDCS)
P.O. Box 22800
Lincoln, NE 68542-2800

Notice this correspondence was mailed from an
Institution operated by Nebraska Department
Of Correctional Services. It contents are Uncensored.




quadient
CORRECTION
IMI
$009.16
01/27/2026 ZIP
043M3025165

**RECEIVED**

FEB 0 2 2026

CLERK
U.S. DISTRICT COURT

RECEIVED

FEB 0 2 2026

CLERK
U.S. DISTRICT COURT

Clerk of the Federal court
Robert Denney Federal Building
100 Centennial Mall North #593
Lincoln, NE 68508

Legal